IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 13-171-02 |
| ASKIA WASHINGTON | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT
ASKIA WASHINGTON'S THIRD MOTION FOR DISCOVERY
PERTAINING TO CLAIM OF SELECTIVE ENFORCEMENT**

Defendant Askia Washington filed a motion seeking additional discovery regarding his claim of selective law enforcement. The government here provides information in response to part of his inquiry, and submits that the motion should in remaining respects be denied.

**A.     Background.**

In this case, Washington was prosecuted in a "stash house sting," in which he and others conspired to steal 10 kilograms of cocaine from a stash house. The cocaine did not exist, as the sting was devised by the Philadelphia office of ATF. The matter began when Washington's co-defendant, Dwight Berry, approached an ATF confidential informant (CI) in late 2012 and told the CI he was interested in robbing drug dealers and users. The CI then introduced Berry to an undercover agent, who purported to be familiar with a stash house where 10 kilograms of cocaine could be found. Berry then gathered a robbery crew, which included Washington and two others. After many meetings and phone calls,

the men gathered on the day of the purported robbery – March 15, 2013 – with two guns and other robbery accoutrements, when they were arrested by ATF. *United States v. Washington*, 869 F.3d 193, 198-99 (3d Cir. 2017).

Washington was convicted at trial of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Three); and attempted possession of five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count Four). The jury acquitted Washington of a firearm charge under 18 U.S.C. § 924(c), and the government then dismissed a firearm charge under 18 U.S.C. § 922(g). The Court imposed a sentence of imprisonment of 22 years, and other penalties.

Before trial, Washington had moved for a hearing and discovery on the issue of racial profiling and selective prosecution, alleging that he had been targeted for prosecution by the government based on his race. He argued that the stash house sting and similar investigations improperly targeted minorities. This Court denied the motion, finding that Washington had failed to make the requisite threshold showing for such discovery, under *United States v. Armstrong*, 517 U.S. 456 (1996), and *United States v. Bass*, 536 U.S. 862 (2002) (per curiam),

In *Armstrong*, the Supreme Court held that, to succeed on a selective prosecution claim, a defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" 517 U.S. at

465, quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985). In keeping with this "rigorous standard" for proving a selective prosecution claim, the Court required "a correspondingly rigorous standard for discovery in aid of such a claim," and required the defendant to present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468. With respect to the discriminatory effect element, the Court held that a defendant must make a "credible showing" that similarly situated defendants of other races could have been prosecuted but were not. *Id*. at 469-70. The Court stated that the standard for a selective prosecution claim "is a demanding one," and "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id.* at 463-64.

On the basis of this standard, this Court denied discovery of other stash house prosecutions. However, it ordered the government to release redacted portions of an ATF policy manual on stash house sting operations, and defense counsel employed this manual in cross-examination at trial.

On appeal, the Third Circuit affirmed the conviction and sentence. It denied a claim that Washington's trial counsel was ineffective in opening the door on cross-examination to revelation of a previous drug conviction of the defendant, and also denied a due process challenge to imposition of a mandatory minimum sentence. The Court of Appeals concluded, however, that remand was warranted for further consideration of discovery respecting the claim of discrimination.

### B.     The First Post-Remand Discovery Request.

Subsequently, on remand, the defense requested additional discovery regarding ATF stash house sting investigations in the continental districts in the Third Circuit, which this Court granted. The government did not object to the request, to the extent that it applied to the investigating agency, the Philadelphia Field Division of ATF, but objected to the production of information from elsewhere in New Jersey and Delaware. The Court denied that objection and ordered the production of discovery as requested by the defendant. Specifically, the Court directed the government to produce:

> 1. A list by case name and number of each defendant in every stash house robbery sting conducted in Pennsylvania, New Jersey, and Delaware by the Field Office of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") responsible for investigations in these states that occurred from 2009 until 2014 and was prosecuted. This list shall also include:
>
>> a. The race of each such defendant.
>>
>> b. Whether an informant was used in the investigation that led to the prosecution, and if so, the race of the informant.
>>
>> c. Whether the informant initiated contact with the defendant or the defendant initiated contact with the informant.
>
> 2. A list of every stash house robbery sting investigation conducted by the Field Office of ATF responsible for investigations in Pennsylvania, New Jersey, and Delaware between 2009 and 2014 that did not result in arrest or prosecution. The list shall also include:
>
>> a. The race of the individual investigated ("target").
>>
>> b. The race of any informant who participated in the investigation of the target.
>>
>> c. Whether the informant initiated contact with the target or the target initiated contact with the informant.

      d. The reason, if known, why the target was not arrested.

