IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ASKIA WASHINGTON

CRIMINAL ACTION
NO. 13-171-2

**ORDER**

**AND NOW**, this 18th day of March 2020, upon consideration of Defendant Askia Washington's Third Motion for Discovery Pertaining to [a] Claim of Selective Enforcement (Doc. No. 368), the Government's Response (Doc. No. 372), and Defendant's Reply (Doc. No. 374), it is **ORDERED** that within sixty (60) days of the filing date of this Order, the Government shall disclose to Defendant whether any agent involved in any capacity in the pre-indictment investigation of Defendant or his codefendants was one of the "others" that Agent A said he "joked with . . . about race/religion/ethnicity" as noted in Section 2(a) the Government's second discovery disclosure, dated January 16, 2020 (Doc. No. 371). If the "others" have never been identified, the Government shall disclose this fact to Defendant.[1]

---

[1] On January 22, 2020, Defendant Askia Washington filed the instant Third Motion for Discovery Pertaining to [a] Claim of Selective Enforcement. (Doc. No. 368.) Defendant describes his Motion as the third "in a series of 'measured steps' designed to determine whether [he] was unconstitutionally targeted for investigation by the Bureau of Alcohol, Tobacco and Firearms ("ATF") in [a] fictitious stash house robbery sting because of his race." (Id. at 1.)

Defendant's instant Motion follows two prior discovery productions by the Government consistent with the Court's Orders dated August 29, 2018 (Doc. No. 329) and December 6, 2019 (Doc. No. 365).

As the Court has previously detailed,

> [i]n [its] initial [discovery] production, the Government provided a statistical breakdown of all stash house robbery stings in Pennsylvania, New Jersey, and

> Delaware from 2009 to 2014 that included (1) a list of each defendant who was prosecuted in those States during the relevant time period, as well as (a) the race of such defendant; (b) whether an informant was used in the investigation that led to the prosecution, and if so, the race of the informant; and (c) whether the informant initiated contact with the defendant or if the defendant initiated contact with the informant; and (2) a list of all stash house robbery investigations conducted by ATF in the relevant States during the relevant time period that did not result in arrest or prosecution, as well as (a) the race of the target; (b) the race of any informant who participated in the investigation of the target; (c) whether the informant initiated contact with the defendant or if the defendant initiated contact with the informant; and (d) the reason, if known, why the target was not arrested. (See Doc. No. 329.)
>
> The Government's initial production revealed that, from 2009 to 2014, the targets—and resulting criminal defendants—of fictitious stash house robbery stings in Pennsylvania, New Jersey, and Delaware were overwhelmingly persons of color. During this five-year period, ATF conducted 40 stash house robbery investigations, and in those investigations, 128 of the 132 targets were persons of color. (Doc. No. 358 at 5.) Further, in the resulting 62 criminal prosecutions, all 62 defendants were persons of color. (Id.)
>
> Based on these findings, on January 28, 2019, Defendant filed [a second discovery] [m]otion and requested that the Government turn over additional discovery to determine if the agencies or agents in these 40 investigations intended to discriminate against persons of color. (Doc. No. 353 at 7.)

(Doc. No. 365 at 2-3.)

On December 6, 2019, the Court issued an Order that largely granted Defendant's second discovery request and required the Government to disclose the following information, if it existed:

1. Any disciplinary actions taken against any of the case agents primarily in charge of the 40 stash house robbery investigations that occurred in the Third Circuit between 2009 and 2014 (the "Stash House Robbery Investigations" or "Investigations") and taken against any undercover agents involved in any of these Investigations, in which any of these agents have been alleged to have engaged in racial bias, discrimination, or profiling;

2. Any information in possession of the investigating agencies in the 40 Stash House Robbery Investigations which show that any of the case agents primarily in charge of these Investigations or any undercover agents involved in any of these Investigations uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias, discrimination, or profiling;

2

3. Any information in possession of the investigating agencies in the 40 Stash House Robbery Investigations that show that any of the case agents primarily in charge of these Investigations or any undercover agents involved in any of these Investigations, by their actions or words, reasonably can be said to have been engaged in racial bias, discrimination, or profiling;

4. In the Stash House Robbery Investigations where an informant initiated contact with the target(s), information surrounding the training provided to the informants by the investigating agency regarding how and who to target;

5. In the Stash House Robbery Investigations involving caucasian informants, any information which may tend to show that the caucasian informants were directed, either explicitly or implicitly, to target African-Americans.

