IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | : CRIMINAL NO. 13-171-02 |
| ASKIA WASHINGTON | : |

**GOVERNMENT'S RESPONSE TO DEFENDANT
ASKIA WASHINGTON'S MOTION TO VACATE
JUDGMENT AND DISMISS SUPERSEDING INDICTMENT**

Following a discovery process that yielded no evidence whatsoever of any racial discrimination in the investigation or prosecution of this matter, defendant Askia Washington filed a perfunctory motion to vacate the judgment and dismiss the superseding indictment in this case. The motion should be denied.

A.  **Background.**

In this case, Washington was prosecuted in a "stash house sting," in which he and others conspired to steal 10 kilograms of cocaine from a stash house. The cocaine did not exist, as the sting was devised by the Philadelphia office of ATF. The matter began when Washington's co-defendant, Dwight Berry, approached an ATF confidential informant (CI) in late 2012 and told the CI he was interested in robbing drug dealers and users. The CI then introduced Berry to an undercover agent, who purported to be familiar with a stash house where 10 kilograms of cocaine could be found. Berry then gathered a robbery crew, which included Washington and two others. After many meetings and phone calls,

the men gathered on the day of the purported robbery – March 15, 2013 – with two guns and other robbery accoutrements, when they were arrested by ATF. *United States v. Washington*, 869 F.3d 193, 198-99 (3d Cir. 2017).

Washington was convicted at trial of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Three); and attempted possession of five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count Four). The jury acquitted Washington of a firearm charge under 18 U.S.C. § 924(c), and the government then dismissed a firearm charge under 18 U.S.C. § 922(g). The Court imposed a sentence of imprisonment of 22 years, and other penalties.

Before trial, Washington had moved for a hearing and discovery on the issue of racial profiling and selective prosecution, alleging that he had been targeted for prosecution by the government based on his race. He argued that the stash house sting and similar investigations improperly targeted minorities. This Court denied the motion, finding that Washington had failed to make the requisite threshold showing for such discovery, under *United States v. Armstrong*, 517 U.S. 456 (1996), and *United States v. Bass*, 536 U.S. 862 (2002) (per curiam),

In *Armstrong*, the Supreme Court held that, to succeed on a selective prosecution claim, a defendant "must demonstrate that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" 517 U.S. at

465, quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985). In keeping with this "rigorous standard" for proving a selective prosecution claim, the Court required "a correspondingly rigorous standard for discovery in aid of such a claim," and required the defendant to present "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468. With respect to the discriminatory effect element, the Court held that a defendant must make a "credible showing" that similarly situated defendants of other races could have been prosecuted but were not. *Id*. at 469-70. The Court stated that the standard for a selective prosecution claim "is a demanding one," and "the showing necessary to obtain discovery should itself be a significant barrier to the litigation of insubstantial claims." *Id*. at 463-64.

On the basis of this standard, this Court denied discovery of other stash house prosecutions. However, it ordered the government to release redacted portions of an ATF policy manual on stash house sting operations, and defense counsel employed this manual in cross-examination at trial.

On appeal, the Third Circuit affirmed the conviction and sentence. It denied a claim that Washington's trial counsel was ineffective in opening the door on cross-examination to revelation of a previous drug conviction of the defendant, and also denied a due process challenge to imposition of a mandatory minimum sentence. The Court of Appeals concluded, however, that remand was warranted for further consideration of discovery respecting the claim of discrimination.

The Third Circuit held that a different threshold for discovery applies where the claim is of "selective law enforcement," as opposed to the selective prosecution assertion at issue in *Armstrong*. In contrast to discovery regarding a selective prosecution claim, which may be initiated only upon a showing of "some evidence tending to show the existence of the essential elements of the defense, discriminatory effect and discriminatory intent," *Armstrong*, 517 U.S. at 468, the Third Circuit stated: "Distinct from what is required under *Armstrong/Bass*, a defendant need not, at the initial stage, provide 'some evidence' of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." *United States v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017).

