IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

ASKIA WASHINGTON,

Defendant.

CRIMINAL ACTION
NO. 13-171-2

## OPINION

**Slomsky, J.**                                                          **January 13, 2021**

### TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 3

II.  BACKGROUND .......................................................................................................... 4

   A.  Defendant's Conviction ........................................................................................ 4

   B.  ATF Stash House Sting Operation ....................................................................... 6

   C.  Defendant's Selective Enforcement Claim .......................................................... 8

      1. Defendant's Initial Discovery Motion.............................................................. 8

      2. Government's Response to Initial Discovery Motion.......................................11

      3. Order Denying Initial Discovery Motion........................................................ 13

   D.  Third Circuit Decision ......................................................................................... 15

   E.  Proceedings in the District Court on Remand...................................................... 19

      1. First Discovery Motion .................................................................................... 19

         a. Defendant's Motion to Compel Discovery .................................................. 19

         b. Government's Response to First Discovery Motion ................................. 21

         c. Order Granting the Discovery Motion ........................................................ 22

1

2. Second Discovery Motion....................................................................... 22

   a. Defendant's Second Motion to Compel Discovery ................................. 22

   b. Government's Response to Second Discovery Motion ............................ 25

   c. Defendant's Reply to Government's Response....................................... 28

   d. Order Granting the Second Discovery Motion ........................................ 28

3. Final Discovery Motion ........................................................................ 29

   a. Defendant's Third Motion to Compel Discovery .................................... 29

   b. Government's Response to Third Discovery Motion ............................... 31

   c. Defendant's Reply to Government's Response....................................... 32

   d. Order Granting in Part and Denying in Part the Third Discovery Motion ............. 32

   e. Government's Supplemental Response/Production of Discovery .......................... 34

4. The Motion Presently Before the Court.................................................... 35

   a. Defendant's Motion to Vacate Judgment and Dismiss Superseding Indictment ...... 35

   b. Government's Response to the Motion.................................................... 37

III. DISCUSSION ......................................................................................... 41

  A. Standard for Equal Protection Selective Enforcement Claim............................ 41

   1. Discriminatory Effect.......................................................................... 42

   2. Discriminatory Intent ......................................................................... 47

IV. CONCLUSION ....................................................................................... 53

## I.    INTRODUCTION

For decades, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has conducted "stash house" reverse sting operations across the country, in which undercover agents allegedly entice individuals to rob a fictitious drug stash house with the promise of a large payout. The operations are called "reverse" stings because federal agents initiate the opportunity for criminal conduct by setting up the fictitious robbery and arrest the suspects just before they carry out what they believe is a real robbery.[1]  These stings have become increasingly controversial over the years as their fictional nature has resulted in convicting a disproportionate number of minorities.[2]  In several cases, minority defendants have moved to obtain discovery on ATF's policies, procedures, and investigation and case records, hoping that the disclosed evidence reveals some indicia of racial profiling.  Defendant Askia Washington, who is African American, is one of those individuals.

After four discovery requests, three following a remand from the Third Circuit Court of Appeals, Defendant now files the instant Motion to Vacate Judgment and Dismiss [his] Superseding Indictment.  (Doc. No. 380.)  He claims that the evidence disclosed by the Government shows ATF agents violated equal protection rights when conducting stash house sting

---

[1]   See United States v. Black, 733 F.3d 294, 297 n.1 (9th Cir. 2013).

[2]   See United States v. Sellers, 906 F.3d 848, 859 (9th Cir. 2018) (alteration in original) (quoting Marc D. Esterow, Lead Us Not into Temptation: Stash House Stings and the Outrageous Government Conduct Defense, 8 DREXEL L. REV. ONLINE 1, 31 (2016) ("[L]aw enforcement agents—whether consciously or not—appear to primarily target racial minorities. Nationwide, 'approximately 90% of the individuals currently imprisoned as a result of [a] . . . stash house sting are either African-American or Hispanic.'"); United States v. McLean, 85 F. Supp. 3d 825, 827 (E.D. Pa. 2015) (citing Brad Heath, Investigation: ATF Drug Stings Targeted Minorities, U.S.A. TODAY, July 20, 2014, available at http://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stingsracial-profiling/12800195/) ("[A]pproximately 90 percent of the defendants were racial or ethnic minorities.").

operations in this District.  As a reprieve, he asks the Court to vacate his judgment and dismiss his Superseding Indictment on the ground that ATF agents investigated him because of his race and violated his equal protection rights.  Although Defendant's proffered evidence confirms that ATF stash house stings disproportionately impact minorities, under the legal standard governing selective enforcement claims, Defendant's Motion will be denied because his proffered evidence falls short of proving selective enforcement by ATF agents.[3]

## II.    BACKGROUND

The procedural history of this case spans six years and largely concerns defense discovery requests to establish selective enforcement.  In this regard, the Third Circuit remanded this case in 2017 for this Court to reconsider Defendant's requests for discovery on ATF policies, procedures, and stash house stings, and thereafter, to decide the merits of the selective enforcement claim.  To understand how the Motion to Vacate Judgment and Dismiss [his] Superseding Indictment (Doc. No. 380) came to fruition, a lengthy recitation of the factual history is necessary.

### A.    Defendant's Conviction

On April 11, 2014, a grand jury returned a six-count Indictment against Defendant Askia Washington ("Defendant") and three co-defendants.  (Doc. No. 24.)  Defendant was charged with:

---

[3]    Selective enforcement is different from selective prosecution.  The Third Circuit has aptly described the distinction in United States v. Washington, 869 F.3d 193 (3d Cir. 2017), cert. denied, 138 S. Ct. 713 (2018).  The court noted as follows:

> Washington's argument rests on the distinction between "selective prosecution" and "selective enforcement," labels that we (and others) sometimes deploy interchangeably.  Here, we use them as Washington does.  "Prosecution" refers to the actions of prosecutors (in their capacity as prosecutors) and "enforcement" to the actions of law enforcement and those affiliated with law-enforcement personnel.

Id. at 214.

(1) Conspiracy to commit robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951 (Count 1);

(2) Attempted robbery which interferes with interstate commerce, in violation of 18 U.S.C. § 1951 (Count 2);

(3) Conspiracy to possess with the intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count 3);

(4) Attempted possession with intent to distribute 5 kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count 4);

(5) Possession of a firearm in furtherance of a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 5); and

(6) Being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 6).

(Id.)  The Superseding Indictment was filed after Defendant's three co-defendants pled guilty and it contains the same six charges as set forth in the original Indictment.  (See Doc. No. 184.)

On June 1, 2015, Defendant's case proceeded to trial, and on June 9, 2015, a jury found him guilty on Counts 1 to 4 and not guilty on Count 5.  (See Doc. Nos. 206, 218.)  Count 6 was dismissed.  (See Doc. Nos. 218-19.)  On June 13, 2016, Defendant was sentenced to 264 months' imprisonment followed by 10 years' supervised release.  (See Doc. No. 287.)

### B.    ATF Stash House Sting Operation[4]

Defendant's conviction stems from a "stash house"[5] sting operation overseen by agents of the Philadelphia Office of ATF.  ATF agents are alert to individuals who they believe are involved in planning robberies of drug "stash houses," and once identified, undercover agents "plan" a robbery of the fictitious drug stash house with the individuals.  It is carried out as follows:

> [A]n undercover agent poses as a disgruntled drug courier with knowledge about a stash house protected by armed guards and containing a large amount of cocaine. The agent suggests to targets of the reverse sting that they join forces, rob the house, and split the proceeds.  Once the targets have taken steps to rob the fictional house, they are arrested and charged with conspiracy to violate federal narcotics laws.

United States v. Pedrin, 797 F.3d 792, 794 (9th Cir. 2015), cert. denied, 136 S. Ct. 2401 (2016).

In late 2012, co-defendant Dwight Berry ("Berry") approached an ATF confidential informant ("CI") and asked if he knew anyone that Berry could rob for drugs.  (See Doc. No. 280 at 2.)  The CI alerted ATF of the encounter, and ATF subsequently started an investigation into Berry led by Special Agent John Bowman.  (See id.)  On February 18, 2013, Berry met with the CI to discuss the prospect of robbing a drug stash house.  (See id. at 3.)  The CI told Berry about a drug courier friend who knew of a stash house where kilograms of cocaine were located and could be stolen, and Berry expressed interest in robbing it.  (See id.; Doc. No. 184 at 3.)  In reality, the friend was Special Agent Patrick Edwards ("Edwards") acting in an undercover capacity.  (See id.; Doc. No. 184 at 3.)  Two days later, Berry met with the CI and Edwards to discuss plans to rob the

---

[4]    The factual background of the ATF sting operation is primarily taken from the Superseding Indictment (Doc. No. 184) and the Court's Superseding Opinion denying Defendant's Motion for a New Trial (Doc. No. 280).  The description of the general nature of ATF stash house sting operations is taken from United States v. Pedrin, 797 F.3d 792, 794 (9th Cir. 2015), cert. denied, 136 S. Ct. 2401 (2016), which was cited by the Third Circuit in describing ATF sting operations in their Opinion in this case.  See Washington, 869 F.3d at 196 n.1.

[5]    "[H]ouses in which drugs are 'stashed.'"  Pedrin, 797 F.3d at 794.

stash house.  (See Doc. No. 280 at 3.)  It was at this meeting that Berry told the CI and Edwards of others who would be interested in participating in the robbery, one being Defendant.  (See id.)

On March 4, 2013, Berry introduced Defendant Washington and another individual to the CI and Edwards "as the individuals who will be committing the robbery with Berry."  (Doc. No. 184 at 4.)  During this meeting, Defendant expressed his desire to participate in the robbery, discussed details of the plan to do so with Berry, and helped Edwards decide what to do with his portion of the stolen cocaine.  (See id.; Doc. No. 280 at 4.)  From this time to March 15, 2013, the date of the planned robbery, phone calls recorded by Edwards show Defendant and Berry "[speaking] frequently about the plan to rob the stash house[,]" and Berry continuing to meet with the CI and Edwards to further discuss details.  (Doc. No. 280 at 4.)

On March 15, 2013, Defendant, Berry, and two other co-defendants met the CI and Edwards at the Hilton Hotel on Island Avenue in Philadelphia, Pennsylvania.  (See id. at 5.)  At this meeting, which preceded the planned robbery, Edwards provided the address of the stash house and, upon Berry's request, reviewed the robbery plan:

> [T]he target of the robbery was a house at which 10 kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man further inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house.

(Id.)  The men then discussed their plan of action:

> [T]hat they would all drive to a staging area closer to the target location; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; that they would treat [Edwards], who would be in the house, as if he were another victim to evade the suspicion by the drug dealers . . . .

(Id.)  "From the hotel, [Edwards] and the five member robbery crew drove to a parking lot in Southwest Philadelphia where the robbery conspirators were arrested."  (Id. at 6.)  Defendant's

girlfriend drove him to the parking lot separately in a Chrysler 300, and Defendant was immediately taken into custody upon arrival.  (See id.)  ATF agents recovered a backpack, gloves, a mask, a lighter, and lighter fluid from the Chrysler.  (See id.)

### C.    Defendant's Selective Enforcement Claim

### 1.    Defendant's Initial Discovery Motion

On April 27, 2014, after indictment but before trial, Defendant filed a Motion for Discovery and an Evidentiary Hearing on the Issue of Racial Profiling/Selective Prosecution.  (Doc. No. 126.) In his motion, Defendant asserted that the Philadelphia District Office of ATF, in concert with the United States Attorney for the Eastern District of Pennsylvania, illegally targeted Defendant Washington, Berry, and the other co-defendants, who are all African American men, to execute the sting operation.  (See id. at 2.)

