# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NO. 13-171-02** |
| **ASKIA WASHINGTON** | **:** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255

Defendant Askia Washington seeks relief under 28 U.S.C. § 2255. All of his claims are without merit, and his motion should be denied without a hearing.

## I.     Background.

This matter has been the subject of extensive litigation in this Court. In brief, Washington was prosecuted in a "stash house sting," in which he and others conspired to steal 10 kilograms of cocaine from a stash house. The cocaine did not exist, as the sting was devised by the Philadelphia office of ATF. The matter began when Washington's co-defendant, Dwight Berry, approached an ATF confidential informant (CI) in late 2012 and told the CI he was interested in robbing drug dealers and users. The CI then introduced Berry to an undercover agent, who purported to be familiar with a stash house where 10 kilograms of cocaine could be found. Berry then gathered a robbery crew, which included Washington and two others. After many meetings and phone calls, the men gathered on the day of the purported robbery – March 15, 2013 – with two guns and

other robbery accoutrements, when they were arrested by ATF. *United States v. Washington*, 869 F.3d 193, 198-99 (3d Cir. 2017).

Washington was convicted at trial of conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count One); attempted Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Count Two); conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count Three); and attempted possession of five kilograms or more of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count Four). The jury acquitted Washington of a firearm charge under 18 U.S.C. § 924(c), and the government then dismissed a firearm charge under 18 U.S.C. § 922(g).

Washington, who was 33 years old at the time of the offenses, had never held verifiable employment, and had a long criminal record. In 1999, at age 19, he was convicted of possession of a controlled substance. In 2001, at age 21, he committed an assault, after he fired three shots at a woman as she and her children ran into their home. In 2003, at age 23, he committed aggravated assault and other offenses. On that occasion, after hearing gunshots, officers saw Washington, in a vehicle, putting a firearm in the glove box; Washington tried to escape, driving his car at a police officer at a high rate of speed; he was apprehended after the front tire of his vehicle blew out. In 2004, he possessed narcotics with intent to distribute, as well as a firearm. As a result of the 2003 and 2004 offenses, and his violation of parole on the 2001 assault, he served cumulative sentences in prison totaling close to five years, and was not paroled until August 2010.

PSR ¶¶ 38-41. Less than three years later, while still on parole, he committed the instant offenses.

In this case, on June 13, 2016, the Court imposed a sentence of imprisonment of 264 months, and other penalties.

Before trial, Washington had moved for a hearing and discovery on the issue of racial profiling and selective prosecution, alleging that he had been targeted for prosecution by the government based on his race (despite the fact that it was his co-defendant, Berry, who recruited him to join the robbery conspiracy). He argued that the stash house sting and similar investigations improperly targeted minorities. This Court denied the motion, finding that Washington had failed to make the requisite threshold showing for such discovery, under *United States v. Armstrong*, 517 U.S. 456 (1996), and *United States v. Bass*, 536 U.S. 862 (2002) (per curiam),

On appeal, the Third Circuit affirmed the conviction and sentence. It denied a claim that Washington's trial counsel was ineffective in opening the door on cross-examination to revelation of a previous drug conviction of the defendant, and also denied a due process challenge to imposition of a mandatory minimum sentence. The Court of Appeals concluded, however, that remand was warranted for further consideration of discovery respecting the claim of discrimination. A lengthy process of discovery ensued, after which, on January 13, 2021, this Court denied further relief, and denied the defendant's motion to dismiss the indictment. It concluded: "Although Defendant's proffered evidence confirms that ATF stash house stings disproportionately impact minorities, under the legal standard governing selective enforcement claims, Defendant's

Motion will be denied because his proffered evidence falls short of proving selective enforcement by ATF agents." ECF 391 at p. 4. Washington did not appeal from that ruling.

On February 8, 2021 (ECF 394), Washington filed a 2255 motion raising seven claims.[1] We respond to each here.

## II.    Discussion.

### A.    Impossibility Is Not a Defense.

Washington first asserts that the fact that impossibility is not a defense to attempted Hobbs Act robbery presents a due process violation.[2]

There is no authority supporting this assertion. It is well settled that "[t]he Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy . . . ." *United States v. Jannotti*, 673 F.2d 578, 592 (3d Cir. 1982) (en banc). Accordingly, the Third Circuit has often upheld a conviction for an attempted Hobbs Act violation in the context of a sting, where successful completion of the crime is a factual impossibility. *Jannotti*, involving the famed Abscam investigation targeting local and federal officials, was such a case, as was *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011), among

---

[1]  Washington labels as his eighth claim a statement that reads in its entirety, "Actual innocence claim!" The government does not address this claim here, as "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court." *United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000).

[2]  Washington asserts that this "[i]ssue was not raised on direct appeal because it's a constitutional claim." Of course, any constitutional claim may be raised on direct appeal. There is therefore no basis for Washington's default of this issue, but that is not significant, as the assertion is meritless in any event.

others. In the present case, the Third Circuit reaffirmed, "Under federal law on conspiracy and attempt, the government could, and did, prosecute the crew as if fantasy had been reality." *United States v. Washington*, 869 F.3d 193, 196 (3d Cir. 2017).