Docket no. 327 (Aug. 10, 2018). The government obliged and produced the material requested (which it supplemented on August 14, 2019, when responding to the defendant's second request for discovery). The information showed:

- There were 17 investigations in the three states in which individuals were charged. Of the defendants, 57 were African-American and 5 were Hispanic.

  In the same cases, 17 possible suspects who were African-American, 2 possible suspects who were Hispanic, and 1 possible white suspect were identified, but not charged (almost always, regardless of race, because they did not appear at the planned robbery scene).

  In those investigations, there were 16 African-American informants, 4 white informants, and 1 Hispanic informant. (Some matters involved the use of more than one informant.)

- There were 23 investigations in which no individual at all was charged. Those matters were often terminated when only one suspect had been identified before the investigation terminated, for the reasons set forth in a summary produced by the government. Accordingly, the full number of possible participants in these matters will never be known. Of the identified suspects in those matters, 40 were African-American, 6 were Hispanic, 3 were white, and 1 was "Indian."

  The investigations that did not lead to charges involved 15 African-American informants, 4 Hispanic informants, 3 white informants, and 1 white undercover officer who provided information.

### C.     The Second Post-Remand Discovery Request.

After this production, Washington presented what he described as "the second, and ideally the last, in a series of 'measured steps' designed to determine whether Washington was unconstitutionally targeted for investigation by the Bureau of Alcohol, Tobacco and Firearms ('ATF') in this fictitious stash house robbery sting because of his

race." Docket no. 353 at 1. This request sought information regarding any agents involved in any of the 40 investigations related to allegations against them concerning "racial bias/discrimination/profiling," and further sought information regarding any instructions or training provided to informants regarding whom to target in these stash house investigations.

In response (docket no. 358), the government agreed that Washington was entitled to any information regarding discriminatory intent as to him. We therefore investigated and confirmed that no information exists that Special Agent John Bowman, who conducted this investigation, Special Agent Patrick Edwards, who acted as the undercover contact with the conspirators (and is himself African-American), and their direct supervisor, ever evinced any "racial bias/discrimination/profiling." Further, we reported, the informant in this case was African-American, and he did not initiate contact with any suspect; rather, defendant Dwight Berry, acting on his own, approached this informant with the idea of robbing drug dealers and users. As for Washington, the only person who approached and recruited him was his co-defendant, Berry.

The government further responded to Washington's request for information regarding whether any white informants in other cases were instructed to target minorities, stating: "There is no record of any such abhorrent instruction given, and we would take action if there were. Further, as explained above, ATF as a rule did not seek out any subjects at all; instead, investigations began when informants or others learned of suspects' already-articulated interest in robberies. No informant was instructed to simply target people at random."

As for the remainder of the discovery request with respect to the 39 investigations other than that involving Washington, asking for records regarding complaints concerning agents and the instructions given to informants in all of those cases, the government objected, presenting the concern that the inquiry was a "fishing expedition." The government observed, "The term 'any agents involved in these . . . investigations' could potentially include several hundred agents, particularly if it is understood to cover members of arrest teams." The government further argued that the defense was not making progress in its effort to establish both discriminatory effect and discriminatory intent, as required by law, and the discovery process should therefore come to an end.