(Id. at 1-2.)

On January 16, 2020, the Government provided Defendant written responses that were responsive to the Court's December 6, 2019 Order. (See Doc. No. 371.) For purposes of Defendant's instant Motion, only one disclosure is relevant. (See Doc. No. 368) (explaining that Section 2(a) of the Government's Response is relevant to Defendant's third discovery request). In response to the second category of information required to be turned over to Defendant under the Court's December 6, 2019 Order—whether any case agents primarily in charge of the Investigations or any undercover agents involved in any of the Investigations were alleged to have engaged in misconduct related to racial bias—the Government disclosed the following:

> Agent A [who is Italian-American] was involved in Operation Gold Rush (New Jersey). Years later, an internal affairs investigation was opened on November 2, 2016, based in part on an allegation by a contractor, B [who is Pakistani-American], that while both were employed in the ATF field office in Philadelphia, A made recurring derogatory comments regarding people of Islamic faith, and on one occasion took a Quran from B's work space and played a game of "hot potato" with it with other interns (an alleged incident that she did not herself witness). For his part, A said that he helped get B her position, and considered her a friend. He said that matters in the group turned sour when B competed with another employee for a position that neither ultimately received. A said that he joked with B and others about race/religion/ethnicity, and B even initiated some of the "jokes" that he thought might be insensitive to Muslims. A shared a copy of a photo text he received from B that in fact presents an effort at humor that is overtly racist.

3

(Doc. No. 372 at 9-10) (see also Doc. No. 371 at 3-4.) The Government claims that "the allegations were never held to be founded[.]" (Doc. No. 371 at 3.)

On January 22, 2020, based on the above disclosure, Defendant filed the instant Third Motion for Discovery Pertaining to [a] Claim of Selective Enforcement. (Doc. No. 368.) In his Motion, Defendant asked the Court to order the Government to disclose

1. whether either [ATF Agent] John Bowman[, who managed ATF's investigation of the conspiracy that led to Defendant's arrest,] and/or [undercover Agent] Patrick Edwards[, the undercover agent on the case,] were one of the "other[s]" involved in the activity . . . described in the [G]overnment's second discovery disclosure dated January 16, 2020; [and]

2. any information in possession of the Philadelphia field office of the ATF which tend to show, between 2009 and 2014, that any of its agents, contractors or other personnel uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias/discrimination/profiling.

(Id. at 9.) Asserting that the instant Motion was "in accordance with the 'measured steps' contemplated by the court of appeal's [sic] mandate[,]" Defendant described his instant Motion as seeking to "drill down on whether the [sic] Bowman and Edwards in particular, and the Philadelphia field office of ATF more broadly, acted with discriminatory intent/purpose in investigating [Defendant]." (Id. at 7.)

On January 31, 2020, the Government filed a Response to Defendant's Motion. (Doc. No. 372.) In its Response, the Government agreed that Defendant's first request was reasonable and answered it, but argued that Defendant's second request was overbroad and out of step with the Third Circuit's measured approach to discovery. (Id. at 11-12.) With respect to Defendant's first request, the Government reported that "neither Bowman nor Edwards was involved in or aware of any of the matters alleged in the 2016 [incident]" and that "there is no information in the [G]overnment's possession that either was ever involved in any activity suggesting any racial bias." (Id. at 11.) With respect to Defendant's second request, the Government objected and argued that given the prior discovery provided on the agents involved in this case, as well as the 39 other stash house robbery investigations in Pennsylvania, New Jersey, and Delaware during the relevant time frame, that a wider review of the entire Philadelphia ATF office would be irrelevant. (Id.) Accordingly, only this category of information remained in dispute.

On February 1, 2020, Defendant filed a Reply contesting the Government's characterizations of Defendant's second request as overbroad and out of step with the measured approach envisioned by the Third Circuit. (Doc. No. 374.) He argued that whether ATF's Philadelphia office was "marbled with racist activity" may lead the Court to conclude that Defendant was unconstitutionally targeted because of his race, and that this inquiry was more tailored than his earlier discovery requests because it was limited to a single ATF office, while his prior two

discovery requests sought information on the universe of the fictitious stash house robbery investigations and the ATF personnel involved. (Id. at 2.)