The Court of Appeals made clear that the ultimate requirement of proof of a claim of selective law enforcement – actual discriminatory intent and effect – is not changed. Addressing the permissible scope of discovery, the Third Circuit explained: "Throughout, the district court must be mindful that the end 'goal' of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish. If the district court's initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery and to proceed to trial." *Id.* at 221.

With this direction, the parties commenced a discovery process here, subject to this Court's supervision. That process has come to an end, with the defendant now not

seeking further discovery, and moving to dismiss the case based on the information produced.

### B.     The Information Revealed in Discovery.

The facts revealed in discovery are not in dispute.

#### 1.     Defendant Washington was recruited by his co-conspirator.

First, it is apparent that no racial discrimination occurred in the prosecution of defendant Washington himself, in that he personally was not targeted by law enforcement. Nor was his confederate, Berry, who led the robbery crew. Berry himself approached a confidential informant (who was himself African-American) with the idea of committing robberies, and the informant then introduced Berry to an undercover agent (also African-American). Berry then recruited Washington and brought him into the endeavor.

#### 2.     There is no evidence that the agents involved in this investigation engaged in racial discrimination.

Further, the government revealed, the key government agents in the matter have never exhibited any racial animus or misconduct. The government reported that no information exists that Special Agent John Bowman, who conducted this investigation, Special Agent Patrick Edwards, who acted as the undercover contact with the conspirators (and is himself African-American), and their direct supervisor, ever evinced any conduct or made any statements consisting of racial bias or discrimination or profiling.

> **3.  There is no evidence that the agents involved in any other stash house investigation in this Circuit engaged in any impropriety, with one possible exception that proved irrelevant.**

At the Court's direction, the government also produced voluminous information regarding every other stash house sting investigation conducted by ATF in Pennsylvania, New Jersey, and Delaware during the period from 2009 through 2014 – a total of 40 investigations. The government examined its records regarding the 36 law enforcement officers involved as the case agent or undercover agent in the 40 investigations at issue (this includes task force officers not employed by the federal government; in those instances, we requested and received responses from the employing agencies). We found and reported that there have been no disciplinary actions taken against any of these 36 officers on the basis of racial bias, discrimination, or profiling, and moreover, except in two limited instances, the government had no evidence that any of these officers ever engaged in or made any statements that could reasonably be described as racial bias, discrimination, or profiling.

One of those two instances was plainly immaterial.[1] The other led to further exploration in discovery. Specifically, the government reported:

---

[1] Specifically, the government informed defense counsel that on March 25, 2019, an African-American ATF agent made a complaint about the demeanor toward him exhibited by TS, another ATF agent who earlier had been involved in one of the Delaware stash house sting investigations, and in 2019 was serving as a supervisor in an ATF office in Ohio. The government reported that ATF's Internal Affairs Division investigated the matter and recommended no disciplinary action. The matter was referred to the Special Agent-In-Charge, who addressed the matter by counseling all individuals involved. Washington has not raised any claim on the basis of this information. No one involved had a role in the investigation in this case.

> Agent A [who is Italian-American] was involved in Operation Gold Rush (New Jersey). Years later, an internal affairs investigation was opened on November 2, 2016, based in part on an allegation by a contractor, B [who is Pakistani-American], that while both were employed in the ATF field office in Philadelphia, A made recurring derogatory comments regarding people of Islamic faith, and on one occasion took a Quran from B's work space and played a game of "hot potato" with it with other interns (an alleged incident that she did not herself witness). For his part, A said that he helped get B her position, and considered her a friend. He said that matters in the group turned sour when B competed with another employee for a position that neither ultimately received. A said that he joked with B and others about race/religion/ethnicity, and B even initiated some of the "jokes" that he thought might be insensitive to Muslims. A shared a copy of a photo text he received from B that in fact presents an effort at humor that is overtly racist.