At the outset, Defendant argued that "the prosecution in the instant case is based on the racial identity of the targets[,]" and ATF confidential informants "were allowed to randomly identify and solicit" minority targets for the purpose of "creating and instigating a 'sting' operation in the form of a specific type of crime, to wit: a phony robbery of a non-existent drug 'stash house.'"  (Id.)  Defendant contended that the sting operation carried out in his case is just "another in what has become a staple practice" of ATF agents.  (Id. ¶ 1.)  All ATF stash house sting operations are allegedly carried out in the same manner:

> [A]n informant and undercover agent purport to have knowledge of numerous stash house operations run by a drug kingpin whose identity and location was known only to the informant and/or undercover agent wherein drugs (invariably cocaine or crack cocaine and always in sufficient quantities to trigger statutory minimum sentences) were stored and guarded by just a few people with guns.  The informant and/or undercover agent purported to have prior knowledge of and access to the hypothetical residence because they were involved in purchasing and/or delivering large quantities of drugs as Couriers . . . the fictional stash house and cocaine would be bait . . . and the firearms were to be promoted and provided by the Government.[6]

---

[6]    In this case, the firearms were provided by the co-defendants.  (See Doc. No. 280 at 6.)

(Id. at 4 ¶ 1.)  "Using this policy and practice," Defendant argued that the Government gives the green light for their informants and agents to "search, invariably, and seemingly deliberately, for their prey: African-Americans or Latinos whom they believe possibly would be interested in the commission of a stash house robbery[,]" namely those who would be "persuaded to act on the Government's legal and factual fiction."  (Id.)

Including the ATF sting operation in this case, Defendant pointed to "at least four phone [sic] stash house robbery cases charging 20 individuals, all African Americans[]" from 2009 to 2014.  (Id. ¶ 5.)[7]  These "phony stash house" sting operations, Defendant asserted, "illustrate a discriminatory law enforcement policy and/or practice by the Government" where ATF agents willfully and deliberately select African Americans.  (Id. ¶ 6.)  Based on these revelations, Defendant sought the following discovery from the Government:

> a.  A list by case name, number and the race of each defendant of all phony stash house robbery cases brought by the United States Attorney's Office for the Eastern District of Pennsylvania from 2009 to the present based on investigations conducted

---

[7]  Specifically, Defendant cited the following four cases from the Eastern District of Pennsylvania:

a. United States v. Alhinde Weens and Lamar C. Smith, Magistrate Case No. 09 583, Criminal No. 09-708 [], in which both defendants were African American[,]

b. United States v. Charles Bryant, Brian Andrews Sr., Brian Andrews Jr., Shawn Mobley, Tito Hoskins, and Kenyon Williams, Magistrate Case No. 12-935-M, Criminal No. 12-346 [], in which all defendants were African American[,]

c. United States v. Robert Lamar Whitfield, Marlon Graham, Kareem Long, Najee Murray and Frank Thompson (Magistrate Case No. 12-1089, Criminal No. 12-418 [], in which all defendants are African Americans[, and]

d. The instant case, United States v. Dwight Berry, Antonio Ellis, Jermau Johnston and Askia Washington, Magistrate Case No. 13-316, Criminal No. 13-171 [], in which all defendants are African American.

(Doc. No. 126 ¶ 4(a)-(d).)

by ATF or any other federal law enforcement agency, and any documents that show that the information stated in paragraph 4a-d *supra*[][8] is incorrect.

b.   For each such case listed in response to section "a" above, a statement of prior Criminal contact each investigating federal agency had with each defendant prior to initiating every fictitious stash house robbery. (If all such information for a particular case is contained in the criminal complaint, provision of a copy of the complaint would be a sufficient response).

c. The statutory or regulatory authority for ATF or any other federal law enforcement agency to instigate and/or pursue fictitious stash house robbery cases involving any pretext of illegal drugs (e.g. heroin, cocaine, crack, ecstasy, methamphetamine, etc.), or any decision by any federal agency, the Justice Department or the White House to authorize AFT [sic] or any other federal law enforcement agency to pursue such cases in the Eastern District of Pennsylvania.

d.   All national and Philadelphia Field Office ATF manuals, circulars, field notes, correspondence or any other material which discuss "stings", "reverse stings", "phony stash house rip-offs or robberies" or entrapment operations, including protocols and/or directions to agents and to confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, how to ensure that the targets do not seek to quit or leave before an arrest can be made, and how to ensure that the agents are not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

e.   All documents that contain information on whether and how supervisors and managers of the Philadelphia Area ATF and other federal law enforcement agencies involved in phony stash house robbery cases sought to determine whether or not its agents and informants were targeting persons on the basis of their race, color, ancestry or national origin for these phony stash house robbery cases, and what actions did the Philadelphia Area ATF (i.e., operating in the Eastern District of Pennsylvania) or other federal law enforcement agency supervisors and managers took to ensure that agents and/or informants were not targeting persons for such operations on the basis of their race, color, ancestry or national origin.

f.   The number of paid and unpaid confidential informants utilized by the Philadelphia Area ATF from 2009 to the present and the number of those confidential informants who had access to non-African American or persons of non-African descent who could be targeted for fictitious stash house robbery cases.

g.   The factual basis in each case cited in paragraph 4 and cases produced in response to the above and the cases produced in response to paragraph 10a

---

[8]   See supra note 7.

regarding decisions made to pursue or initiate an investigation against any of the individuals listed as defendants in these cases.

h.    All documents containing instructions given to Assistant United States Attorneys since 2009 regarding the responsibilities of Assistant United States Attorney to ensure that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have not been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

i.    All documents that contain information about all actions taken during the time the United States Attorney for the Eastern District of Pennsylvania [sic] regarding all duties and responsibilities of Assistant United States Attorneys for the Eastern District of Pennsylvania to ensure and/or check to determine that defendants in cases brought by the Office of the United States Attorney for the Eastern District of Pennsylvania have not been targeted due to their race, color, ancestry or national origin and specifically that those persons who are defendants in phony stash house cases in which ATF was the investigatory agency have [not] been targeted due to their race, color, ancestry or national origin and that such prosecutions have not been brought with any discriminatory intent on the basis of the defendant's race, color, ancestry or national origin.

(Id. ¶ 10(a)-(i).)

## 2.    Government's Response to Initial Discovery Motion

On April 28, 2014, the Government responded to Defendant's Discovery Motion on the Issue of Racial Profiling/Selective Prosecution.  (Doc. No. 127.)  Opposing Defendant's motion, the Government argued that the motion lacked merit because the allegations failed to meet the standards set forth in United States v. Armstrong, 517 U.S. 456 (1996) and United States v. Bass, 536 U.S. 862 (2002).  (See id. at 1.)  Since Armstrong and Bass "do not permit disclosure of information regarding prosecutorial policies and decisions absent 'a credible showing of different treatment of similarly situated persons[]'" of a different race, the Government asked the Court to deny Defendant's discovery motion as he "failed to make such a showing . . . ."  (Id. at 1-2) (quoting Armstrong, 517 U.S. at 470).

11

The Government pointed out that "Federal Rule of Criminal Procedure 16, which governs discovery in criminal cases, does not authorize defendants to examine government documents in preparation for a selective prosecution claim." (Id. at 2) (citing Armstrong, 517 U.S. at 463). Instead, a defendant requesting discovery must meet the "demanding" Armstrong standard: a "'credible showing' that 'similarly situated individuals of a different race were not prosecuted.'" (Id.) (quoting Armstrong, 517 U.S. at 465).[9]

The Government then stated that the Supreme Court "reaffirmed its unwavering antipathy toward examination of prosecutorial files" in Bass when it held that "statistical data alone was insufficient, in the absence of proof regarding particular similarly situated persons who were treated differently than the defendant." (Id. at 5-6.) As the Government summarily argued:

> In Armstrong and Bass, as in the instant motion, the issue is not simply a lack of statistics, but rather the absence of evidence regarding particular similarly situated persons who were treated differently than the defendant . . . As in Armstrong and Bass, the defendant here has not presented any evidence that any similarly situated person of a different race has not been prosecuted.

(Id. at 7.) Because "the sum total of all 'evidence' provided by the [D]efendant in support of his selective prosecution discovery demands is an anecdotal list of four cases, including his own[,]" the Government asked the Court to deny Defendant's motion since his proffered evidence was "far less than the evidence submitted to the district court in Armstrong, which the Supreme Court deemed insufficient to merit discovery." (Id. at 6-7.)

---

[9]  After discussing Armstrong (see Doc. No. 127 at 2-4), the Government noted how "neither the Supreme Court nor the Third Circuit has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices," citing United States v. Hedaithy, 392 F.3d 580 (3d Cir. 2004) and United States v. Abuhouran, 161 F.3d 206 (3d Cir. 1998) as examples. (Id. at 4.)

### 3.     Order Denying Initial Discovery Motion

After hearing the parties' arguments at a hearing on the motion (Doc. Nos. 131-32), and reviewing supplemental documents provided by Defendant at the hearing (Doc. No. 130), the Court denied Defendant's motion on June 30, 2014.  (See Doc. No. 135.)

While the Court held that Armstrong set forth the applicable standard for Defendant to meet to obtain discovery, the Court noted Defendant's motion raised a claim of selective enforcement, not selective prosecution.  (See id. at 5.)  As the Court explained:

> While Defendant refers to "selective prosecution" in his Motion, he actually complains of racial profiling or "selective law enforcement."  However, "the same analysis governs both types of claims: a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that Armstrong outlines for selective prosecution claims."  United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002).

(Id. at 5-6 n.2.)  Therefore, the Court reiterated the Armstrong standard:

> The claimant must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose."  To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted.

(Id. at 6) (quoting Armstrong, 517 U.S. at 465-66).  "This requires a criminal defendant to make 'a credible showing of different treatment of similarly situated persons.'"  (Id.) (quoting Armstrong, 517 U.S. at 470).  After Armstrong, the Supreme Court in Bass "further explained that 'raw statistics regarding overall charges say nothing about charges brought against similarly situated defendants.'"  (Id. at 7) (quoting Bass, 536 U.S. at 864).

This Court then described all proffered evidence in support of Defendant's motion:

> [F]rom 2009 to the present, the Government has brought at least four phony stash house robbery cases against twenty individuals, all of whom are African American[;] . . . various news articles discussing the Government's use of these types of sting operations; filings in phony stash house robbery cases from outside

the Third Circuit; and Department of Justice policy guidelines regarding the impermissibility of racial profiling by federal law enforcement agencies.[10]

(Id.)  Ultimately, the Court agreed with the Government and found that the evidence did not meet the Armstrong standard and Defendant was not entitled to discovery.  (See id.)

In reaching this conclusion, the Court strictly adhered to Armstrong and distinguished similar cases where courts did not do the same.  (See id. at 8-10.)[11]  Next, because "the only evidence Defendant submitted relevant to sting operations in this district is the fact that since 2009, the Government has brought at least four phony stash house robbery cases, in which only African Americans were charged[,]" the Court held that, in light of Bass, this statistical evidence did not meet the "discriminatory effect" prong of Armstrong.  (Id. at 10.)  Defendant also failed to establish "discriminatory purpose" because he could not rest on general allegations "that he may have been unintentionally discriminated against by a Government practice or policy."  (Id. at 11.)  Thus, "[w]ithout presenting evidence that similarly situated individuals were not targeted for these sting

---

[10]   The news articles, filings in stash house cases outside the Third Circuit, and Department of Justice policy guidelines were proffered by Defendant in a pro se filing.  (See Doc. No. 121.)

[11]   The Court distinguished United States v. Brown, et al., 12-cr-632, Doc. No. 153 (N.D. Ill. July 31, 2013), United States v. Williams, et al., 12-887, Doc. No. 70 (N.D. Ill. July 31, 2013), and United States v. Davis, et al., 13-cr-63, Doc. No. 124 (N.D. Ill. Oct. 30, 2013) for either not applying the Armstrong standard in full or not applying it at all.  (See Doc. No. 135 at 8.)