The Supreme Court has stated: "As with other inchoate crimes—attempt and conspiracy, for example—impossibility of completing the crime because the facts were not as the defendant believed is not a defense. 'All courts are in agreement that what is usually referred to as "factual impossibility" is no defense to a charge of attempt.' 2 W. LaFave, Substantive Criminal Law § 11.5(a)(2) (2d ed.2003)." *United States v. Williams*, 553 U.S. 285, 300 (2008).

The absence of an impossibility defense presents no due process issue. *See, e.g.*, *State v. Sommers*, 569 P.2d 1110, 1111 (Utah 1977) ("The defense of impossibility is not a fundamental right essential to an Anglo-American regime of ordered liberty."). The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "An attempt conviction 'requires evidence that the defendants (1) acted with the requisite intent to violate the statute, and (2) performed an act that, under the circumstances as they believe them to be, constituted a substantial step in the commission of the crime.'" *United States v. Manzo*, 636 F.3d 56, 66 (3d Cir. 2011) (quoting *United States v. Tykarsky*, 446 F.3d 458, 469 (3d Cir. 2006)) (internal marks omitted). The government proved those elements beyond a reasonable doubt; due process requires no more. The unavailability of an impossibility defense infringes no constitutional right, and Washington's first claim is without merit.

**B.      Ineffectiveness of Trial Counsel Was Previously Litigated.**

Washington next asserts that his trial counsel, Roland Jarvis, was intoxicated at trial, and that his appellate counsel, Mark Greenberg, was unable to present this issue on direct appeal as a claim of ineffective assistance of counsel. This is inaccurate; the issue has been fully litigated.

Greenberg in fact raised this issue before this Court prior to sentencing, in a motion for new trial. This Court held an evidentiary hearing and fully considered the claim. Ultimately, this Court denied the claim.

This Court correctly concluded that alcohol consumption by itself does not amount to constitutional ineffectiveness, and the defendant must instead establish particular shortcomings at trial that meet the two-part *Strickland* test. Washington advanced two: that trial counsel elicited on cross-examination of a government witness that Washington had a prior drug conviction; and that counsel elicited that the government informant ("Roc") had been deactivated because he had been threatened, something that Washington suggested made the informant more sympathetic in the eyes of the jury. With respect to both of these matters, this Court held that counsel's actions did not cause prejudice. The Court further held that there was a sound trial strategy for eliciting the evidence regarding the informant. Notably, the Court added in conclusion:

> Finally, and most importantly, there is no evidence in this record that defense counsel's questions regarding Defendant's prior drug conviction and Roc's relocation due to threats and safety concerns were caused by, or associated with, alcohol consumption. With the one exception relating to the drug conviction, defense counsel's advocacy in this case was within the bounds of professional responsibility. Defense counsel was a zealous advocate on behalf of Defendant, even to the point where the jury acquitted Defendant on a serious gun charge that

> carried a mandatory minimum sentence that would have run consecutive to sentences imposed on other Counts. No conclusion can be drawn that what appears to be moderate consumption of alcohol in any way contributed to the conviction of Defendant.

Opinion denying new trial (ECF 268, Apr. 12, 2016), at 28.

Attorney Greenberg then raised the issue on appeal, limiting the challenge to the incident where trial counsel opened the door to testimony about Washington's prior drug conviction. The Third Circuit agreed "that Washington's is the uncommon case where resolving an ineffectiveness claim on direct appeal is both feasible and efficient," given that it had been fully litigated before the trial court. 869 F.3d at 203. The Court of Appeals then further agreed with this Court "that the general allegations of alcohol use do not require a departure from *Strickland*'s two-prong standard . . . ." *Id.* at 204. Finally, the Court agreed with the conclusion "that Washington has not met his burden, under *Strickland*, of showing that the mistake [in revealing the prior conviction] undermined confidence in the jury's verdict. Accordingly, the ineffective assistance claim fails." *Id.* at 208.

Thus, the issue has been fully adjudicated and cannot be raised again at this time. *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (explaining that a claim raised on direct appeal cannot be relitigated in habeas).

### C. The Court Granted a Variance Based on the Type of Washington's Prior Aggravated Assault Conviction.

Washington asserts that his counsel was ineffective at sentencing for failing to challenge the career offender designation on the grounds that his previous conviction for aggravated assault should not qualify as a career offender predicate. Washington

overlooks that counsel in fact made this argument and gained sentencing leniency as a result.

Washington was deemed a career offender on the basis of two prior convictions, one for drug trafficking, and the other for aggravated assault. That status produced an advisory guideline range of 360 months to life. At this time, he does not challenge application of the drug offense as a predicate, but asserts that counsel was ineffective in not challenging reliance on the aggravated assault conviction.