This Court disagreed, entering an order on December 6, 2019 (docket no. 365), directing the following additional production:

> 1. Any disciplinary actions taken against any of the case agents primarily in charge of the 40 stash house robbery investigations that occurred in the Third Circuit between 2009 and 2014 (the "Stash House Robbery Investigations" or "Investigations") and taken against any undercover agents involved in any of these Investigations, in which any of these agents have been alleged to have engaged in racial bias, discrimination, or profiling;

> 2. Any information in possession of the investigating agencies in the 40 Stash House Robbery Investigations which show that any of the case agents primarily in charge of these Investigations or any undercover agents involved in any of these Investigations uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias, discrimination, or profiling;

> 3. Any information in possession of the investigating agencies in the 40 Stash House Robbery Investigations that show that any of the case agents primarily in charge of these Investigations or any undercover agents involved in any of these Investigations, by their actions or words, reasonably can be said to have been engaged in racial bias, discrimination, or profiling;

4. In the Stash House Robbery Investigations where an informant initiated contact with the target(s), information surrounding the training provided to the informants by the investigating agency regarding how and who to target;

5. In the Stash House Robbery Investigations involving caucasian informants, any information which may tend to show that the caucasian informants were directed, either explicitly or implicitly, to target African-Americans.

The Court explained that it limited the first three categories of information to "the case agents primarily in charge of these Investigations or any undercover agents involved in any of these Investigations" on the basis of the government's "legitimate" concern about the scope of the defendant's request. The Court stated: "The term 'agent' shall not include individuals who were merely members of the arrest teams because these individuals did not have pertinent decision-making responsibilities. This limitation will serve the interests of both parties because the Government will be relieved of some administrative burden and Defendant will be provided with critical information, if any exists, that he seeks, consistent with this Order entered pursuant to the guidance of the Third Circuit Court of Appeals."

On January 16, 2020, the government produced the information described by the Court in its order. With respect to informants, the government again explained that, in all of the stash house investigations at issue, no informant simply recruited a target, and thus received instruction regarding how and whom to target. Rather, every investigation began after ATF received information that a specific target was already interested in committing a robbery. Consistently, the government added, "there is no information in our possession 'which may tend to show that the caucasian informants were directed, either explicitly or implicitly, to target African-Americans.'"

As for the case agents and undercover agents involved in the investigations, the government examined its records regarding the 36 law enforcement officers involved in the 40 investigations at issue (this includes task force officers not employed by the federal government; in those instances, we requested and received responses from the employing agencies). We found and reported that there have been no disciplinary actions of the type described taken against any of these 36 officers, and moreover, except in two limited instances described in our response, there was no information that any ever made any statement or engaged in any action that could be construed to demonstrate racial bias, discrimination, or profiling.

### D. The Third Post-Remand Discovery Request.

Presently, Washington's third request for discovery rests only on one of the specific instances described in the government's response. In response to the inquiry regarding information alleging misconduct by an agent pertaining to racial bias, we disclosed the following (providing names that are redacted here):

> Agent A [who is Italian-American] was involved in Operation Gold Rush (New Jersey). Years later, an internal affairs investigation was opened on November 2, 2016, based in part on an allegation by a contractor, B [who is Pakistani-American], that while both were employed in the ATF field office in Philadelphia, A made recurring derogatory comments regarding people of Islamic faith, and on one occasion took a Quran from B's work space and played a game of "hot potato" with it with other interns (an alleged incident that she did not herself witness). For his part, A said that he helped get B her position, and considered her a friend. He said that matters in the group turned sour when B competed with another employee for a position that neither ultimately received. A said that he joked with B and others about race/religion/ethnicity, and B even initiated some of the "jokes" that he thought might be insensitive to Muslims. A shared a copy of a photo text he received from B that in fact presents an effort at humor that is overtly racist.

> Following an investigation, no disciplinary action was taken. The matter was referred to management. In 2017, the leadership of the Philadelphia Field Division met with each employee and conducted a verbal counseling session. A supervisor wrote, "I advised each of the employees of ATF's policy of zero tolerance as it relates to any kind of harassment, intimidation, or reprisals with any of their co-workers. I further reminded them that ATF, and in particular the Philadelphia Field Division will not accept any deviation from the policy and that we not only expect a professional atmosphere but demand it. I cautioned each employee that any future issues relating to workplace harassment of any sort will be dealt with severely up to and including suspension."

The government further advised that the alleged incidents occurred between October 2015 and October 2016, although the specific dates are unknown.