After a review of the foregoing, and for reasons that follow, the Court will grant, in part, Defendant's Motion (Doc. No. 368). The Government will be required to disclose to Defendant whether any agent who worked on the pre-indictment investigation of Defendant or any of his codefendants were one of the "others" involved in Contractor B's 2016 complaint.

As the Court has previously explained,

> [a]t the outset, it is important to place Defendant's instant discovery request in context: his ultimate goal is to strike the indictment, in whole or in part, by establishing a substantive claim of selective enforcement. [United States v. Washington. 869 F.3d 193, 223 (3d Cir. 2017)]. To do so, he must satisfy a two-part test requiring "clear evidence" of discriminatory effect and discriminatory intent. Id. at 214.
>
> The "clear evidence" standard is a high bar. See id. (discussing the burden of establishing a substantive claim of selective enforcement); United States v. Taylor, 686 F.3d 182, 197 (3d Cir. 2012). "Meeting this standard generally requires evidence that similarly situated individuals of a different race or classification were not prosecuted, arrested, or otherwise investigated." Washington, 869 F.3d at 214.
>
> "A criminal defendant, however, will not often have access to the information, statistical or otherwise, that might satisfy a 'clear evidence' burden." Id. Thus, when a criminal defendant seeks discovery to support a claim of selective enforcement, the Third Circuit grants district courts the "discretion to conduct . . . limited pretrial inquir[ies] into the challenged law-enforcement practice on a proffer that shows 'some evidence' of discriminatory effect." Id. at 220-21. This standard, established by the Third Circuit in the instant case, is less stringent than its progenitor, the Armstrong/Bass test, which is applied to discovery motions aimed at claims of selective prosecution. See id. Unlike Armstrong/Bass—which requires "some evidence" of discriminatory effect and discriminatory intent to permit discovery of a prosecutor's policies or practices—the Washington standard only requires "some evidence" of discriminatory effect to permit discovery of law enforcement's policies or practices. Id. at 214-15, 220-21. "However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." Id. at 221.
>
> "If a district court finds the above has been met, it may conduct limited inquiries" into the challenged law enforcement practice. Id. The scope of these inquiries is subject to the "considerable discretion" of the district court and is cabined by the goal of the discovery request(s). Id. [These limited inquiries should follow a "measured steps" approach to discovery that is reactive "to the particular

5

BY THE COURT:


/s/ Joel H. Slomsky
JOEL H. SLOMSKY, J.

---

> circumstances of a case[.]" <u>Id.</u> at 220.] "Throughout, the district court must be mindful that the end 'goal' of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish. If the district court's initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery[.]" <u>Id.</u>

(Doc. No. 365 at 4.)

In the instant case, Defendant's Motion will be granted in part because his pursuit of establishing a claim of selective enforcement has not yet receded or stalled. While Contractor B's complaint is hardly a proverbial "smoking gun," the allegations suggest some level of racial insensitivity within ATF's Philadelphia field office around the time of Defendant's investigation. Consistent with the measured steps approach envisioned by the Third Circuit, and in accordance with the discretion the Third Circuit has granted to a district court judge to conduct selective enforcement discovery inquiries, the Government's recent disclosures justify further, limited inquiry into ATF's Philadelphia field office during the relevant time frame.

This Order seeks to strike a balance between the strength of Defendant's proffer and the breadth of discovery. Although Defendant's claim is waning, Contractor B's complaint and the Government's Response provide evidence of racially insensitive activity in ATF's Philadelphia office. It includes remarks made by a case agent, a contractor, and "others."

Critical to this Order is that not all individuals involved in Contractor B's complaint have been identified. Based on the Government's Response, the key decisionmakers in Defendant's investigation—Bowman and Edwards—have been cleared, but it would be prudent to determine whether any agent involved in Defendant's investigation in any capacity, or in the investigation of his codefendants, are one of the "others" referenced in Contractor B's complaint. This includes agents who worked as surveillance agents, agents who participated in the arrests, and agents who otherwise participated in the investigation of Defendant or his codefendants in this case. Accordingly, consistent with the guidance of the Third Circuit, and this Court's considerable discretion, the Government will be required to provide Defendant with the information covered by this Order, if any exists.