The government further advised that the alleged incidents occurred between October 2015 and October 2016 in one ATF group in the Philadelphia office, with the specific dates unknown, and that following a thorough internal affairs investigation no disciplinary action was ultimately taken.

Based on later inquiries approved by the Court, the government advised that neither Agent Bowman nor Agent Edwards, the investigators in this case, had any involvement in this later incident or even any awareness of it at the time. Further, there was one other ATF employee who had played a part in the investigation years earlier of defendant Washington and his associates, and who was assigned to the ATF group at issue for a brief period in the 2015-2016 time frame, but he too confirmed that he was unaware of any joking described by Agent A and did not participate in any such joking during the limited times he was delegated to the group. Indeed, no one involved in the

2012-2013 Washington investigation is mentioned in the lengthy internal affairs report regarding the 2015-2016 incident.

### 4. No white informant was told to engage in racial discrimination, and none did.

Washington further inquired whether any white informants in any of the stash house sting investigations were instructed to target minorities. We responded that there is no record of any such abhorrent instruction given, and we would take action if there were. Further, the government explained in detail that ATF not only did not instruct *anyone* to target minorities, but as a rule did not seek out any subjects at all; instead, investigations began when informants or others learned of suspects' already-articulated interest in robberies. No informant was instructed to simply target people in the community at random, of any race, in any case.

The government provided detailed information describing each of the 40 investigations in the three states from 2009 through 2014. These summaries (which we will also provide to the Court at its direction) revealed that in none of the cases did an informant simply roam around a community and approach possible targets on a whim. Every investigation was premised on information provided by or learned about the suspect before any stash house scenario was approved and pitched.

Matters arose, for instance, where a suspect openly bragged to an informant about committing robberies; the informant overhead the suspect planning robberies; the suspect asked the informant to provide information about persons and/or residences to rob; the suspect asked the informant to participate in robberies; the informant learned that

suspects were en route to or had participated in robberies; and the informant was the victim of a robbery committed by a suspect. Other cases developed based on information originally presented by local law enforcement officials. In no case was an informant directed, in the absence of any prior indication of a suspect's interest, to raise the idea himself.

Further, no investigation was pursued based on an informant's information alone. That represented only the initial germ of the investigation. ATF protocols mandate that only targets who show a propensity to do harm to the public through violent behavior, as documented through, among other things, their criminal histories, admissions to others, or reputation in the community, may be selected for further investigation through a home invasion sting. Accordingly, no investigation was pursued until additional investigation was conducted, including thorough record checks and inquiries of local law enforcement authorities. And then no sting was initiated without approval at the highest levels of ATF.

In short, none of the investigations was initiated unless ATF had advance knowledge that a particular target was interested in committing robberies, based on conduct or statements of the target. The point, after all, was to use a safe method for apprehending those participating in such crimes. This case was typical. In defendant Washington's case, the target (co-defendant Berry) approached the informant (who was African-American) with the idea, and the informant advised ATF that Berry was inquiring about committing robberies. Once the operation was approved, the informant pitched the ATF-developed scenario to Berry, who then brought in Washington and others.

### 5. No similarly situated white individual was not prosecuted.

The detailed information provided concerning the 40 investigations showed:

- There were 17 investigations in the three states in which individuals were charged. Of the defendants, 57 were African-American and 5 were Hispanic.

  In the same cases, 17 possible suspects who were African-American, 2 possible suspects who were Hispanic, and 1 possible white suspect were identified, but not charged (almost always, regardless of race, because they did not appear at the planned robbery scene).

  In those investigations, there were 16 African-American informants, 4 white informants, and 1 Hispanic informant. (Some matters involved the use of more than one informant.)

- There were 23 investigations in which no individual at all was charged. Those matters were often terminated when only one suspect had been identified before the investigation terminated, for the reasons set forth in the summary produced by the government. Accordingly, the full number of possible participants in these matters will never be known. Of the identified suspects in those matters, 40 were African-American, 6 were Hispanic, 3 were white, and 1 was "Indian."