The Court also distinguished United States v. Alexander, No. 11-148-1, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013) even though the district court judge conducted "a full Armstrong analysis."  (Id. at 8-9.)  The court in Alexander "found that the defendant failed to make a credible showing of discriminatory effect and also failed to provide evidence of discriminatory intent[,]" but "nevertheless ordered the Government to produce limited discovery in the case."  (Id. at 9) (citing Alexander, 2013 WL 6491476, at *4-5).  And shortly after Alexander was issued came United States v. Hare, No. 13-650, 2014 WL 1573545 (D. Md. Apr. 17, 2014), in which "the production of limited discovery" was ordered "despite finding that the defendants had failed to make the necessary showing of discriminatory effect and discriminatory intent under Armstrong."  (Id. at 9.)  This Court found Alexander and Hare unpersuasive because the "two district courts ordered discovery, despite finding that defendants failed to satisfy Armstrong's rigorous standard."  (Id.)

operations," the Court denied Defendant's discovery motion because he did not meet "Armstrong's rigorous burden[]" of "demonstrat[ing] that the Government's use of fictitious stash house sting operations ha[d] both a discriminatory effect and a discriminatory purpose." (Id. at 11-12.)

### D.    Third Circuit Decision

On June 14, 2016, Defendant appealed his conviction to the Third Circuit (see Doc. No. 288), and on August 28, 2017 the Third Circuit affirmed the conviction and sentence, vacated the Court's Order denying discovery (Doc. No. 135), and remanded for post-judgment proceedings on the matter of discovery for the selective enforcement claim and a decision on the merits of the claim. (See Doc. Nos. 308, 310); United States v. Washington, 869 F.3d 193 (3d Cir. 2017), cert denied, 138 S. Ct. 713 (2018).

Defendant had raised three issues on appeal.[12] See Washington, 869 F.3d at 197. One issue before the Third Circuit was whether this Court "erroneously relied on the hard-to-meet test for 'selective prosecution' discovery" established in Armstrong and Bass (hereinafter "Armstrong/Bass") in denying Defendant's discovery motion. Id. Defendant asked the Third Circuit to follow the Seventh Circuit's decision in United States v. Davis, 793 F.3d 712 (7th Cir. 2015) (en banc),[13] to distinguish a selective prosecution claim from a selective enforcement claim, and to apply "a relaxed discovery standard for the latter." Id.

---

[12]   Two of the three issues Defendant raised on appeal—a challenge to statutory mandatory minimums and a claim of ineffective assistance of counsel—were rejected by the Third Circuit, see Washington, 869 F.3d at 197, and are not in issue here.

[13]   In Davis, the Seventh Circuit directed the district court to "take 'measured steps' to determine the scope and boundaries of discovery" as follows:

> First, the district court was to determine whether there was reason to believe that race played a role in the investigation—that "forbidden selectivity occurred or plausibly could have occurred"—by evaluating the evidence already of record, new evidence acquired by the defendants, and (if necessary) the affidavits and limited testimony of case agents. If the inquiry gave the district court reason to believe that

The Third Circuit noted that "selective prosecution" and "selective enforcement" are often used interchangeably by courts but found it important to separate the terms from one another— "'[p]rosecution' refers to the actions of prosecutors (in their capacity as prosecutors) and 'enforcement' to the actions of law enforcement and those affiliated with law-enforcement personnel." Id. at 214. In view of the distinction, the Third Circuit explained:

> We start with a point of commonality. *Substantive* claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test, which is derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system. A defendant challenging a criminal prosecution at either the law enforcement or prosecution inflection points must provide "clear evidence" of discriminatory effect and discriminatory intent (the latter is sometimes referred to as "discriminatory purpose"). Meeting this standard generally requires evidence that similarly situated individuals of a difference [sic] race or classification were not prosecuted, arrested, or otherwise investigated.

Id. at 214 (emphasis in original).

But the Supreme Court found "clear evidence" was too high a hurdle for criminal defendants to meet in seeking discovery for a selective prosecution claim. See id. "Instead of 'clear evidence,'" under Armstrong/Bass "a successful discovery motion can rest on 'some evidence.'" Id. (citations omitted) (emphasis added). This "still include[s] a showing that similarly situated persons were not prosecuted[,]" and "the defendant's showing must be 'credible' and cannot generally be satisfied with nationwide statistics." Id. at 214-15 (citations omitted).

---

similarly situated persons would not have been pursued by law enforcement, *in camera* disclosure of targeting criteria might be called for. If the trail of breadcrumbs continued, additional targeted inquiries might be justified; and if the obtained information crossed the Armstrong/Bass threshold, the discovery could be "extended to the prosecutor's office."

Washington, 869 F.3d at 218 (citing United States v. Davis, 793 F.3d 712, 722-23 (7th Cir. 2015) (en banc)) (emphasis in original).

The Third Circuit then noted that "Armstrong/Bass has proven to be a demanding gatekeeper[]" for those seeking discovery on a selective prosecution claim.  Id. at 215.  "The government itself concede[d] that 'neither the Supreme Court nor this [c]ourt has ever found sufficient evidence to permit discovery of a prosecutor's decision-making policies and practices.'" Id.; (see also Doc. No. 127 at 4.)  Defendant highlighted this burden by arguing that "requiring the same [standard] in law-enforcement cases—when there are likely to be no records of similarly situated individuals who were not arrested or investigated—would transform the functional impossibility of Armstrong/Bass into a complete impossibility."  Id. at 216.  Because of this burden, he asked the Third Circuit to allow selective enforcement discovery requests to "travel on a less rocky path."  Id.

The Third Circuit agreed that "the special solicitude shown to prosecutorial discretion, which animated the Supreme Court's reasoning in Armstrong and Bass . . . does not inevitably flow to the actions of law enforcement . . . ."  Id. at 219.  Prosecutors and law enforcement are afforded different blankets of immunity— "[p]rosecutors are ordinarily shielded by absolute immunity for their prosecutorial acts, but police officers and federal agents enjoy no such categorical protection."  Id.[14]  And challenges to an ATF reverse stash house sting operation, "a defined operation . . . with policies, manuals, targeting criteria, and standards," is a challenge "lodged against entities rather than individuals[]" which "often cannot be met with qualified or good-faith immunity defenses at all."  Id. at 220.

Therefore, the Third Circuit held:

In ruling on a pretrial discovery request that alleges selective prosecution and/or selective enforcement, a district court applies Armstrong/Bass to claims that

---

[14]   "[F]ederal law enforcement officers are entitled only to qualified, or good faith, immunity." Washington, 869 F.3d at 219 n.118 (first citing Orsatti v. N.J. State Police, 71 F.3d 480, 483 (3d Cir. 1995); then citing Forsyth v. Kleindienst, 599 F.2d 1203, 1216 (3d Cir. 1979)).

implicate protected prosecutorial functions, such as those that arose in the namesake cases. If claims of selective law enforcement are raised, or there are "mixed" claims that involve prosecutors acting in investigative or other capacities (in short, performing functions that ordinarily would not draw absolute immunity), the standard guiding the district court's discretion is different. While Armstrong/Bass remains the lodestar, a district court retains the discretion to conduct a limited pretrial inquiry into the challenged law-enforcement practice on a proffer that shows "some evidence" of discriminatory effect. The proffer must contain reliable statistical evidence, or its equivalent, and may be based in part on patterns of prosecutorial decisions (as was the case in Davis) *even if* the underlying challenge is to law enforcement decisions. Distinct from what is required under Armstrong/Bass, a defendant need not, at the initial stage, provide "some evidence" of discriminatory intent, or show that (on the effect prong) similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement. However, the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.

If a district court finds that the above has been met, it may conduct limited inquiries of the sort recommended in Davis, and cabined to the same considerations of judicial economy and the need to avoid protracted pretrial litigation of matters collateral to the upcoming trial—as well as the need to avoid impinging on other areas of executive privilege. Areas of consideration could include the testimony, in person or otherwise, of case agents or supervisors, and the *in camera* analysis of policy statements, manuals, or other agency documents. Relevant information, having passed the filter, can also be disclosed to the defendant, although the district court retains discretion to forgo disclosure of or otherwise restrict the use of information that, while relevant to a selective enforcement claim, might not ordinarily be the sort of discovery material available to a criminal defendant under Fed. R. Crim. P. 16 or Brady and its progeny.

Throughout, the district court must be mindful that the end "goal" of such a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish. If the district court's initial or secondary inquiry sees that destination recede or stand still, not advance, the court operates within its discretion to deny additional discovery and to proceed to trial.

Id. at 220-21 (emphasis in original). So while "motions for discovery seeking information on

putative claims of unconstitutional selective enforcement are not governed by strict application of

the Armstrong/Bass framework[,]" they are still "guided by the spirit of Armstrong/Bass, which

incorporates the demands placed on the underlying substantive claims: not just 'some evidence,'

but the heightened 'clear evidence' standard." Id. at 220.  In light of this holding, the Third Circuit

vacated and remanded as follows:

> Accordingly, we will vacate the District Court's discovery orders and remand for a
> renewed decision under the framework we articulate today.  We emphasize that we
> are not directing the District Court to grant discovery; our collective thumbs are not
> on the scale.  Rather, we commit the inquiry to the District Court's considerable
> discretion.  We note that the District Court may, if it so chooses, consider additional
> information offered by Washington on remand as part of his proffer, as well as any
> relevant information (such as testimony about the racial cast of prior prosecutions)
> that was disclosed at trial.

Id. at 222.

### E.      Proceedings in the District Court on Remand

Following the Third Circuit's ruling, this Court granted Defendant a 60-day window "in

which to file a motion to establish evidence of discriminatory effect of selective enforcement and

a motion for discovery."  (Doc. No. 316.)  Defendant then filed a motion seeking such discovery.

#### 1.      First Discovery Motion

##### a.      Defendant's Motion to Compel Discovery

On March 17, 2018, Defendant timely filed a Motion for Discovery Pertaining to a Claim

of Selective Enforcement.  (Doc. No. 319.)  In this motion, Defendant requested the following

from the Government:

> 13.  A list by case name and number of each defendant in every stash house robbery
> sting conducted by ATF from 2009 until 2014 that has been prosecuted, either by
> indictment of information, in the Eastern, Middle and Western Districts of
> Pennsylvania, the District of New Jersey and the District of Delaware;

> 14.  The race of each defendant;

> 15.  Whether informants were used in the investigations that led to the prosecutions
> and, if so, the race of the informant;

> 16.  Whether the informant initiated contact with the defendant or the defendant
> initiated contact with the informant;

17.   If records exist, the following information pertaining to ATF sting investigations between 2009 and 2014 that did not result in arrest or prosecution:

- the race of the individual investigated ("target");

- the race of the informant who participated in the investigation of the target;

- whether the informant initiated contact with the target or the target initiated contact with the informant;

- the reason, if known, why the target was not arrested[.]

(Id. ¶¶ 13-17.)