Paragraph 40 of the presentence report relates that on March 23, 2003, officers were informed that shots had been fired from a vehicle, and when they approached, they saw Washington, the driver, putting a firearm in the glovebox. "The defendant was ordered not to move, but instead drove the vehicle at a police officer at a high rate of speed. Washington fled from police but was soon apprehended after blowing out the front tire of his vehicle." He was convicted of aggravated assault and other offenses.

Washington's attorney at sentencing, Mark Greenberg, in fact zeroed in on this issue in a third supplemental sentencing memorandum (ECF 285). He explained that Washington was charged in the case with both first-degree and second-degree aggravated assault, and the certified record, attached to the memorandum, showed that the conviction was entered for second-degree aggravated assault. Greenberg stated that this presented an anomaly, in that first-degree aggravated assault under Pennsylvania law would not qualify as a crime of violence under the career offender guideline, but second-degree aggravated assault does qualify. He wrote:

Felony of the second degree aggravated assault involves a defendant who "attempts to cause or intentionally or knowingly causes bodily injury to [a police officer] in the performance of duty[.]" 18 Pa. C.S.A. § 2702(a)(3). Because felony of the second degree aggravated assault requires intent, rather than recklessness, it appears to qualify as a crime of violence. The upshot of Mr. Washington having been convicted of second degree aggravated assault, a less severe offense than first degree aggravated assault, is that he qualifies as a career offender, a perverse development to say the least.

Counsel asked the Court to take this into account when imposing sentence. He made the same argument at the sentencing hearing. Sent. tr. (ECF 293) at 42-43. This Court obliged.

The Court varied below the guideline range of 360 months to life, and imposed a term of 264 months. It stated, in part:

And I note another reason for a variance and that is what Mr. Greenberg has brought to my attention with respect to what the Guidelines would be had Mr. Washington been convicted of first degree aggravated assault the Guidelines would be lower than they are now. Not significantly lower, but lower than they are now, but he was convicted of second degree felony aggravated assault. And I note that there has been no substantive challenge for what Mr. Greenberg has brought to my attention, but we do try to treat people fairly under the law and this is apparently a dichotomy that exists in the law.

*Id.* at 67-68.

This conclusion, arguably, was unduly beneficial to Washington, as it has nothing to do with his actual prior conduct (when he fired a gun from a car and tried to run over a police officer), but only with application of the bizarre categorical approach, that assesses a defendant's liability not based on what he himself did but on whether *someone else* could violate the same statute he did but do it in a less violent manner.

Defense counsel was indeed correct that second-degree felony aggravated assault in Pennsylvania is a "crime of violence" under the "elements clause" of U.S.S.G.

§ 4B1.2(a)(1), which refers to a felony that "has as an element the use, attempted use, or threatened use of physical force against the person of another."

Whether an offense qualifies under the elements clause is determined through a categorical approach. Here, that means the Court must examine the statute addressing the predicate offense to determine whether it requires, as an element, the use, attempted use, or threatened use of physical force, and does not allow conviction in the absence of such an element. If the statute allows for conviction on a broader basis and is not divisible, then it does not qualify, regardless of the actual facts of the defendant's conduct. The mandate is "to ascertain the least culpable conduct hypothetically necessary to sustain a conviction under the statute." *Hernandez-Cruz v. Att'y Gen.*, 764 F.3d 281, 285 (3d Cir. 2014).

In this matter, the charging document charged first-degree aggravated assault in violation of 18 Pa. Cons. Stat. § 2702(a)(1) ("attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life"), and second-degree aggravated assault in violation of Section 2702(a)(3) ("attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty"). The certified record shows that the conviction was entered for the second-degree offense.

The second-degree offense requires proof of the knowing infliction of bodily injury. That is categorically a "crime of violence." *United States v. Pitts*, 655 F. App'x 78 (3d Cir. 2016) (not precedential) (holding on plain error review that § 2702(a)(3) is a

crime of violence). *See United States v. Ramos*, 892 F.3d 599 (3d Cir. 2018) (holding that second-degree aggravated assault in violation of § 2702(a)(4) – knowing infliction of bodily injury with a deadly weapon – is a crime of violence); *see also Stokeling v. United States*, 139 S. Ct. 544, 553 (2019) (the "physical force" requirement of the elements clause is satisfied by force that is "capable of causing physical pain or injury"); *United States v. Chapman*, 866 F.3d 129, 135 (3d Cir. 2017) (mailing a "threat to injure," 18 U.S.C. § 876(c), is categorically a crime of violence under § 4B1.2 because "threatening to injure the person of the addressee or of another necessarily threatens the use of physical force").