Washington now seeks further discovery, describing the government's report as revealing "that before Washington's sentencing, a special agent, a contractor and 'others' employed at the ATF field office in Philadelphia, engaged in racist activity and acts evincing Islamophobia for approximately one year." Mtn. 1-2. That is an inaccurate statement. In fact, whether contractor B's allegations were true was never confirmed. Investigators (who conducted a quite thorough inquiry[1]) were unable to determine the veracity of the assertions, and it is quite possible that the matter at issue, at most, only involved attempts at puerile humor. Accordingly, no disciplinary action was taken against anyone.

In any event, Washington now requests that the Court order further discovery, directing the government to produce:

---

[1] The government is in possession of a very lengthy file regarding the matter, which we will produce for in camera review at the Court's direction (though we suggest there is no need for that). The undersigned has reviewed all of it, and confirmed that no one involved in the Washington stash house matter years earlier is mentioned.

- whether either SA John Bowman and/or SA Patrick Edwards were one of the "other[s]" involved in the activity engaged in by [A and B] described in the government's second discovery disclosure dated January 16, 2020;

- any information in possession of the Philadelphia field office of the ATF which tend to show, between 2009 and 2014, that any of its agents, contractors or other personnel uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias/discrimination/profiling.

Washington's first request is reasonable, and we respond here: neither Bowman nor Edwards was involved in or aware of any of the matters alleged in the 2016 complaint. As we have previously reported, there is no information in the government's possession that either was ever involved in any activity suggesting any racial bias.

As for the second request, it should be denied. This is exactly the type of overbroad inquiry which this Court previously sought to limit. We estimate that, during the period from 2009 to 2014, there were approximately 125 people employed by the Philadelphia Field Division of ATF. We have already examined the files of all case agents and undercover agents involved in the present case and in the 39 other stash house sting investigations. There is no basis for a wider investigation, which would reveal nothing about the conduct of the stash house investigations. Even if one or more of the 125 employees did make an improper statement or take an improper action (something that the undersigned is unaware of at this time), that would not have any conceivable bearing on the proper conduct of this and the dozens of other stash house investigations in which they were not the decision-making investigators. Further, no suggestion that there was any impropriety in the division as of the time of Washington's arrest on March 15, 2013, can even be derived from the fact that a small number of employees

allegedly engaged in wrongful conduct (never proven) that began over 2½ years later. Accordingly, Washington's second request should be denied.[2]

Addressing this case more broadly, it is time for the discovery process to end and for the matter to be closed. We repeat here what we stated in our response to the second request for discovery: the discovery thus far has not satisfied the defendant's burden to justify proceeding.

A claim of selective enforcement or prosecution requires a showing of both discriminatory intent and discriminatory effect. In its decision in this case, the Third Circuit made clear that discovery on a claim of selective prosecution may be initiated upon a showing of "'some evidence' of discriminatory effect," such as proof that only members of one race were prosecuted for a particular offense. The Court stated: "Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." *United States v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017). On this basis, the defendant initiated and the government complied with the previous discovery requests.

At this time, the Court must decide whether to proceed further, and it is apparent that the defendant is not meeting his burden to prove either prong of the selective

---

[2] Washington asserts that his request "is more tailored than his other two." Mtn. 7. That is plainly not the case.

enforcement test. The Third Circuit explained: "Throughout, the district court must be mindful that the end 'goal' of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish. If the district court's initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery and to proceed to trial." *Id.* at 221. The Court added: "We emphasize that we are not directing the District Court to grant discovery; our collective thumbs are not on the scale. Rather, we commit the inquiry to the District Court's considerable discretion." *Id.* at 222.

Here, the defendant's end goal is receding, in that the defendant has not set forth any evidence establishing either prong of the test.

First, to make a showing of discriminatory effect, the defendant must show that similarly situated offenders of another race have not been prosecuted.