  The investigations that did not lead to charges involved 15 African-American informants, 4 Hispanic informants, 3 white informants, and 1 white undercover officer who provided information.

The government provided an explanation regarding the reason that no charge was brought against each uncharged suspect in every case (as noted earlier, by far the most common reason that an investigation ended as to one or more suspects, regardless of their race, was that the suspect did not show up for a first or subsequent meeting, in contrast to the defendants in this case). The specific explanations regarding the four white uncharged suspects in the 40 cases were as follows:

- In the "Broken Spoke" investigation (New Jersey), there were three African-American men prosecuted for attempting to commit a stash house

    robbery. Three others – one white and two African-American – were not charged, as they did not show up at the appointed time for commission of the robbery.

- In the "Bloodhound" investigation (New Jersey), there were 10 subjects – nine African-American and one white. None was prosecuted, because none appeared after a second meeting to continue the plot.

- In an investigation labeled "Newark HI Crew" (New Jersey), an informant principally had discussions with one of the two white suspects. But during the course of those discussions, entirely independently of the ATF investigation, that suspect continued to commit burglaries in northern New Jersey, for which he was arrested on multiple occasions by local authorities. Eventually, he was held by the state court, and received a five-year sentence. That ended any discussion with the ATF informant about a stash house robbery scenario, and thus also terminated any investigation of the suspect's confederate.

    **C.**    **Washington Has Not Established Selective Law Enforcement.**

    As explained earlier, a claim of selective enforcement or prosecution requires a showing of both discriminatory intent and discriminatory effect. The information summarized above makes clear that Washington proves neither. Indeed, there is no evidence whatsoever of either.

    **Discriminatory intent.** There is no proof of discriminatory intent, given that Washington not targeted by law enforcement, and he was prosecuted because he personally appeared and committed to engaging in the robbery. Washington was recruited by Barry, who in turn himself volunteered for the mission.

    Further, the government has now confirmed that there is no information that any agent who directed this investigation, or indeed any of 39 other similar investigations in this area during a five-year period, has ever been disciplined for or reliably accused of any discriminatory act at all, let alone engaged in a pernicious act of targeting an

individual for investigation or prosecution on the basis of race. Washington is left only to cite the "racist and Islamophobic hijinks that took place at the Philadelphia ATF Field Office before Washington was sentenced between an Italian-American agent and a Pakistani-American contractor," Mot. at 6, referring to instances of puerile humor that took place over two years after the arrest in this case, involving people who had nothing to do with this case.[2]

The government also explained in detail how this case and every other one in the region was initiated, showing that no one was targeted at all without information coming to ATF's attention of a suspect's preexisting interest in committing robberies.

**Discriminatory effect.** Further, there was also no discriminatory effect as defined by the law, meaning no evidence that similarly situated persons of another race were not investigated or prosecuted.

---

[2] Washington complains that he was restricted in learning additional information about possible racism in the Philadelphia field office, but this Court acted within its discretion in denying the fishing expedition he had proposed. Washington had requested production of "any information in possession of the Philadelphia field office of the ATF which tend to show, between 2009 and 2014, that any of its agents, contractors or other personnel uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias/discrimination/profiling." The government objected to this request, estimating that, during the period from 2009 to 2014, there were approximately 125 people employed by the Philadelphia Field Division of ATF. The government stated: "We have already examined the files of all case agents and undercover agents involved in the present case and in the 39 other stash house sting investigations. There is no basis for a wider investigation, which would reveal nothing about the conduct of the stash house investigations. Even if one or more of the 125 employees did make an improper statement or take an improper action (something that the undersigned is unaware of at this time), that would not have any conceivable bearing on the proper conduct of this and the dozens of other stash house investigations in which they were not the decision-making investigators."