Defendant claimed he was entitled to such discovery because he proffered "some evidence" of discriminatory effect in his motion, as required under the Third Circuit's decision.  (See id. ¶¶ 3-4); Washington, 869 F.3d at 220-21.  First, Defendant resubmitted the statistics cited in his pretrial discovery motion[15] which showed the four stash house operations in this District from 2009 to 2014 involved 20 African Americans.[16]  (See id. ¶ 6.)  Second, from his own research and from information disclosed by a Federal Public Defender in the District of New Jersey, Defendant submitted statistics showing that, since 2011, six fictitious stash house robbery prosecutions in New Jersey all involved individuals of color.  (See id. ¶ 7.)  Finally, using the ten identified stash house stings in the Eastern District of Pennsylvania and District of New Jersey involving a total of 37 defendants of color, Defendant contrasted this statistic against the backdrop of United States Census data showing the racial composition of these districts:

In New Jersey, 55.8% of the population is white (not Hispanic); 15% is Black or African-American and 20.0% are Hispanic.  In Philadelphia County, the largest county in the Eastern District of Pennsylvania, 34.9% of the population is white (not Hispanic); 44.2% is Black or African-American and 14.4% are Hispanic.  The

---

[15]  See supra note 7.

[16]  Defendant believed this alone constituted "some evidence" sufficient to grant his discovery request.  (See Doc. No. 319 ¶ 6.)  This Court agreed.  (See id.)

demographic in the remaining seven counties comprising the Eastern District of Pennsylvania is overwhelmingly white.

(Id. ¶¶ 9-11.)  Defendant claimed that this Census data, compared to the racial composition of stash house defendants, shows the racial disparity and potential discriminatory enforcement in this geographical area.  (See id.)

Defendant made clear that his discovery request was "preliminary in nature" and was "tailored to address the issue of whether [he] can show 'clear evidence' of discriminatory effect and, to some degree, discriminatory intent on the part of ATF to target people of color in stash house robbery sting investigations."  (Id. ¶ 4); Washington, 869 F.3d at 216.  And if the Court granted his discovery request and "the disclosed discovery turn[ed] out to be relevant to whether there is 'clear evidence' of discriminatory effect," Defendant would then make "additional discovery requests that drill down deeper on the twin issues of whether (a) ATF did not arrest or investigate similarly situated individuals of a different race and whether (b) ATF agents acted with discriminatory intent in targeting Washington because of his race."  (Id. ¶ 20.)

**b.      Government's Response to First Discovery Motion**

On July 2, 2018, the Government responded to Defendant's discovery motion.  (Doc. No. 324.)  They questioned whether the Court should grant the motion because Defendant had "already received the ATF manual[]17 and was able to cross-examine the agent at length at trial."  (Id. at 7.)  Moreover, Defendant's proffered statistical evidence might have suggested discriminatory effect but it "certainly [did] not meet the additional requirement stated by the Third Circuit that, to justify discovery, 'the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement.'"  (Id.) (quoting Washington, 869 F.3d at 220-21).

---

17   In June 2015, prior to trial, the Court ordered the Government to disclose to defense counsel redacted portions of the ATF manual on stash house sting operations.  (See Doc. No. 204); see also Washington, 869 F.3d at 200.

The Government did not object, however, to Defendant's narrow request that sought "only to confirm the universe of stash house prosecutions and investigations during the pertinent time period[.]"  (Id. at 8.)  The Government asked that the Court limit the discovery to "investigations conducted in Pennsylvania by the Philadelphia Field Division of ATF[]"  because "operations in New Jersey and Delaware were conducted by different regional offices" and "litigation is ongoing in New Jersey regarding the propriety of stash house stings that occurred there."  (Id.)

### c.        Order Granting the Discovery Motion

On August 10, 2018, this Court granted Defendant's limited discovery request in its entirety because "the limited discovery this Court [approved] is in accordance with the measured discretion the Third Circuit has given to a district court judge in Washington."  (Doc. No. 327 at 2.)  Moreover, "ordering the Government to make available the limited information covered by the instant Order would not interfere with any proceedings in New Jersey."  (Id.)

### 2.        Second Discovery Motion

### a.        Defendant's Second Motion to Compel Discovery

Following the August 10, 2018 Order, the Government sent Defendant the discovery, providing him with the basis to file a Second Motion for Discovery Pertaining to a Claim of Selective Enforcement.  (See Doc. No. 353.)  In the second motion filed on January 28, 2019, Defendant summarized in part the following disclosed discovery:

> 7.  The discovery reveals that between 2009-2014, there were a total of 39 stash house robbery sting investigations in the Third Circuit in which a total of 44 informants were used[].
>
> 8.  Of these 39 investigations, 17 culminated in prosecution[]
>
> 9.  The 17 prosecutions involved 62 criminal defendants:
>
> • 57 African-Americans; and
> • 5 Hispanics.

10.  The discovery reveals that an additional 61 individuals targeted in these investigations[] were not prosecuted:

- 49 African-Americans;
- 7 Hispanics;
- 4 Whites;
- 1 Indian.

11.  Therefore, a total of 123 individuals were the subjects of the investigations:

- 106 African-Americans;
- 12 Hispanics;
- 4 Whites; and
- 1 Indian.

12.  A total of 44 informants were used in the investigations:

- 31 African-Americans;
- 6 Whites;
- 7 Hispanics.

13.  Of the 123 individuals who were the targets of the investigations,

- the 31 African-American informants targeted 94 African-Americans; 4 Hispanics; 2 Whites and 1 Indian;
- the 6 White informants targeted 13 African-Americans;
- the 7 Hispanic informants targeted 5 Hispanics, 3 African-Americans and 1 White individual.

14.  In the Eastern District of Pennsylvania, the discovery reveals that there were 6 investigations, all of which resulted in prosecutions, involving 26 defendants, all of whom are African-American.

14.[sic] The discovery, as analyzed above, reveals the following:

- 119 out of the 123 targets circuit-wide were individuals of color;
- only individuals of color were prosecuted;
- the four White targets were not prosecuted;
- the white informants, who targeted approximately 11 % of all the subjects circuit-wide (13 out of 123), targeted exclusively African-Americans.

(Id. ¶¶ 7-14.)[18]

---

[18]  In the Government's response to Defendant's second motion, they corrected and adjusted these findings:

Defendant asserted that this disclosed material constituted "'some' if not 'clear evidence' that these stash house robbery sting investigations had the discriminatory effect of unconstitutionally targeting people of color, including Washington, because of their race[,]" thus satisfying "the first prong of the two-part test" for substantive selective enforcement claims.  (Id. ¶ 15) (citing Washington, 869 F.3d at 214).  In order to prove the second prong, discriminatory intent/purpose, Defendant filed a second discovery motion seeking the following from the Government:

> • any disciplinary actions taken against any of the agents involved in these 39 investigations in which the agents have been alleged to have engaged in racial bias/ discrimination/profiling;
>
> • any information in possession of the investigating agencies in these 39 investigations which tend to show that any of the agents involved in these investigations uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias/discrimination/profiling;
>
> • any information in possession of the investigating agencies in these 39 investigations which tend to show that any of the agents, by their actions or words, reasonably can be said to have been engaged in racial bias/discrimination/profiling;
>
> • in the investigations where the informants initiated contact with the targets[], information surrounding the training provided to the informants by the investigating agency regarding how and who to target;[19]

---

The actual numbers are slightly different, as corrected here, through no fault of defense counsel.  As will be explained, there were in fact a total of 40 investigations, 17 of which resulted in charges against 62 people (57 African-American and 5 Hispanic).  The total of identified suspects was 132; of the 70 identified persons who were not prosecuted, 57 were African-American, 8 were Hispanic, 4 were white, and 1 was "Indian."

(Doc. No. 358 at 5 n.1.)

[19]  Defendant posited: "For example, were there particular areas of the Third Circuit where informants were instructed to target individuals to participate in a stash house robbery?  If it turns out that informants were instructed to target areas where individuals of color rather than Whites primarily lived, an inference could be drawn of racial profiling."  (Doc. No. 353 ¶ 16 n.7.)

• in investigations involving White informants[], any information which may tend to show that the White informants were directed, either explicitly or implicitly, to target African-Americans.

(Id. ¶ 16.)

### b. Government's Response to Second Discovery Motion

On August 14, 2019, the Government responded to Defendant's second discovery motion, once again agreeing to the disclosure of some, but not all, of the requested discovery.  (See Doc. No. 358 at 9.)  They agreed to disclose "any information regarding discriminatory intent as to [Defendant]" and "information regarding whether any white informants in other cases were instructed to target minorities . . . ."  (Id. at 9-10.)  They resisted providing "records regarding complaints concerning agents and the instructions given to informants" in the 39 investigations initially disclosed to Defendant, claiming the latter "inquiry is a fishing expedition . . . ."[20]  (Id. at 11.)

With regard to evidence of discriminatory intent by ATF agents who worked on Defendant's case, the Government disclosed that Special Agents Bowman, Edwards, and their group supervisor "have never been the subject of any disciplinary action involving an allegation of racial bias/discrimination/profiling[]" and have never "uttered, either verbally or in writing, words that reasonably can be construed to demonstrate racial bias/discrimination/profiling, or . . . by [] actions or words, reasonably can be said to have been engaged in racial bias/discrimination/profiling."  (Id. at 9.)  "Further, the informant in this case was African-American, and he did not initiate contact with any suspect; rather, [co-]defendant Dwight Berry, acting on his own, approached this informant with the idea of robbing drug dealers and users."

---

[20]   The Government cautioned that the term "any agents" "could potentially include several hundred agents, particularly if it is understood to cover members of arrest teams."  (Doc. No. 358 at 11 n.4.)

(Id. at 10.)  According to the Government, these facts coupled with the fact that "the only person who approached and recruited [Defendant] was his co-defendant, Berry[]" proved "there was no racial targeting [in] this case."  (Id.)

With regard to whether "any white informants in other cases were instructed to target minorities[,]" the Government plainly stated "[t]here is no record of any such abhorrent instruction given, and [they] would take action if there were."  (Id.)  "ATF as a rule did not seek out any subjects at all; instead, investigations began when informants or others learned of suspects' already-articulated interest in robberies. No informant was instructed to simply target people at random."  (Id.)  This was true of the investigations conducted by white ATF informants.[21]  (Id.) Furthermore, ATF informants did not "simply roam around a community and approach possible targets on a whim[]" and "[i]n no case was an informant directed, in the absence of any prior indication of a suspect's interest, to raise the idea himself."  (Id. at 6.)  Rather, "[e]very

---

[21]   The Government explained:

> All six matters reported in the summary involving white confidential informants confirm this.  In the Stewart case, the informant already had knowledge that the target was involved in robberies, which he relayed to ATF.  In the Dennis case, the target told the informant that he committed home invasion robberies and robbed a check cashing store, and asked the informant to rob a check cashing store with him. The informant reported this to ATF.  In the "Dirty Deeds" case, in which two white informants were employed, the ATF investigation actually began when a victim of a robbery, who was a cooperating defendant in an unrelated case, advised ATF that the main target robbed the victim at gunpoint for drugs and was known by the victim to commit such robberies.

> Three other matters involving white informants did not lead to charges, because the plots did not reach fruition. In two ("KD Home Invasion" and "RB Home Invasion"), the target told the informant of plans to commit robberies; in the latter, the target asked the informant to participate. In the "DG" investigation, the informant already had knowledge that he provided to ATF that the suspect and his associates were involved in drug robberies. In short, there was no targeting at all.

(Doc. No. 358 at 10 n.3.)

investigation was premised on information provided by or learned about the suspect before any stash house scenario was approved and pitched."[22]  (Id.)