Defense counsel was further correct that, under current law, the first-degree aggravated assault provision would not qualify. *In United States v. Mayo,* 901 F.3d 218 (3d Cir. 2018), the Court held that, under the categorical approach, first-degree aggravated assault in violation of Section 2702(a)(1) does not state a violent felony under the identical elements clause that appears in the Armed Career Criminal Act, 18 U.S.C. § 924(e). The Court reasoned that, under state law, the crime may be committed without the "use of physical force," as required by the elements clause, because it may be offended through an "act of omission." In support, the appellate panel relied on a single state court precedential decision, *Commonwealth v. Thomas*, 867 A.2d 594 (Pa. Super. Ct. 2005), in which a defendant was convicted of first-degree aggravated assault for starving her four-year-old son to death.

The government strongly disagrees with the *Mayo* decision, particularly because it did not assess the facts presented in the Thomas case. *Thomas* in fact did not involve a

mere "omission to act," but the prolonged confinement, torture, and starvation of a little

boy, which unquestionably involved the use of physical force as the U.S. Supreme Court

has defined that term. *Mayo* does not identify any case ever in Pennsylvania in which a

defendant was convicted of first-degree aggravated assault on the basis of a mere

"omission," as opposed to the intentional or reckless infliction of (or attempt to cause)

serious bodily injury. The government is pressing this vital issue in other cases, including

*United States v. Marc Harris,* No. 17-1961, which is pending before the en banc Court of

Appeals. But for now, under Third Circuit precedent, first-degree aggravated assault does

not qualify under the elements clause.

That should not adhere to Washington's benefit. The facts here are the facts –

Washington committed an unquestionably violent offense, and is exactly the type of

offender Congress targeted in dictating the career offender provision. *See* 28 U.S.C.

§ 994(h).

The only reason he would not qualify, if convicted of first-degree instead of

second-degree assault, is because of the strange categorical approach, which focuses on

statutory drafting and not on facts. It is difficult to express how truly absurd this area of

the law has become, though many judges have certainly tried.[3]

_____

[3] *See, e.g., United States v. Williams*, 898 F.3d 323, 337 (3d Cir. 2018) (Roth, J., concurring, expressing the "concern that the categorical approach, along with its offspring, the modified categorical approach, is pushing us into a catechism of inquiry that renders these approaches ludicrous."); *United States v. Chapman*, 866 F.3d 129, 136-37 (3d Cir. 2017) (Jordan, J., concurring); *United States v. Escalante*, 933 F.3d 395, 406 (5th Cir. 2019) ("In the nearly three decades since its inception, the categorical approach has developed a reputation for crushing common sense in any area of the law in which its tentacles find an inroad."); *United States v. Burris*, 912 F.3d 386 (6th Cir. 2019) (en

In any event, Washington did benefit. His counsel made the argument that Washington repeats now, and this Court stated that it rested the significant variance in part on the distinction counsel drew. The issue should not be considered further at this time.

### D.  Counsel Argued Sentencing Manipulation.

Washington argues that his counsel was ineffective at sentencing for failing to argue for a lower sentence on the grounds of sentence manipulation, based on the fact

<hr />

banc) (Thapar, J., joined by four judges) ("The time has come to dispose of the long-baffling categorical approach."); *United States v. Scott*, 990 F.3d 94, 126 (2d Cir. 2021) (en banc) (Park, J., concurring on behalf of five judges, quoting numerous other judges, and stating: "As a growing number of judges across the country have explained, the categorical approach perverts the will of Congress, leads to inconsistent results, wastes judicial resources, and undermines confidence in the administration of justice."); *United States v. Doctor*, 842 F.3d 306, 313-15 (4th Cir. 2016) (Wilkinson, J., concurring) (it "can serve as a protracted ruse for paradoxically finding even the worst and most violent offenses not to constitute crimes of violence," that, "too aggressively applied, eviscerates Congress's attempt to enhance penalties for violent recidivist behavior," creating "a criminal sentencing regime so frankly and explicitly at odds with reality."); *Lopez-Aguilar v. Barr*, 948 F.3d 1143, 1149 (9th Cir. 2020) (Graber, J., concurring) ("I write separately to add my voice to the substantial chorus of federal judges pleading for the Supreme Court or Congress to rescue us from the morass of the categorical approach. . . . The categorical approach requires us to perform absurd legal gymnastics, and it produces absurd results. . . . It is past time for someone with the power to fix this mess to do so."); *United States v. McCollum*, 885 F.3d 300, 314 (4th Cir. 2018) (dissenting from a ruling that conspiracy to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5), is not a crime of violence under § 4B1.2, Judge Traxler stated: "The majority has ignored plain Guidelines text, its own prior precedent, and elementary common sense. It has embraced the principle that law must of necessity be counterintuitive, that the straightforward must yield to the convoluted, and that the obscure must supersede the obvious, as though clouds had been summoned to hide the sun. And this, finally, is what we have come to: plotting to murder one's fellow human beings is not a crime of violence. Heaven help us."); *United States v. Begay*, 934 F.3d 1033, 1042 (9th Cir. 2019) (Judge N.R. Smith, dissenting from a ruling that second-degree murder in violation of 18 U.S.C. § 1111 is not a 924(c) crime of violence, quotes the film *Zoolander*: "I feel like I am taking crazy pills.").

that the government made up the drug quantity that drove the sentencing calculation as part of the stash house sting scenario. But once again, Washington is presenting an issue that in fact his counsel presented earlier.