> The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." [*Wayte v. United States,* 470 U.S. 598, 608 (1985).] The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Ibid.*; *accord, Oyler* [*v. Bowles*, 368 U.S. 448, 456 (1962)]. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. This requirement has been established in our case law since *Ah Sin v. Wittman*, 198 U.S. 500 (1905). Ah Sin, a subject of China, petitioned a California state court for a writ of habeas corpus, seeking discharge from imprisonment under a San Francisco County ordinance prohibiting persons from setting up gambling tables in rooms barricaded to stop police from entering. *Id.*, at 503. He alleged in his habeas petition "that the ordinance is enforced 'solely and exclusively against persons of the Chinese race and not otherwise.'" *Id.*, at 507. We rejected his contention that this averment made out a claim under the Equal Protection Clause, because it did not allege "that the conditions and practices to which the ordinance was directed did not exist exclusively among the

> Chinese, or that there were other offenders against the ordinance than the Chinese as to whom it was not enforced." *Id.*, at 507-508.
>
> The similarly situated requirement does not make a selective-prosecution claim impossible to prove. Twenty years before *Ah Sin*, we invalidated an ordinance, also adopted by San Francisco, that prohibited the operation of laundries in wooden buildings. *Yick Wo* [*v. Hopkins*, 118 U.S. 356, 374 (1886)]. The plaintiff in error successfully demonstrated that the ordinance was applied against Chinese nationals but not against other laundry-shop operators. The authorities had denied the applications of 200 Chinese subjects for permits to operate shops in wooden buildings, but granted the applications of 80 individuals who were not Chinese subjects to operate laundries in wooden buildings "under similar conditions." *Ibid*.

*Armstrong*, 517 U.S. at 465-66. Thus, the Third Circuit confirmed:

> We start with a point of commonality. Substantive claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system. A defendant challenging a criminal prosecution at either the law enforcement or prosecution inflection points must provide "clear evidence" of discriminatory effect and discriminatory intent (the latter is sometimes referred to as "discriminatory purpose"). Meeting this standard generally requires evidence that similarly situated individuals of a difference [sic] race or classification were not prosecuted, arrested, or otherwise investigated.

*Washington*, 869 F.3d at 214.

Washington has not produced any evidence of discriminatory effect, let alone "clear evidence." We addressed this issue at length in our response to the second request for discovery, docket no. 358 at 15-16, explaining that there were 132 suspects identified in the course of the investigations at issue, only four of those people were white, and none was similarly situated to Washington in that none committed to a stash house robbery. We gave detailed information about each of the cases in which a white suspect was identified but then not charged because he did not commit to a robbery. Therefore, as a matter of law, there is no showing here of discriminatory effect. *See, e.g., United States*

- 14 -

*v. Al Hedaithy*, 392 F.3d 580, 607-08 & n.24 (3d Cir. 2004) (rejecting under *Armstrong/Bass* a selective prosecution discovery request premised on newspaper articles showing rampant cheating on a standardized test: "The defect in Al Hedaithy's proffer is that none of this evidence indicates that similarly situated persons were treated differently. Demonstrating that thousands of other people have also cheated on the [ ] exam does nothing to identify persons who are similarly situated"). Washington's latest request, focused on scores of ATF employees who had nothing to do with any of the stash house cases, would do nothing to advance a showing of discriminatory effect. His selective enforcement claim is therefore untenable, and the discovery process should end for this reason alone.

Second, Washington has not presented any evidence to satisfy the discriminatory intent prong, either. We have now confirmed that there is no information that any agent who directed this investigation, or indeed any similar investigation in this area during a five-year period, has ever been disciplined for or reliably accused of any discriminatory act at all, let alone engaged in a pernicious act of targeting an individual for investigation or prosecution on the basis of race. As this Court has already determined, an exploration of the files of ATF employees and contractors who had no decision-making role in any of these cases would not produce anything of any relevance on this issue.

It is apparent that Washington's goal of proving selective enforcement is not advancing, but has come to a dead end. There is no evidence that the agents who investigated this matter acted with any discriminatory intent, nor that, in any similar investigation during a five-year period in this region, any similarly situated person of

another race was not prosecuted. There is accordingly no support for either of the required showings in a selective enforcement or prosecution claim, and this matter should come to a conclusion.

        Respectfully yours,

        WILLIAM M. McSWAIN
        United States Attorney


        */s Robert A. Zauzmer*
        ROBERT A. ZAUZMER
        Assistant United States Attorney
        Chief of Appeals

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

>Mark S. Greenberg, Esq.
>920 Lenmar Drive
>Blue Bell, PA  19422

>*/s Robert A. Zauzmer*
>ROBERT A. ZAUZMER
>Assistant United States Attorney

Dated:  January 31, 2020.