> The requirements for a selective-prosecution claim draw on "ordinary equal protection standards." [*Wayte v. United States,* 470 U.S. 598, 608 (1985).] The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Ibid.*; *accord, Oyler* [*v. Bowles*, 368 U.S. 448, 456 (1962)]. To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted. This requirement has been established in our case law since *Ah Sin v. Wittman*, 198 U.S. 500 (1905). Ah Sin, a subject of China, petitioned a California state court for a writ of habeas corpus, seeking discharge from imprisonment under a San Francisco County ordinance prohibiting persons from setting up gambling tables in rooms barricaded to stop police from entering. *Id.*, at 503. He alleged in his habeas petition "that the ordinance is enforced 'solely and exclusively against persons of the Chinese race and not otherwise.'" *Id.*, at 507. We rejected his contention that this averment made out a claim under the Equal Protection Clause, because it did not allege "that the conditions and practices to which the ordinance was directed did not exist exclusively among the Chinese, or that there were other offenders against the ordinance than the Chinese as to whom it was not enforced." *Id.*, at 507-508.
>
> The similarly situated requirement does not make a selective-prosecution claim impossible to prove. Twenty years before *Ah Sin*, we invalidated an ordinance, also adopted by San Francisco, that prohibited the operation of laundries in wooden buildings. *Yick Wo* [*v. Hopkins*, 118 U.S. 356, 374 (1886)]. The plaintiff in error successfully demonstrated that the ordinance was applied against Chinese nationals but not against other laundry-shop operators. The authorities had denied the applications of 200 Chinese subjects for permits to operate shops in wooden buildings, but granted the applications of 80 individuals who were not Chinese subjects to operate laundries in wooden buildings "under similar conditions." *Ibid*.

*Armstrong*, 517 U.S. at 465-66. Thus, the Third Circuit confirmed in this case:

> We start with a point of commonality. Substantive claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system. A defendant challenging a criminal prosecution at either the law enforcement or prosecution inflection points must provide "clear evidence" of discriminatory effect and discriminatory intent (the latter is sometimes referred to as "discriminatory purpose"). Meeting this standard generally requires evidence that similarly situated individuals of a difference [sic] race or classification were not prosecuted, arrested, or otherwise investigated.

*Washington*, 869 F.3d at 214.

Washington has not produced any evidence at all of discriminatory effect, let alone "clear evidence." As set forth above, there were 132 suspects identified in the course of the investigations at issue, only four of those people were white, and none was similarly situated to Washington in that none committed to a stash house robbery. As explained in detail above, each of these white suspects was not charged because he did not commit to a robbery. Therefore, as a matter of law, there is no showing here of discriminatory effect. *See, e.g., United States v. Al Hedaithy*, 392 F.3d 580, 607-08 & n.24 (3d Cir. 2004) (rejecting under *Armstrong/Bass* a selective prosecution discovery request premised on newspaper articles showing rampant cheating on a standardized test: "The defect in Al Hedaithy's proffer is that none of this evidence indicates that similarly situated persons were treated differently. Demonstrating that thousands of other people have also cheated on the [ ] exam does nothing to identify persons who are similarly situated").

Washington states, "persons of color comprised 50% of the individuals who were not arrested or prosecuted whereas 100% of the similarly situated four white individuals were not arrested or prosecuted." Mot. at 6. But in fact, *every person* who was not prosecuted, of every color, was not arrested or prosecuted for the same reason – he did not appear to commit a robbery. And every person who was prosecuted was prosecuted for the same reason – he, like Washington here, committed to the illegal endeavor.

It is clear that there is no evidence in the investigations at issue of white persons (indeed, people of any race) who are similarly situated to Washington in that they endeavored and appeared to commit a stash house robbery, but were not charged. On top

of that, as explained above, there is a cogent explanation for every investigation that involved no targeting at all. Washington charges that "informants of color targeted individuals of all races whereas 100% [of] the similarly situated six white informants targeted African-Americans exclusively," Mot. at 6, but in fact there is no evidence that anyone "targeted" anyone.