In sum, the Government argued that "the discovery thus far has not satisfied the [D]efendant's burden to justify proceeding[]" as he failed to "set forth any evidence that similarly situated offenders of another race have not been prosecuted[,]" a "critical component" to proving selective enforcement.  (Id. at 11-12.)  Out of the 132 suspects that were identified in the disclosed ATF investigations, "only four of those people were white" and "none of those four people committed to a stash house robbery; thus, none is similarly situated to those who did."  (Id. at 15.)  In addition, the Government provided the following information about the four uncharged white individuals:

> •  . . . . in the "Broken Spoke" investigation, there were three African-American men prosecuted for attempting to commit a stash house robbery.  Three others – one white and two African-American – were not charged, as they did not show up at the appointed time for commission of the robbery.[][23]
>
> •  . . . . in the "Bloodhound" investigation, there were 10 subjects –nine African-American and one white.  None was prosecuted, because none appeared after a second meeting to continue the plot.
>
> •  In an investigation labeled "Newark HI Crew," an informant principally had discussions with one of the two white suspects.  But during the course of those discussions, entirely independently of the ATF investigation, that suspect continued to commit burglaries in northern New Jersey, for which he was arrested on multiple occasions by local authorities.  Eventually, he was held by the state court, and received a five-year sentence.  That ended any discussion with the ATF informant

---

[22]  In the disclosures, the Government provided Defendant with information on whether the informant or the suspect "initiated contact" in each investigation.  (See Doc. No. 353 at 10-18.)  Though not relied upon by Defendant in his second discovery motion, the Government found it important to clarify that in each investigation where an informant initiated contact, it was in response to some indicia that the suspect was interested in committing robberies.  (See Doc. No. 358 at 6.)

[23]  The Government explained "this was by far the most common reason that an investigation ended as to one or more suspects, regardless of their race: the suspect did not show up for a first or subsequent meeting."  (Doc. No. 358 at 15-16 n.5.)

about a stash house robbery scenario, and thus also terminated any investigation of
the suspect's confederate.

(Id. at 15-16.)  Therefore, because there was "no evidence in the investigations at issue of white

persons (indeed, people of any race) who are similarly situated to Washington . . . but were not

charged[,]" the Government asked the Court to put an end to "the burdensome and intrusive

discovery process[.]"  (Id. at 16.)

### c.      Defendant's Reply to Government's Response

On August 30, 2019, Defendant replied to the Government's response in which he

explained why the Court should grant his discovery request in toto.  (Doc. No. 362.)  His second

request was "designed to ferret out subtle, but no less relevant, circumstantial evidence of racial

animus" in the 39 other investigations.  (Id. at 3.)  "It very well may be that Washington's discovery

request unearths nothing of a racially charged nature[,]" which Defendant acknowledged would

end his inquiry.  (Id. at 4.)  "But until there is an affirmative effort by the government to ascertain

the existence of the information Washington has requested, the government's mere passive

representation that it is 'unaware' of any discriminatory conduct does not fulfill its discovery

responsibilities."  (Id.)

### d.      Order Granting the Second Discovery Motion

On December 6, 2019, this Court granted Defendant's second discovery request in full.

(Doc. No. 365.)  The Court found the statistics from the first disclosure compelling and disagreed

with the Government's "description of Defendant's [m]otion[.]"  (Id. at 4-5.)  The statistic that

"nearly ninety-seven percent of the targets of fictitious stash house robbery investigations in the

Third Circuit from 2009 to 2014 were persons of color" was a "racial disparity" that warranted

additional discovery for the purpose of proving discriminatory intent.  (Id.)  The Government's

concern as to the scope of discovery was legitimate, however, so the Court narrowed the term

"agent" in the discovery requests to "case agents primarily in charge of the investigations and the undercover agents who were the connection between ATF and the investigations' targets." (Id.)

### 3.   Final Discovery Motion

#### a.   Defendant's Third Motion to Compel Discovery

On January 22, 2020, Defendant filed his third and final Motion for Discovery Pertaining to a Claim of Selective Enforcement. (Doc. No. 368.) His third motion was prompted by an alleged racist incident found in the Government's second discovery disclosure: "before Washington's sentencing, a special agent, a contractor and 'others' employed at the ATF field office in Philadelphia, engaged in racist activity and acts evincing Islamophobia for approximately one year." (Id. ¶ 3.) The contractor had reported the alleged conduct.[24] The relevant portion of the disclosure describing this incident states:

> a. Agent [A] was involved in Operation G. R. (New Jersey). Years later, an internal affairs investigation was opened on November 2, 2016, based in part on an allegation by a contractor, [B], that while both were employed in the ATF field office in Philadelphia, [A] made recurring derogatory comments regarding people of Islamic faith, and on one occasion took a Quran from [B]'s work space and played a game of "hot potato" with it with other interns (an alleged incident that she did not herself witness). For his part, [A] said that he helped get [B] her position, and considered her a friend. He said that matters in the group turned sour when [B] competed with another employee for a position that neither ultimately received. [A] said that he joked with [B] and others about race/religion/ethnicity, and [B] even initiated some of the "jokes" that he thought might be insensitive to Muslims. [A] shared a copy of a photo text he received from [B] that in fact presents an effort at humor that is overtly racist.[25]
>
> Following an investigation, no disciplinary action was taken. The matter was referred to management. In 2017, the leadership of the Philadelphia Field Division

---

[24]   The Government refuted the validity of the contractor's allegations, claiming the allegations were "never confirmed" and investigators were "unable to determine the veracity of the assertions[.]" (Doc. No. 372 at 10.) They further speculated that "the matter at issue, at most, only involved attempts at puerile humor." (Id.)

[25]   For confidentiality purposes, the agents' names have been substituted with the same letters the Government used when quoting this excerpt in their response to the third discovery motion. (See Doc. No. 372 at 9-10.)

met with each employee and conducted a verbal counseling session.  A supervisor wrote, "I advised each of the employees of ATF's policy of zero tolerance as it relates to any kind of harassment, intimidation, or reprisals with any of their co-workers.  I further reminded them that ATF, and in particular the Philadelphia Field Division will not accept any deviation from the policy and that we not only expect a professional atmosphere but demand it.  I cautioned each employee that any future issues relating to workplace harassment of any sort will be dealt with severely up to and including suspension."

(Id. ¶ 10) (emphasis in original).[26]

Hoping to "drill down on whether [] Bowman or Edwards in particular, and the Philadelphia field office of ATF more broadly, acted with discriminatory intent/purpose in investigating Washington[]" (id. ¶ 11), Defendant asked the Court to enter an order:

• directing the government to identify whether case agent John Bowman and/or undercover agent Patrick Edwards were one of the "others" who engaged in the racist/Islamophobic activity revealed in the government's second discovery disclosure, and

• in light of this racist/Islamophobic activity so close in time to Washington's arrest and prosecution, an Order directing the government to disclose all information in possession of the ATF field office in Philadelphia which shows, between 2009 and 2014, the results of investigations of personnel of that office who may have uttered, either verbally or in writing, words or acts that reasonably can be construed to demonstrate racial bias, discrimination, or profiling.

(Id. ¶ 3.)

---

[26]  The Government also disclosed an incident of an agent who allegedly engaged in racist conduct.  They describe the incident as follows:

[O]n March 25, 2019, an African-American ATF agent made a complaint about the demeanor toward him exhibited by TS, another ATF agent who earlier had been involved in one of the Delaware stash house sting investigations, and in 2019 was serving as a supervisor in an ATF office in Ohio.  The government reported that ATF's Internal Affairs Division investigated the matter and recommended no disciplinary action.  The matter was referred to the Special Agent-In-Charge, who addressed the matter by counseling all individuals involved . . . No one involved had a role in the investigation in this case.

(Id. at 6 n.1.)  Defendant does not make any claim here that this incident supports his selective enforcement argument.

"If Bowman and Edwards are one of the 'others' who engaged in racist/Islamophobic behavior" with the individuals who allegedly engaged in racist activity and Islamophobia, or if Defendant could show that the Philadelphia Office of the ATF "was rife with racist activity during the operative period of 2009-2014," he claimed it would "either bring [him] one-step closer to the holy grail of establishing discriminatory intent/purpose or put an end to his valiant quest." (Id. ¶¶ 11-12.) Whatever the end result, Defendant asked the Court to grant his third request since the Court thought Defendant's "goal of establishing a claim of selective enforcement ha[d] not receded or stalled." (Id.; Doc. No. 365 at 4.)

### b.      Government's Response to Third Discovery Motion

On January 31, 2020, the Government responded to Defendant's third discovery motion, disclosing information on the first half of Defendant's request and objecting to disclosure on the second half. (Doc. No. 372 at 1.) The Government believed Defendant's first request for information on Special Agents Bowman and Edwards to be reasonable and disclosed that "neither Bowman nor Edwards was involved in or aware of any of the matters alleged in the 2016 complaint." (Id. at 11.)

But the Government opposed Defendant's second request as it was "exactly the type of overbroad inquiry which this Court previously sought to limit." (Id.) They claimed "[t]here [was] no basis for a wider investigation, which would reveal nothing about the conduct of the stash house investigations[,]" and that any alleged wrongdoing by Philadelphia ATF agents in 2016 could not be correlated with "any impropriety in the division" before or at the time of Defendant's arrest on March 15, 2013. (Id. at 11-12.) And so, as a result, the Government asked that Defendant not be afforded further discovery since "[t]here [was] no evidence that the agents who investigated this matter acted with any discriminatory intent, nor that, in any similar investigation during a five-

year period in this region, any similarly situated person of another race was not prosecuted."  (Id.
at 15-16.)

### c.        Defendant's Reply to Government's Response

On February 1, 2020, Defendant replied to the Government's response, doubling down on
his belief that the discovery disclosed thus far contained evidence of discriminatory effect and, as
such, warranted further discovery.  (See Doc. No. 374.)  The scope of each subsequent request was
narrower than the former, and Defendant's third discovery motion aimed to uncover any "evidence
of an ATF Philadelphia Field Office rife with racial bias during the time of the instant
investigation[.]"  (Id. at 3.)

Defendant focused on a specific piece of evidence from the first discovery disclosure—the
"four white individuals investigated in [the] stash house stings" who were not arrested or
prosecuted.  (Id. at 1-2.)  In Defendant's view, this showed "that similarly situated individuals of
a different race were not arrested or prosecuted; a prerequisite to establishing a selective
enforcement claim."  (Id. at 2.)  Even though the Government claimed the individuals were not
arrested or prosecuted because they "didn't show up at subsequent meetings to continue the plot
or participate in the robbery[,]" Defendant averred that the "factual determination as to why the
four whites were not arrested or prosecuted[]" was ultimately up to the Court, and his third motion
was "designed to assist the Court in making this determination."  (Id.)

### d.        Order Granting in Part and Denying in Part the Third
### Discovery Motion

On March 18, 2020, the Court found Defendant's "pursuit of establishing a claim of
selective enforcement ha[d] not yet receded or stalled[]" and entered an Order granting in part his
third discovery motion.  (Doc. No. 376 at 6.)  The Government was directed to disclose:

> [W]hether any agent involved in any capacity in the pre-indictment investigation
> of Defendant or his codefendants was one of the "others" that Agent A said he

"joked with . . . about race/religion/ethnicity" as noted in Section 2(a) the Government's second discovery disclosure, dated January 16, 2020 (Doc. No. 371). If the "others" have never been identified, the Government shall disclose this fact to Defendant.

(Id. at 1) (see also Doc. Nos. 368 ¶ 10; 371 at 3-4; 372 at 9-10.)

The Court thought the 2016 complaint of alleged racial animus and Islamophobia justified a "further, limited inquiry into ATF's Philadelphia field office." (Id. at 6.) "While Contractor B's complaint is hardly a proverbial 'smoking gun,' the allegations suggest some level of racial insensitivity within ATF's Philadelphia field office around the time of Defendant's investigation." (Id.) Clearing agents Bowman and Edwards from any connection to this alleged incident was not enough; the Court found it important to also "determine whether any agent[27] involved in Defendant's investigation in any capacity, or in the investigation of his codefendants, are one of the 'others' referenced in Contractor B's complaint." (Id.) If such information existed, the Court instructed the Government to disclose it to Defendant. (See id.)