At sentencing, defense counsel argued that the government engaged in sentence manipulation, asserting that as a result the Court should not only impose a lower sentence but should discard entirely the statutory mandatory minimum sentence of 20 years. That mandatory applied under 21 U.S.C. § 841(b)(1)(A) based on the fact that the jury found that the conspiracy involved five kilograms or more of cocaine (the scenario actually set forth that ten kilograms were held in the fictitious stash house), and Washington had a prior conviction for a felony drug offense. Counsel made the argument at the sentencing hearing, Sent. tr. 11-14. The Court denied the effort to eliminate the mandatory minimum, stating that it must follow the applicable law, but stated that it would consider the claimed sentence manipulation when determining the final sentence (which as stated earlier, became a significant downward variance from the guideline range). *Id.* at 16-17.

Washington's counsel raised the issue again on appeal. The Third Circuit stated that the claim of "sentencing factor manipulation" was a "due process challenge [that] falls within the broader category of 'outrageous government conduct'—that is, an allegation that the government's conduct was so outrageous that due process and fundamental fairness cannot abide the defendant's conviction." *United States v. Washington*, 869 F.3d 193, 209 (3d Cir. 2017).

The Court noted that it has not adopted this concept of "sentencing factor manipulation," though other courts have. It highlighted the Eleventh Circuit's articulation:

> [S]entencing factor manipulation occurs when the government's manipulation of a sting operation, even if insufficient to support a due process claim, requires that the manipulation be filtered out of the sentencing calculus. Outrageous government conduct would necessitate the reversal of a defendant's conviction, while sentencing factor manipulation would simply reduce the sentence applied to his conduct. . . . When a court filters the manipulation out of the sentencing calculus before applying a sentencing provision, no mandatory minimum would arise in the first place.

*United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007). In Washington's appeal, the Third Circuit stated:

> Our previous precedential opinions have declined to take a definitive stance on the viability of this doctrine in our Circuit. But even assuming without deciding that the generous *Ciszkowski* framing of sentencing factor manipulation should apply—requiring a lesser showing than an "outrageous conduct" claim, and allowing for a District Court to depart below the mandatory minimum range—we find that Washington has failed to demonstrate, on the facts of this case, that the mandatory minimum should be excised from the indictment.

*Washington*, 869 F.3d at 210. The Court continued:

> [E]ven assuming some impropriety here on the part of the government, most of the factors it created for the crime, and which were within its unique control, were not the drivers of Washington's actual sentence. Agent Edwards told the conspirators that they would encounter resistance, so they brought guns—and, had Washington been convicted of the gun charge, he would have faced an additional mandatory consecutive term. But he was not. Further, Agent Edwards told the conspirators that they could expect to recover 10 kilograms of cocaine in the robbery, corresponding to 2014 Guidelines base offense level of 30. However, because he was a career offender, Washington's Guidelines range was not governed directly by the 10 kilogram drug-quantity amount—and the District Court sentenced him far below the recommended Guidelines range anyway.
>
> Instead, the 20-year mandatory minimum was the product of two factors: the 5 kilograms of cocaine charged in the indictment and found by a jury, and the

§ 851 statement filed by the government. The latter, as the Supreme Court has indicated, is a matter of discretion "similar to the discretion a prosecutor exercises when he decides what, if any, charges to bring against a criminal suspect . . . and is appropriate, so long as it is not based upon improper factors." Washington does not argue that the process envisioned by § 851 was not properly followed or was based on impermissible considerations.

So it comes down, in the end, to the drug quantity. We acknowledge Washington's concerns, which are well stated and logical, that the drugs did not exist, and that his ironclad mandatory minimum has no real-world foundation. Other courts of appeals, however, have roundly rejected claims that amounts greater than 5 kilograms, or even 10 kilograms, amount to sentencing factor manipulation. Further, Agent Edwards testified at trial that the amount chosen for the sting was a "conservative" number based upon the drug weights found in "a typical [Philadelphia] stash house." He explained that the proposed scenario "always has to be realistic" or it might be questioned by the robbery crews. Washington has not offered anything to the contrary. Put simply, there is not enough here for us to conclude that the government chose the 10 kilogram amount primarily, or even secondarily, "to inflate [Washington's] sentence upon a conviction."

*Id.* at 210-12 (footnotes omitted).

The claim of sentence manipulation was thus thoroughly considered on direct appeal, and Washington cannot show ineffective assistance of counsel now with respect to that issue.

**E.      There Is No Viable Claim of Outrageous Government Conduct.**

Washington asserts that his counsel was ineffective for failing to seek dismissal of the indictment on the grounds of "outrageous government conduct."