In his motion to dismiss, Washington just makes the conclusory statement that "[t]he discovery shows 'clear evidence' of discriminatory effect and discriminatory intent on the part of the agents who investigated Washington in this matter. The discovery further shows that similarly situated white individuals were not arrested or prosecuted." Mot. at 3. Yet he points to no evidence whatsoever of any misconduct ever by "the agents who investigated Washington in this matter," nor does he identify a single "similarly situated white individual[ who was] not arrested or prosecuted."

He simply cites statistics about the people who were prosecuted, but that is unavailing. The Supreme Court has repeatedly made clear that a simple showing that members of one race were disproportionately charged does not suffice to demonstrate that similarly situated members of another race were not prosecuted.

Notably, in *Armstrong* itself, defendants charged with crack cocaine offenses asserted that they were selectively prosecuted by federal authorities on the basis of their race. They presented an affidavit attesting that, in 24 drug trafficking cases handled by the Federal Defender in the district at issue in one year, all of the defendants were black. The Supreme Court held that this showing did not prove discriminatory effect, or even justify further discovery, given that there was no showing "that similarly situated

individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. "The study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." *Id.*

*United States v. Bass*, 536 U.S. 862 (2002), repeated this conclusion. In that case, a federal grand jury charged Bass with the intentional killing of two individuals, and the government filed a notice of intent to seek the death penalty. Bass, an African-American, raised a selective prosecution claim and sought discovery regarding racial bias in the government's death-penalty decision process. In support of his claim of selective prosecution, Bass presented a Department of Justice report that showed a significant difference between the percentage of white and black prisoners charged by the United States with death-eligible crimes. The DOJ report also showed that the United States entered into a plea bargain with 48 percent of white defendants against whom it sought the death penalty, but only 25 percent of black defendants. In addition to the statistical evidence, Bass introduced evidence of statements by high-ranking Justice Department officials, including former Attorney General Reno and Deputy Attorney General Holder, who expressed concern over the significant racial disparities uncovered by the Justice Department's own report.

The district court found that Bass had presented sufficient evidence of racial bias in the death-penalty process to justify further discovery. The government refused to comply with the district court's discovery order, and the district court sanctioned the government by dismissing its notice of intent to seek the death penalty. The Sixth Circuit affirmed the district court's discovery order. The Supreme Court, in a unanimous per

curiam opinion, summarily reversed the Sixth Circuit, relying on the *Armstrong* opinion and the absence of any showing of discrimination in particular cases. *Bass*, 536 U.S. at 862-64. The Court explained that statistical data alone was insufficient, in the absence of proof regarding particular similarly situated persons who were treated differently than the defendant. The Court concluded: "Under *Armstrong*, therefore, because respondent failed to submit relevant evidence that similarly situated persons were treated differently, he was not entitled to discovery." *Bass*, 536 U.S. at 863-64.

The present case is different only in that discovery was permitted, because of the different context of a claim of selective law enforcement. But the ultimate legal standard is the same, and the discovery process did nothing to advance the defendant's claim. At the end of the day, he relies only on statistics, without any evidence whatsoever of a similarly situated person of a different race who was not prosecuted, nor, for good measure, any evidence of any discriminatory intent by any government actor.

In sum, there is no evidence in this case that the agents who investigated this matter acted with any discriminatory intent. There is no evidence in this case that, in any similar investigation during a five-year period in this region, any such misconduct occurred. And there is no evidence in this case that any similarly situated person of another race was not prosecuted. There is accordingly no support for either of the required showings in a selective enforcement or prosecution claim, and the defendant's motion must be denied.

Respectfully yours,

WILLIAM M. McSWAIN
United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below through the Electronic Case Filing (ECF) system:

>Mark S. Greenberg, Esq.
>920 Lenmar Drive
>Blue Bell, PA  19422

>*/s Robert A. Zauzmer*
>ROBERT A. ZAUZMER
>Assistant United States Attorney

Dated:  June 22, 2020.