At this point, the Court did not require the Government to search for whether any other personnel in the Philadelphia ATF field office between 2009 and 2014 engaged in conduct that could be construed to demonstrate racial bias or profiling. The Government estimated that "there were approximately 125 people employed by the Philadelphia Field Division of the ATF" between 2009 and 2014. (Doc. No. 372 at 11.) "Consistent with the measured steps approach envisioned by the Third Circuit," the Court believed that, in view of the totality of the disclosures thus far, to require such a search into potential investigations of this number of persons, many of whom never worked on the investigation of Defendant or his co-defendants, would be excessive under the

---

[27] "Any agent" meant "agents who worked as surveillance agents, agents who participated in the arrests, and agents who otherwise participated in the investigation of Defendant or his codefendants in this case." (Doc. No. 376 at 6.)

circumstances.  (Doc. No. 376 at 6.) [28]  The Court sought to "strike a balance between the strength of Defendant's proffer and the breadth of discovery."  (Id.)

**e.    Government's Supplemental Response/Production of Discovery**

On March 24, 2020 in a "Supplemental Response," the Government disclosed information in accordance with the Court's order granting limited discovery.  (Doc. No. 377.)

While reviewing "the lengthy internal affairs report regarding the investigation of" allegations made by Contractor B in the 2016 complaint, the Government found the following statement from Agent A: "[t]here was 'joking' about race/religion/ethnicity between [A], [Contractor B] and other members of the group . . . [Contractor B] even initiated some of the 'jokes' that he thought might be insensitive to Muslims."  (Id. at 3) (emphasis added).  The Government determined that "other members of the group" referred to agents assigned to the same group as Agent A and Contractor B at the time of the complaint and identified "the persons assigned to this group (including agents, delegated officers, contractors, and support personnel) during the period of Contractor B's employment before her complaint, that is, from the fall of 2015 through October 2016."  (Id.)

The Government did not identify any agents assigned to Defendant's investigation as the "others" in the group who joked with Agent A about race, religion, and diversity.  (See id. at 3-4.) Two agents assigned to his investigation, one being Special Agent Bowman, were in the group "for

---

[28]  It is evident from all the facts of this case that the decisionmakers in the investigation of Defendant Washington and his co-defendants were Special Agent Bowman, undercover Special Agent Edwards, and their supervisor.  (See Doc. No. 358 at 9.)  To require the Government to investigate whether any other person who was not a decisionmaker but who had any involvement at all in the investigation of Defendant had engaged in discriminatory acts or statements would have been an unwarranted fishing expedition.  Because discriminatory intent primarily focuses on the state of mind of the decisionmakers, see Section III.A.2, infra, this would be another reason to deny the broad discovery request.

brief periods in 2015 or 2016," but "both confirmed . . . that they were unaware of any joking described by Agent A and did not participate in any such joking during the limited times they were delegated to the group." (Id. at 3.) Moreover, "[n]o other person assigned to the group in the relevant 2015-2016 time period, per the rosters, was involved in any manner in the investigation in 2012-2013 of defendant Washington and his confederates." (Id. at 3-4.)

### 4.    The Motion Presently Before the Court

#### a.    Defendant's Motion to Vacate Judgment and Dismiss Superseding Indictment

Defendant sought no other discovery on selective enforcement and filed the instant Motion to Vacate Judgment and Dismiss [his] Superseding Indictment on April 4, 2020. (Doc. No. 380.) Armed with all disclosed discovery, Defendant is now pursuing his end goal—proving a substantive claim of selective enforcement violative of his equal protection rights. (See id. at 3.)

In a section titled "Discovery Revelations," Defendant lists key findings which he argues meet the "clear evidence" standard for selective enforcement claims. (Id. at 4.) The findings read:

7. The discovery reveals that between 2009 and 2014, there were a total of 40 stash house sting investigations in this circuit:

- 97% (128 out of 132) of the individuals investigated in the 40 stash house stings were individuals of color[];

- 100% of the 62 criminal defendants arrested in the 17 stash house stings that resulted in prosecution were persons of color[];[29]

- 100% of the 26 defendants arrested and prosecuted in connection with the six investigations in the Eastern District of Pennsylvania were African-American[];

- 100% of the four white individuals identified in these investigations were not arrested or prosecuted[];

- 100% of the individuals targeted by the six white informants were African-

---

[29] "Of the 70 individuals who were not prosecuted, 57 were African-American, 8 were Hispanic, 4 were white, and 1 was 'Indian'." (Doc. No. 380 ¶ 7 n.3) (citing Doc. No. 358 at 5 n.1).

Americans[];[30]

- prior to Washington's sentencing, [Agent A] and [Contractor B] who worked at the ATF field office in Philadelphia, admitted to participating in racist and Islamaphobic activity in front of "other" individuals who were not involved in Washington's investigation[].

(Id. ¶ 7.)  To further summarize these findings, Defendant quotes numbers the Court highlighted in its previous Orders granting discovery:

- ". . . the statistics revealed by [Washington's] initial discovery request are compelling: nearly ninety-seven percent of the targets of fictitious stash house robbery investigations in the Third Circuit from 2009 to 2014 were persons of color." []

- "Further, in the resulting 62 criminal prosecutions, all 62 defendants were persons of color." []

(Id. ¶ 8) (quoting Doc. Nos. 365 at 4; 376 at 2).  He also summarizes the findings regarding "similarly situated white individuals" who were not arrested or prosecuted:

- persons of color comprised 50%[][31] of the individuals who were not arrested or prosecuted whereas 100% of the similarly situated four white individuals were not arrested or prosecuted;

- informants of color targeted individuals of all races whereas 100% [of] the similarly situated six white informants targeted African-Americans exclusively.

---

[30]   Following this statistic, Defendant writes:

The six white informants targeted a total of 13 African-Americans, i.e., approximately 10% of 132 of the individuals investigated. This information is gleaned from the 17-page summary of the investigations which the government submitted to defense counsel as an exhibit. [] The government appears not to take issue with Washington's summary of the informant information. [] ("As for the numbers, defense counsel's summary is generally accurate.")

(Doc. No. 380 ¶ 7 n.6) (citing Doc. Nos. 353; 354; 358 at 5, 7).

[31]   "66/132."  (Doc. No. 380 ¶ 8 n.8.)

(Id. ¶ 8.)  Lastly, Defendant points to the "racist and Islamophobic hijinks that took place at the Philadelphia ATF Field Office before Washington was sentenced between [Agent A] and [Contractor B]."  (Id. ¶ 9.)

Defendant states he "is not in a position to say the that the Philadelphia Field Office was rife with racism while it investigated him[]" because he was "stymied in his effort to obtain discovery that may have shown racist conduct taking place in the Philadelphia filed [sic] office between 2009 and 2014."  (Id.)  Still, "the disparate treatment between persons of color . . . and white individuals targeted in these stash house investigations[,]" Defendant argues, "is reflective of the disturbing conduct engaged in and witnessed by ATF personnel prior to [his] sentencing." (Id.)  In sum, Defendant asks the Court to find that all above-mentioned evidence, taken together, constitutes "'clear evidence' of discriminatory effect and intent on the part of the agents who investigated [him], and that 'similarly situated' white individuals were treated differently because of their race."  (Id.)

### b.    Government's Response to the Motion

On June 22, 2020, the Government filed their Response to Defendant's Motion to Vacate Judgment and Dismiss [his] Superseding Indictment.  (Doc. No. 384.)  The Government ardently opposes the Motion and avers that Defendant's quest for discovery "yielded no evidence whatsoever of any racial discrimination in the investigation or prosecution of this matter" and his "perfunctory" Motion should therefore be denied.  (Id. at 1.)

The Response directs the Court's attention to five points the Government asserts undermine Defendant's selective enforcement claim.  First, they note that Defendant was not personally targeted by ATF agents, and neither was his co-defendant, Berry, "who led the robbery crew."  (Id. at 5.)  In actuality, the ATF investigation was prompted when "Berry himself approached a confidential informant (who was himself African-American) with the idea of committing

robberies."  (Id.)  It was only after Berry established contact with undercover agents that he "recruited [Defendant] and brought him into the endeavor."  (Id.)

Second, no disclosed information shows that "the key government agents in the matter[,]" Special Agents Bowman, Edwards, and their direct supervisor, "ever evinced any conduct or made statements consisting of racial bias or discrimination or profiling."  (Id.)  And third, on a broader level, of the "36 law enforcement officers involved as the case agent or undercover agent" in the 40 total stash house stings conducted between 2009-2014 in Pennsylvania, New Jersey, and Delaware, "there have been no disciplinary actions taken against any of these 36 officers on the basis of racial bias, discrimination, or profiling[.]"  (Id. at 6.)  With the exception of "two limited instances, the [G]overnment had no evidence that any of these officers ever engaged in or made any statements that could reasonably be described as racial bias, discrimination, or profiling."  (Id.)  "One of th[e] two instances" see note 26, the Government noted "was plainly immaterial[]" and "Washington has not raised any claim on the basis of th[e] information[,]" but they still confirmed that "[n]o one involved had a role in the investigation in this case."  (Id. at 6, 6 n.1.)  The other instance referred to the 2016 complaint of alleged racist conduct and Islamophobia by Agent A, Contractor B, and "others" in an ATF group in the Philadelphia office.  (See id. at 6-7.)  Similarly, "no one involved in the 2012-2013 Washington investigation is mentioned in the lengthy internal affairs report regarding the 2015-2016 incident."  (Id. at 7-8.)

Fourth, the Government found no record of any white ATF informants in stash house sting investigations who "were instructed to target minorities."  (Id. at 8.)  They reiterate that "ATF not only did not instruct anyone to target minorities, but as a rule did not seek out any subjects at all; instead, investigations began when informants or others learned of suspects' already-articulated interest in robberies."  (Id.)  In the 40 total investigations from 2009-2014, "[e]very investigation

was premised on information provided by or learned about the suspect before any stash house scenario was approved and pitched."[32]  (Id.)  And this information is only "the initial germ of the investigation" according to the Government, because ATF protocols forbid "further investigation through a home invasion sting" unless the suspects "as documented through, among other things, their criminal histories, admissions to others, or reputation in the community," exhibit "a propensity to do harm to the public through violent behavior."  (Id. at 9.)

Finally, the "most common reason" investigations ended, regardless of race, was because suspects failed to show up to a planned meeting or to the planned robbery.  (Id. at 10.)  This explains why two of the four white suspects in the 40 total investigations were not charged.  (See id. at 10-11.)  As to the other two white suspects, multiple state-level arrests of one "ended any discussion with the ATF informant about a stash house robbery scenario, and thus also terminated any investigation of" the other.  (Id. at 11.)[33]

---

[32]   The Government provides examples of what often prompts an ATF investigation:

> [A] suspect openly bragged to an informant about committing robberies; the informant overhead the suspect planning robberies; the suspect asked the informant to provide information about persons and/or residences to rob; the suspect asked the informant to participate in robberies; the informant learned that suspects were en route to or had participated in robberies; [or] the informant was the victim of a robbery committed by a suspect.

(Doc. No. 384 at 8-9.)  Some investigations also start with "information . . . presented by local law enforcement officials."  (Id. at 9.)  In any event, the Government states that "[i]n no case was an informant directed, in the absence of any prior indication of a suspect's interest, to raise the idea himself."  (Id.)