However, as noted in the previous section, counsel in fact asserted sentencing factor manipulation both at sentencing and on appeal. The Third Circuit explained that "sentencing factor manipulation" is a "due process challenge [that] falls within the broader category of 'outrageous government conduct.'" 869 F.3d at 209. It further stated

that even though defense counsel had challenged the sentence in the district court only on the grounds of Congressional intent, not due process, the Court of Appeals would, with the government's agreement, assess the due process claim on de novo review. *Id*. at 208. And as explained in part D above, the Court of Appeals then rejected the due process challenge to the sentence.

It is thus apparent that the broader due process challenge to the indictment itself would surely fail. Indeed, that type of challenge essentially never succeeds, and for good reason. As discussed by this Court in *United States v. Nolan-Cooper*, 155 F.3d 221 (3d Cir. 1998), the outrageous government conduct doctrine rests on the theory that some methods of investigation are so egregious they warrant dismissal of a case. However, as *Nolan-Cooper* recounted, the Supreme Court has seemingly disavowed the earlier dicta on which the doctrine rests, many circuits have refused to recognize the doctrine, and the theory has been only applied once by the Third Circuit to dismiss a criminal case. *Id*. at 229-31. Accordingly, *Nolan-Cooper* stated, "it appears that the viability of the doctrine is hanging by a thread." Id. at 230. The Court reported: "The First Circuit similarly has declared the outrageous government misconduct doctrine 'moribund' in light of the fact that, in practice, 'courts have rejected its application with almost monotonous regularity.' *United States v. Santana*, 6 F.3d 1, 4 (1st Cir.1993) ('The banner of outrageous misconduct is often raised but seldom saluted.')." *Nolan-Cooper*, 155 F.3d at 230.

The Third Circuit more recently recounted:

This Court has granted relief on a claim of outrageous government misconduct only once. In *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), this Court held that the Government violated the Due Process Clause when an agent was

> "completely in charge and furnished all of the [relevant] expertise" to create a methamphetamine laboratory. *Id.* at 380–81. In short, the Government "created the crime for the sole purpose of obtaining a conviction." *United States v. Dennis*, 826 F.3d 683, 695 (3d Cir. 2016) (citation omitted). Since *Twigg* was decided, this Court has repeatedly distinguished, and even questioned, its holding. *See, e.g., United States v. Beverly*, 723 F.2d 11, 12 (3d Cir. 1983).

*United States v. Fattah*, 858 F.3d 801, 813 (3d Cir. 2017).

Thus, in *United States v. Dennis*, 826 F.3d 683, 694-95 (3d Cir. 2016), the Court specifically rejected an outrageous conduct challenge to the charges in an identical stash house sting case, where defendants were prosecuted after responding to a government proposal of robbery of a nonexistent stash house. *See also United States v. Brooks*, 734 F. App'x 120, 123 (3d Cir. 2018) (not precedential) (rejecting outrageous government conduct challenge in stash house sting case, like this one, in which it was one of the targets, not the government, who invited the defendant into the scheme).

For all of these reasons, counsel – who unsuccessfully challenged the sentence on due process grounds on appeal – was not ineffective in not broadening the challenge in what would have been a fruitless attempt to seek dismissal of the case.

### F.    Counsel Was Not Ineffective In Failing to Present an Entrapment Defense.

Washington argues that trial counsel was ineffective in not presenting an entrapment defense. However, based on the evidence in this case, Washington would not even have been entitled to a jury instruction on entrapment. And further, counsel acted within the wide range of professional judgment in pursuing a different defense anyway.

The Third Circuit recently recounted:

"Entrapment occurs when a defendant who was not predisposed to commit the crime does so as a result of the government's inducement." We have loosely defined predisposition "as the defendant's inclination to engage in the crime for which he was charged, measured before his initial exposure to government agents." The affirmative defense of entrapment has two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal conduct. If a defendant makes a prima facie showing of both elements, the burden shifts to the government to disprove the entire defense by disproving one of the elements of the defense beyond a reasonable doubt. The government may prove predisposition by showing "(1) an existing course of criminal conduct similar to the crime for which the defendant is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement."

*United States v. Davis*, 985 F.3d 298, 307 (3d Cir. 2021) (citations and footnotes omitted). In this case, there is no prima facie showing of either inducement or predisposition. With regard to inducement:

The defendant must first produce enough evidence to show inducement by the government. A "mere solicitation" or request by the government to participate in a criminal activity, without more, is not inducement. [*United States v. Wright*, 921 F.2d 42, 45 (3d Cir. 1990).] Likewise, merely opening an opportunity for a crime is insufficient. *Mathews v. United States*, 485 U.S. 58, 66 (1988). Rather, the defendant must show that law enforcement engaged in conduct that takes the form of "'persuasion, fraudulent representation, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy or friendship.'" *Wright*, 921 F.2d at 45 . . . .