[33]   As previously noted in their Response to Defendant's Second Discovery Motion (Doc. No. 358), the Government restates the "specific explanations regarding the four white uncharged suspects" in their Response to the instant Motion:

> • In the "Broken Spoke" investigation (New Jersey), there were three African-American men prosecuted for attempting to commit a stash house robbery.  Three

In the final section of their Response, the Government argues that these five points show that Defendant has not proven discriminatory effect or intent, the two elements of selective enforcement.  (See id.)  They submit Defendant's allegations that "[t]he discovery shows 'clear evidence' of discriminatory effect and discriminatory intent" and "that similarly situated white individuals were not arrested or prosecuted[]" are conclusory and not supported by the evidence. (Id. at 15.)  And they again point out that the Supreme Court found "statistical data alone [is] insufficient, in the absence of proof regarding particular similarly situated persons who were treated differently than the defendant."  (Id. at 17) (citing Bass, 536 U.S. at 863-64).  Because Defendant "relies only on statistics, without any evidence whatsoever of a similarly situated person of a different race who was not prosecuted, nor, for good measure, any evidence of any discriminatory intent by any government actor[,]" the Government asks this Court to deny Defendant's Motion and find that he has not proven a substantive claim of selective enforcement. (Id.)

---

others – one white and two African-American – were not charged, as they did not show up at the appointed time for commission of the robbery.

• In the "Bloodhound" investigation (New Jersey), there were 10 subjects – nine African-American and one white.  None was prosecuted, because none appeared after a second meeting to continue the plot.

• In an investigation labeled "Newark HI Crew" (New Jersey), an informant principally had discussions with one of the two white suspects.  But during the course of those discussions, entirely independently of the ATF investigation, that suspect continued to commit burglaries in northern New Jersey, for which he was arrested on multiple occasions by local authorities.  Eventually, he was held by the state court, and received a five-year sentence.  That ended any discussion with the ATF informant about a stash house robbery scenario, and thus also terminated any investigation of the suspect's confederate.

(Doc. No. 384 at 10-11.)

### III.   DISCUSSION

Defendant moves to vacate judgment and dismiss his superseding indictment on the ground that he was investigated by ATF agents because of his race in violation of his equal protection rights.  (See Doc. No. 380 ¶ 5.)  He asserts that the discovery disclosed by the Government contains "clear evidence" of selective enforcement.  (See id.)

Initially, it should be noted that the Court, as described above, exercised its discretion and afforded Defendant the discovery that was warranted under the circumstances.  (See Doc. Nos. 327, 365, 376.)  The Government opposed making certain information available, but the Court felt that, as the discovery unfolded, it revealed "some evidence" of discriminatory effect that justified additional, targeted inquiries.  (See id.)  These inquiries were relevant to a substantive claim of selective enforcement, and a balanced approach was thus taken.

The Third Circuit in Washington described the next step in the process: "the end 'goal' of [] a discovery motion is a valid claim of selective enforcement under the heightened substantive standards, which we are not asked to diminish or distinguish." Washington, 869 F.3d at 221.  With discovery now being closed, this Court will evaluate "the underlying substantive claim[]" under "the heightened 'clear evidence' standard." Id. at 220.

#### A.   Standard for Equal Protection Selective Enforcement Claim

It is a fundamental precept that the "the Constitution prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813 (1996). When a defendant accuses federal agents of engaging in racially discriminatory conduct, the equal protection component of the Fifth Amendment Due Process Clause governs.  See Washington v. Davis, 426 U.S. 229, 239 (1976); Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal

protection claims under the Fourteenth Amendment.").[34]  Thus, a defendant can bring a selective enforcement claim against federal agents on the ground that "the administration of a criminal law [was] 'directed so exclusively against a particular class of persons'" it "amounts to 'a practical denial' of equal protection of the law."  Armstrong, 517 U.S. at 464-65 (quoting Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886)).

In the Third Circuit, selective enforcement claims are "generally evaluated under the same two-part test" as selective prosecution claims.  Washington, 869 F.3d at 214.[35]  The test is "derived from a line of seminal Supreme Court cases about the collision between equal protection principles and the criminal justice system[,]" and requires that defendants proffer "clear evidence" of (1) discriminatory effect and (2) discriminatory intent to successfully allege an equal protection violation.  Id.[36]

### 1.    Discriminatory Effect

To prove discriminatory effect, a defendant must proffer evidence of similarly situated individuals of a different race who were not investigated and/or arrested.  See id.; Armstrong, 517 U.S. at 465.  Statistical evidence can be used to prove discriminatory effect, see Bradley v. United States, 299 F.3d 197, 206 (3d Cir. 2002), but "[t]he statistics proffered must address the crucial

---

[34]  See also United States v. Frame, 885 F.2d 1119, 1137 (3d Cir. 1989) ("The Fifth Amendment contains an implicit equal protection component that prohibits the federal government from discriminating between individuals or groups.")

[35]  See also United States v. Whitfield, 649 F. App'x 192, 196 n.11 (3d Cir. 2016) ("[T]he prima facie elements for both selective prosecution and selective enforcement are the same[.]").

[36]  See also United States v. Armstrong, 517 U.S. 456, 465 (1996) (citations and internal quotations omitted) ("In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present clear evidence to the contrary.");  United States v. Taylor, 686 F.3d 182, 197 (3d Cir. 2012) ("The defendant . . . must establish each of these elements with 'clear evidence' sufficient to overcome the presumption of regularity that attaches to decisions to prosecute[.]").

question of whether one class is being treated differently from another class that is otherwise similarly situated." United States v. Whitfield, 29 F. Supp. 3d 503, 514-15 (E.D. Pa. 2014) (first quoting Chavez v. Illinois State Police, 251 F.3d 612, 638 (7th Cir. 2001); then citing United States v. Hedaithy, 392 F.3d 580, 607-08 (3d Cir. 2004)). "It is not enough to show the racial composition of the individuals targeted by law enforcement; rather, the statistics must compare the racial composition of those targeted to some appropriate benchmark[,]" namely, "similarly situated individuals of another race who could have been targeted but were not[.]" Id. at 515.

Evidence devoid of any comparison to "similarly situated" individuals does not prove discriminatory effect. In Armstrong, the Supreme Court held that a study showing all defendants prosecuted in a given year for drug crimes were black "did not constitute 'some evidence tending to show the existence of the essential elements of' a selective-prosecution claim." Armstrong, 517 U.S. at 459, 470. In Bass, the Court later held that nationwide statistics showing "'[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites' and . . . enters into plea bargains more frequently with whites than it does with blacks[]" is not sufficient evidence of discriminatory effect because it "say[s] nothing about charges brought against *similarly situated defendants*." Bass, 536 U.S. at 863-64 (emphasis in original). Lower courts have since followed suit when presented with similar evidence.[37]

---

[37] See, e.g., United States v. Whitfield, 29 F. Supp. 3d 503, 515 (E.D. Pa. 2014) (holding that defendants' data was insufficient to satisfy their burden of producing "some evidence" of discriminatory effect to obtain discovery because the "data focuse[d] only on the racial composition of those targeted in phony stash house robbery stings and sa[id] nothing about the existence of similarly situated individuals of another race who could have been targeted but were not . . . ."); United States v. Lamar, No. 14-726, 2015 WL 4720282, at *10 (S.D.N.Y. Aug. 7, 2015) (alteration in original) (citation omitted) ("Although Defendants have demonstrated that none of the nineteen defendants initially approached in the eighteen Hobbs Act robbery sting cases is white, this data 'says nothing about whether the [DEA] . . . chose not to conduct . . . stash-house robbery sting cases for similarlysituated [sic] individuals of another race.'"); United States v. Colon, 71 F. Supp. 3d 269, 283 (D. Conn. 2014) (finding no

In cases where defendants believe they have proffered evidence identifying similarly situated individuals of another race who were not investigated, arrested, or prosecuted in ATF stash house stings, courts found that the comparators were not all "similarly situated."  Courts have found such evidence fails to meet the "clear evidence" standard for substantive selective enforcement claims because all identified individuals are not "similarly situated" to all defendants. See, e.g., United States v. Brown, 299 F. Supp. 3d 976, 1003, 1013 (N.D. Ill. 2018) (finding that the proffered evidence, derived from defendants' expert's statistical analyses, failed to "make a proper comparison to a similarly situated group[]" because the analyses "wrongly increase[d] the sample size" and relied upon an overly broad comparison group that was not "similarly situated" to all of the defendants in the case);  Conley v. United States, No. 18-7122, 2020 WL 4226676, at *5-6 (N.D. Ill. July 23, 2020) (holding the same because defendant relied upon the same expert report as in Brown).

Courts have even found such evidence fails to meet the lower "some evidence" standard to justify discovery where the proffer does not exactly show how the individuals are "similarly situated" to the defendants.  See, e.g., United States v. Hare, 820 F.3d 93, 97, 99 (4th Cir. 2016) (internal quotations omitted) (finding that proffered evidence of "a known white crew [] involved in robberies and drug distribution . . . whose members were arrested and prosecuted, but were not the subject of a stash house sting or other ATF investigation[]" did not meet the Armstrong

---

discriminatory effect because "defendants['] cite[d] statistics from Connecticut and elsewhere of the number of minority defendants charged in ATF stash-house schemes . . . do[es] not cure defendants' failure to adduce evidence of similarly situated comparators.");  Alexander, 2013 WL 6491476, at *4 (holding that defendant "failed to make a credible showing of discriminatory effect" because his proffered data showing 75 percent of those prosecuted in ATF stash house sting cases were African American "says nothing about whether the ATF or the United States Attorney chose not to conduct or prosecute stash-house robbery sting cases for similarly situated individuals of another race.").

discovery standard since it was "far from clear . . . that this crew [was] similarly situated, in the sense that their circumstances present no distinguishable legitimate [enforcement] factors that might justify making different [enforcement] decisions with respect to them."); <u>United States v. Lamar</u>, No. 14-726, 2015 WL 4720282, at *14 (S.D.N.Y. Aug. 7, 2015) (finding that defendants' statistical evidence "concerning the percentage of white men ages 16 to 49 living in New York City who have prior New York State felony and violent felony convictions . . . does not . . . identify the relevant group of individuals who are 'similarly situated' to the [d]efendants in this case."); <u>United States v. Cousins</u>, No. 12-865-1, 2014 WL 5023485, at *4 (N.D. Ill. Oct. 7, 2014) (rejecting defendant's contention that "'the pool of similarly situated whites [to use for comparative purposes] is the entire white population in the Northern District of Illinois.' . . . There is no support in the case law for such a broad interpretation of who constitutes a 'similarly situated' individual.").

Here, Defendant proffers the following evidence as probative of discriminatory effect:[38]

7. The discovery reveals that between 2009 and 2014, there were a total of 40 stash house sting investigations in this circuit:

- 97% (128 out of 132) of the individuals investigated in the 40 stash house stings were individuals of color[];

- 100% of the 62 criminal defendants arrested in the 17 stash house stings that resulted in prosecution were persons of color[];

- 100% of the 26 defendants arrested and prosecuted in connection with the six investigations in the Eastern District of Pennsylvania were African-American[];

- 100% of the four white individuals identified in these investigations were not arrested or prosecuted[];

- 100% of the individuals targeted by the six white informants were African-

---

[38] Defendant presents all findings in his Motion as "clear evidence of discriminatory effect and discriminatory intent" and does not designate certain findings as probative of one prong over the other. (<u>See</u> Doc. No. 380 ¶ 8.) For this reason, the Court will address all proffered evidence in this section as well as in the discriminatory intent section, <u>infra</u>.

Americans[];

- prior to Washington's sentencing, [Agent A] and [Contractor B] who worked at the ATF field office in Philadelphia, admitted to participating in racist and Islamaphobic activity in front of "other" individuals who were not involved in Washington's investigation[].

. . .

- persons of color comprised 50%[] of the individuals who were not arrested or prosecuted whereas 100% of the similarly situated four white individuals were not arrested or prosecuted;

- informants of color targeted individuals of all races whereas 100% [of] the similarly situated six white informants targeted African-Americans exclusively.