*United States v. Dennis*, 826 F.3d 683, 690 (3d Cir. 2016).

In this case, there was no government inducement of Washington at all, beyond proposing the crime, in that the government never solicited Washington's involvement at all. To the contrary, Washington was recruited by Berry, who was ATF's target. In contrast, in *Dennis*, another stash house sting case, this Court found sufficient evidence of inducement in the fact that a government informant directly solicited defendant Dennis,

and after the defendant several times declined to commit crimes, played on his sympathies by exploiting a personal relationship that the informant had with Dennis and stating that the informant needed to commit the robbery to help his sick mother, whom Dennis had met on numerous occasions. *Id.* at 691-92. In this case, in contrast, there was no government inducement presented to Washington at all.

Washington likewise could not establish a prima facie case of lack of predisposition. To the contrary, the evidence of predisposition in the record is overwhelming, as every judge to address this case has confirmed. When denying the motion for new trial, this Court stated: "Defendant faced a mountain of evidence against him. Numerous recordings were played to the jury in which Defendant enthusiastically participated in planning the robbery." ECF 268 at p. 20. The Third Circuit majority declared: "At the outset, we agree with the District Court that the evidence admitted at trial against Washington was daunting and, generally, damning. His recorded statements alone, bluster or not, showed a willing and inquisitive member of the conspiracy. On the day of the robbery itself, Washington appeared committed to its success." *United States v. Washington*, 869 F.3d 193, 206 (3d Cir. 2017). Judge McKee, while objecting to application of the mandatory minimum sentence, agreed: "I realize, of course, that even though Washington was just a secondary target, his statements during the planning meetings and subsequent phone conversations show that he was neither a shrinking violet nor reluctant recruit. Rather, Washington was clearly interested in participating and even offered a number of disturbingly violent ideas that he thought would facilitate the planned robbery." *Id.* at 224 (McKee, J., dissenting in part).

For instance, in the opinion denying a motion for new trial, this Court recalled the events of the very first meeting in which Berry introduced Washington to the undercover agent:

> The Government accurately describes the meeting as follows based on the evidence introduced at trial:
>
>> Berry, Washington and the unknown man arrived at the meeting together. Berry introduced the two men, without giving their names, as the individuals who would commit the robbery with Berry, that is, as the robbery team he had boasted about in an earlier meeting. Washington and the unknown man emphatically expressed their desire to take part in the robbery. As the UC provided details about the stash house, Washington was heard repeatedly in the recording stating, "Mm-Hmm," taking it all in and affirming each detail of the discussion. When the UC finished describing the layout and the scenario, Washington asked, "Being that jaun is so safe like that, what about the outside? Like you know, nobody going to be watching the jawn from the outside or nothing?" Interestingly, this was the same question that Berry had asked during a previous meeting. When the UC told Washington that he never saw anyone outside the home, Washington replied, "That's good. Alright, well we got it." He continued to ask for details of the robbery plan. Washington asked, "Alright, so on the tip, you walking in there . . . we walking in behind you;" ". . . When you go in there, you lock the door behind yourself;" "So you want me to be in there with you . . . when you go in there, you want us to come in there;" and "How many guns you think is in that joint?" . . .
>>
>> During this conversation the robbery team discussed the details of the robbery including their willingness to harm the men guarding the stash house if necessary. Washington stated, "I ain't gonna hit you (referring to the UC), but say if I come there . . . I hit him from the rip. I ain't gonna kill him, but I hit him just to make him to know that I ain't fucking playing no games." Later, Washington also stated "I'm walking in with my gun out;" and "Yeah cause I'm gonna hit him cause I know he got a gun. So I got no choice. But I'm not gonna just play. I don't play with them when it comes to this shit." . . . [Washington also stated,] "Everybody should be love at the end of the day. The way you explained it . . . I shouldn't even have to hit this n----r. Cause I'm so sharp on the draw." "Once you open the door, I got you." ". . . We are just gonna be shooting the fuck out of this joint, but you got to be out of the way." "You know what I'm saying? We trying to make it as safe as possible for you." "I'm walking in with my gun out." "So I got

him and he ain't going to risk getting his head blew off and start shooting on everybody."

During the meeting, the UC explained to Berry, Washington, and the unknown man that they will have to be divide [sic] the kilograms of cocaine for distribution after the intended home invasion robbery. The UC explained that he "can't take the cocaine to NY." Washington agreed stating, "Yeah you can't take the shit back." Washington offered to help sell the UC's portion of the stolen cocaine, stating, "So what, you want it sold or what . . .?" "I can't get it moved yo, but I don't like fucking with n-----rs." "See I don't fuck with coke." . . . "They got to be somebody I really trust. Like all right buy this jawn I just came up on." "Buy this jawn real quick so. . . you can most likely, you can get your shit out before you leave. You know what I'm saying?" As the conversation ended, Berry told the UC that "it's gonna get done," referring to the home invasion robbery. Berry added, "However it go down, that shit's gotta go down." Washington agreed and added . . . "I know we can do it. That shit sounds super sweet."