(Doc. No. 380 ¶¶ 7-8.)  The first three findings regarding the racial makeup of those investigated, arrested, and/or prosecuted, fail to show that similarly situated individuals of another race were not investigated, arrested, or prosecuted.  These statistics only focus on those who were involved in ATF stash house stings and say nothing about those who were not involved.  As such, the findings are not probative of discriminatory effect.  See Armstrong, 517 U.S. at 470; Bass, 536 U.S. at 864.

While two findings show (1) four white individuals who were not arrested or prosecuted, and (2) statistical comparisons of minorities and white individuals who were not arrested or prosecuted, this evidence is not "clear evidence" of discriminatory effect because the Court cannot conclude that the white individuals are "similarly situated" to Defendant.  As noted earlier, the Government explained in their Response to Defendant's Second Discovery Motion and Response to the instant Motion why the four white individuals were not arrested or prosecuted:

- In the "Broken Spoke" investigation (New Jersey), there were three African-American men prosecuted for attempting to commit a stash house robbery.  Three others – one white and two African-American – were not charged, as they did not show up at the appointed time for commission of the robbery.

• In the "Bloodhound" investigation (New Jersey), there were 10 subjects – nine African-American and one white.  None was prosecuted, because none appeared after a second meeting to continue the plot.

•  In an investigation labeled "Newark HI Crew" (New Jersey), an informant principally had discussions with one of the two white suspects.  But during the course of those discussions, entirely independently of the ATF investigation, that suspect continued to commit burglaries in northern New Jersey, for which he was arrested on multiple occasions by local authorities.  Eventually, he was held by the state court, and received a five-year sentence.  That ended any discussion with the ATF informant about a stash house robbery scenario, and thus also terminated any investigation of the suspect's confederate.

(Doc. No. 384 at 10-11) (see also Doc. No. 358 at 15-16.)   Conversely, on his own volition, Defendant did show up to, and participate in, meetings planning the robbery.  (See Doc. No. 280 at 3-6.) He also went to the designated location on the day of the robbery where his co-conspirators met just before executing the robbery.  (See id.)  At that point, Defendant was arrested.  (See id.)

The remainder of the proffered evidence also is not probative of discriminatory effect.  The allegation of racially insensitive conduct by ATF agents is not evidence of similarly situated individuals of another race being treated differently from Defendant.  Similarly, statistical evidence showing the racial makeup of ATF informants and their targets is not evidence of similarly situated individuals.

Accordingly, because Defendant has not proffered "clear evidence" of similarly situated individuals of another race who were treated differently from him in ATF stash house stings, he has not proven discriminatory effect.

### 2.        Discriminatory Intent

To prove discriminatory intent,[39] a defendant must present evidence showing "the existence of purposeful discrimination."  McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (citations omitted).

---

[39]   Discriminatory intent is "sometimes referred to as 'discriminatory purpose[.]'"  Washington, 869 F.3d at 214.

"[I]t is not enough for [d]efendants to show that the ATF was willfully blind to the racially disparate impact of its stash house sting operations[.]" Brown, 299 F. Supp. 3d at 1014 (internal quotations omitted) (quoting Hare, 820 F.3d at 100 n.6).   Rather, a defendant must show that the decisionmakers in his case "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." McCleskey, 481 U.S. at 298 (citation omitted); Wayte v. United States, 470 U.S. 598, 610 (1985).   This generally requires that a defendant proffer non-statistical evidence, as it is "rare" that "a statistical pattern of discriminatory impact demonstrate[s] a constitutional violation." McCleskey, 481 U.S. at 293 n.12; see also id. at 293 (citations omitted) ("[S]tatistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution[.]").

But this focus on the intent of decisionmakers does not necessarily preclude a determination of discriminatory intent from another viewpoint.   Discriminatory intent in Defendant's case can also be proven by the totality of a defendant's proffered evidence. See Davis, 426 U.S. at 242 ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . . .").

Here, as previously set forth, Defendant proffers the following evidence as probative of discriminatory intent:

7.  The discovery reveals that between 2009 and 2014, there were a total of 40 stash house sting investigations in this circuit:

- 97% (128 out of 132) of the individuals investigated in the 40 stash house stings were individuals of color[];

- 100% of the 62 criminal defendants arrested in the 17 stash house stings that resulted in prosecution were persons of color[];

- 100% of the 26 defendants arrested and prosecuted in connection with the six investigations in the Eastern District of Pennsylvania were African-American[];

48

- 100% of the four white individuals identified in these investigations were not arrested or prosecuted[];

- 100% of the individuals targeted by the six white informants were African-Americans[];

- prior to Washington's sentencing, [Agent A] and [Contractor B] who worked at the ATF field office in Philadelphia, admitted to participating in racist and Islamaphobic activity in front of "other" individuals who were not involved in Washington's investigation[].

. . .

- persons of color comprised 50%[] of the individuals who were not arrested or prosecuted whereas 100% of the similarly situated four white individuals were not arrested or prosecuted;

- informants of color targeted individuals of all races whereas 100% [of] the similarly situated six white informants targeted African-Americans exclusively.

(Doc. No. 380 ¶¶ 7-8.)

First, addressing whether the key decisionmakers in Defendant's case acted with a discriminatory purpose, the evidence proffered by Defendant is not probative of discriminatory intent. To start, the key decisionmakers in Defendant's investigation—Bowman, Edwards, and their supervisor—never "evinced any conduct or made statements consisting of racial bias or discrimination or profiling." (Doc. No. 384 at 5.) Further, the 2016 complaint of racially insensitive conduct does not establish that the key decisionmakers, or any ATF agents in Defendant's case for that matter, acted with discriminatory intent. It is undisputed that Agent A and Contractor B had no involvement in Defendant's stash house case. The Government also clarifies—and Defendant concedes in his own proffer—that none of the "others" who observed Agent A and Contractor B engage in alleged racist activity were involved in Defendant's case. (See Doc. Nos. 377 at 3; 380 ¶ 7.) Furthermore, there is no evidence that the key decisionmakers

did not follow ATF protocols for conducting stash house investigations.  Absent any evidence of the key decisionmakers in his case engaging in questionable activity, the Court cannot conclude that this alleged incident is probative of discriminatory intent.[40]

Moreover, all the above statistical evidence showing the racial makeup of those targeted, investigated, arrested, or prosecuted is not probative of discriminatory intent because "evidence concerning the racial composition of . . . defendants in . . . unrelated cases tells us nothing about the intent of the decision makers in Defendants[] case." [41]  Lamar, 2015 WL 4720282, at *11; see also Hare, 820 F.3d at 100 (citations omitted) ("[I]n cases involving discretionary judgments 'essential to the criminal justice process,' statistical evidence of racial disparity is insufficient to infer . . . a discriminatory purpose.").  The same is true of the proffered statistics showing those who were not arrested or prosecuted—while it may be relevant evidence to proving discriminatory effect, it says nothing about the intent of the key decisionmakers in this case.

And even when looking at the totality of the proffered evidence, "clear evidence" of discriminatory intent has not been established.  Although the statistical evidence shows that ATF stash house stings disproportionately impact minorities, the Government's main points in their Response to the instant Motion show the controlled manner in which the stings are carried out and dispel the notion that ATF acted with a discriminatory purpose in this case.

---

[40]   Other courts have reached the same conclusion when presented with similar allegations.  See, e.g., Brown, 299 F. Supp. 3d at 1015-16 (finding that race-based comments made by an ATF agent acting as the "disgruntled drug courier" to defendants in every sting operation he worked on "[fell] short of establishing that the decisionmakers in Brown acted with a racially discriminatory purpose.");  Lamar, 2015 WL 4720282, at *16 (finding that the "race-related comments" made by an informant in a different case were "not probative of whether the . . . decision-makers involved in this case acted with discriminatory purpose . . . .").

[41]   Likewise, the proffered statistics showing the racial makeup of ATF informants who targeted individuals says nothing about whether the key decisionmakers in Defendant's case acted with a discriminatory purpose.  See McCleskey v. Kemp, 481 U.S. 279, 292 (1987).

For example, the Government notes that Defendant was not the target of ATF agents or informants in this case; rather, he was brought into the conspiracy by Berry, months after Berry approached a confidential informant—who is African-American—about robbery prospects that resulted in ATF agents opening an investigation into him.  (See Doc. Nos. 280 at 2-3; 384 at 5.) Therefore, the proffered statistical evidence of ATF informants and their targets does not help Defendant prove discriminatory intent because here it was Berry, not Defendant, who was the target that precipitated the resulting investigation and stash house sting operation.[42]

The Government also explains that, in the 40 total identified stash house stings, the ATF "not only did not instruct *anyone* to target minorities, but as a rule did not seek out any subjects at all; instead, investigations began when informants or others learned of suspects' already-articulated interest in robberies."  (Doc. No. 384 at 8) (emphasis in original).  In none of the 40 stash house stings "did an informant simply roam around a community and approach possible targets on a whim.  Every investigation was premised on information provided by or learned about the suspect before any stash house scenario was approved and pitched."[43]  (Id.)  Notably, "ATF protocols mandate that only targets who show a propensity to do harm to the public through violent

---

[42]  See United States v. Sanchez, No. 13-23-GMS, 2014 WL 6953248, at *2 (D. Del. Dec. 8, 2014) (holding that defendant "failed to make the requisite showing of discriminatory purpose" because "ATF did not 'select' Sanchez at all; rather he was originally recruited for the stash house scheme by a co-conspirator."); Lamar, 2015 WL 4720282, at *9 ("Because co-conspirators—and not DEA agents or informants—approached these 76 defendants, it is clear that they were not targeted on the basis of any alleged discriminatory policy or practice of the DEA."); Colon, 71 F. Supp. 3d at 277, 282-83 (holding that ATF stash house defendants did not allege an equal protection claim because "there is no evidence that the government did anything to select any of the seven defendants except for the two [initial targets], who themselves chose their own co-conspirators").

[43]  The Government provides examples of what often prompts ATF stash house sting investigations, see supra note 32, and even summarizes how each of the six identified white informants, in line with ATF protocols, conducted investigations of their targets.  See supra note 21.

behavior, as documented through, among other things, their criminal histories, admissions to others, or reputation in the community, may be selected for further investigation through a home invasion sting[,]" and "no investigation was pursued until additional investigation was conducted[.]"  (Id. at 9.)

Lastly, the Government provides a race neutral explanation for why suspects—including the four white individuals—were not arrested or prosecuted.  The "most common reason" stash house stings ended, regardless of race, "was that the suspect did not show up for a first or subsequent meeting[.]"  (Id. at 10.)  Insofar as the four white uncharged suspects are concerned, the Government explains in detail how each investigation came to an end without these suspects being charged.  (See id. at 10-11.)[44]  They either "did not show up at the appointed time for commission of the robbery[,]" did not "appear[] after a second meeting to continue the plot[,]" or were "arrested on multiple occasions" at the state level "entirely independently of the ATF investigation."  (Doc. No. 358 at 16) (see also Doc. No. 384 at 10-11.)

In sum, Defendant has not proffered "clear evidence" of discriminatory intent because he has not proffered evidence showing the key decisionmakers in his case acted with a discriminatory purpose nor statistical evidence showing a "stark" pattern of discriminatory enforcement. Furthermore, looking at the totality of the proffered evidence, it does not show "clear evidence" of discriminatory intent/purpose by ATF agents in this case.  Accordingly, Defendant has not proffered "clear evidence" of discriminatory effect nor intent to support a claim of selective enforcement.

---

[44]   See also supra note 33.

**IV.     CONCLUSION**

Defendant Askia Washington has failed to demonstrate, on the facts of this case, that ATF agents in his case engaged in selective enforcement in violation of his equal protection rights.  For all the foregoing reasons, Defendant's Motion to Vacate Judgment and Dismiss [his] Superseding Indictment (Doc. No. 380) will be denied.  An appropriate Order follows.