(Doc. No. 264 at 4-6.)

ECF 268 at pp. 3-4. Not surprisingly, even at sentencing, this Court said to Washington, "And at the time you committed – or were involved in the instant offense you were still on State parole so that it's difficult to believe that even if I had the authority to release you tomorrow that the first thing you would probably try to do was possess a firearm and/or somehow think that by selling drugs you can put money in your pocket. Actions speak louder than words." Sent. tr. 63.

In *Davis*, the Third Circuit recently held that an entrapment defense failed upon proof that when the defendant was told he was corresponding with a fourteen-year-old who posted a personals ad for sex, his "ready response" acknowledged her age and asked if she wanted to meet that day. "Based on this evidence," the Court stated, "a reasonable jury could conclude beyond a reasonable doubt that Davis was predisposed to entice a minor." 985 F.3d at 307. An identical conclusion is apparent here with regard to

Washington's predisposition to engage in a robbery of drugs, based on his immediate and enthusiastic embrace of the plan presented to him by co-defendant Berry.[4]

In light of the evidence, it is apparent that an entrapment defense was untenable. Washington would have needed to show a prima facie case of both inducement and lack of predisposition, and he could not show either. Thus, trial counsel was not ineffective in failing to present an unviable defense.

Further, the decision as to what defense to present falls within counsel's considerable professional discretion. Here, as the Court of Appeals recognized, trial counsel pursued a sensible defense, that "Washington did not have the requisite intent to commit a dubious, discriminatory 'conspiracy' that ATF had designed from the ground up. For instance, counsel pointed to Washington's use of a separate vehicle and the presence of his girlfriend on the day of the robbery to suggest that he was cautious and

---

[4]  In the stash house sting prosecution in *Dennis*, the Court held that the jury should have been permitted to consider an entrapment defense as to the attempted robbery charges, as in that case the defendant offered evidence that he had never participated in robberies or any violent crime, he stated that he turned down three prior opportunities to join the informant in robberies, he testified that he had not owned a gun in many years, and an expert testified that the defendant was vulnerable to persuasion due to his low IQ. *Dennis*, 826 F.3d at 692. Even then, the Court held that there was insufficient evidence to show lack of predisposition as to the charges of attempt to possess drugs with intent to distribute, given the defendant's history of convictions for possession and distribution of cocaine and marijuana. The Court added, "Dennis' attempt to distinguish his record of dealing in small quantities of cocaine from the large quantity of cocaine at issue here is unavailing." *Id.* at 693. The Court therefore remanded for further proceedings only on the robbery charges. Here, Washington, who had prior convictions for both violent crimes involving firearms and drug trafficking, offered no evidence at all of lack of predisposition akin to anything presented in *Dennis*. The only evidence, which was on tape, showed Washington's immediate enthusiasm and commitment.

not fully committed." *Washington*, 869 F.3d at 200. It is readily apparent why counsel, endeavoring to gain the jury's support for this view, would not ask it to also cross a bridge too far and conclude that Washington, who had not been recruited by the government, had not at minimum expressed interest in committing the robbery. Washington's explicit words on tape would have made such an effort foolish.

For all of these reasons, Washington cannot establish ineffective assistance of counsel.

**G.     The Court Did Not Enhance the Sentence Based on Acquitted Conduct.**

Lastly, Washington avers that the Court improperly enhanced the offense level by 2 levels based on acquitted conduct (use of a violent weapon). Needless to say, such an action would be permissible; a court may premise a guideline enhancement on acquitted conduct that is proven by a preponderance of the evidence. *United States v. Watts*, 519 U.S. 148 (1997) (per curiam); *United States v. Ciavarella*, 716 F.3d 705, 735-36 (3d Cir. 2013). And moreover, such an enhancement in this case would have no impact on the guideline range, as the range was based instead on the higher career offender offense level.

But most significantly, Washington overlooks that the Court in fact agreed not to consider the acquitted conduct. After defense counsel presented this objection at sentencing, the Court stated: "So I will find that the preponderance of the evidence standard is not met and that – not met in this case, so I will ask the – I will strike the two level enhancement that's noted in paragraph 28. I'll ask the probation officer to make that

change in the presentence report." Sent. tr. 10. Washington thus again raises an issue that has already been resolved.

## III.    Conclusion.

In sum, all of the arguments made by Washington are without merit. None present any factual dispute warranting a hearing, and none presents even a debatable issue. Accordingly, the motion should be denied, and the Court should decline to issue a certificate of appealability.

Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

# CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading has been served by first-class mail, postage prepaid, upon:

Mr. Askia Washington
No. 69032-066
FCI Allenwood Medium
P.O. Box 2000
White Deer, PA  17887

/s Robert A. Zauzmer
ROBERT A. ZAUZMER
Assistant United States Attorney

Dated:  April 28, 2021.