IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

ASKIA WASHINGTON,

                Defendant.

CRIMINAL NO. 13-171-2

## OPINION

**Slomsky, J.**                                    **January 22, 2025**

### Table of Contents

**I.   INTRODUCTION** ......................................................................................... 3

**II.  BACKGROUND** .......................................................................................... 4

  **A.   Events Leading to Defendant's Conviction** ...................................... 4

  **B.   Procedural History** ............................................................................ 8

**III. STANDARD OF REVIEW** ......................................................................... 10

**IV.  ANALYSIS** ................................................................................................. 15

  **A.   Defendant Does Not Present Extraordinary and Compelling Reasons for a
Reduction to His Sentence** ............................................................................ 16

    1.   Defendant's Sentence is Not "Unusually Long" .......................................... 16

    2.   Defendant's Medical Circumstances Do Not Warrant a Reduction
to His Sentence ............................................................................................. 19

    3.   Defendant's Rehabilitation Does Not Warrant a Reduction to His Sentence .............. 20

    4.   Defendant's Reliance on <u>United States v. Cromitie</u> Does Not Present an "Other
Reason" Warranting a Reduction to His Sentence ........................................ 21

**B.    Section 3553(a) Sentencing Factors Weigh Against Defendant's Release**............... 24

**V.  CONCLUSION** ............................................................................................................. 25

## I.    INTRODUCTION

Pro se Defendant Askia Washington ("Defendant"), age 43, is currently serving a 264-month sentence at the Allenwood Federal Correctional Complex in White Deer, Pennsylvania ("FCC Allenwood").   On July 11, 2023, Defendant filed a Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), which allows a court to "modify a term of imprisonment" if, among other reasons, "extraordinary and compelling reasons warrant such a reduction."[1]  (Doc. No. 425.)   In his Motion, Defendant requests the Court to reduce his sentence by 88 months in light of the United States Sentencing Commission's recent amendments to the Sentencing Guidelines in which the Commission further defined what 18 U.S.C. § 3582 means by "extraordinary and compelling reasons."  (See Doc. No. 425 at 2.)

---

[1]   Section 3582(c)(1)(A)(i) provides, in part, that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that—

> (i) extraordinary and compelling reasons warrant such a reduction; . . .

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).  On May 8, 2023, Defendant emailed the Warden at FCC Allenwood to file on his behalf a motion for compassionate release.  (See Doc. No. 425 at 13.)  Defendant states he submitted another request for the Warden to pursue compassionate release on June 8, 2023, but the Warden failed to respond.  (Id. at 3.)  The Court will accept these allegations as true.  Defendant, therefore, has properly exhausted his administrative remedies before filing his Motion for Compassionate Release.

Specifically, Defendant provides four reasons that he claims are extraordinary and compelling reasons for a reduction in his sentence. First, he argues that he is serving an "unusually long sentence" under U.S.S.G. § 1B1.13(b)(6) because, if sentenced today, he would not qualify as a career offender. (Id. at 5.) Second, citing the "medical circumstances" reason for release under § 1B1.13(b)(1), Defendant argues that his existing medical conditions place him at risk of suffering severe medical complications if he were to contract COVID-19. (Id. at 7.) Third, Defendant argues he has been rehabilitated and that this rehabilitation is a change in circumstance that qualifies as another extraordinary and compelling reason for his release. (Id. at 9.) Finally, Defendant relies on United States v. Cromitie, No. 09 CR 558-01, 2024 WL 216540 (S.D.N.Y. Jan. 19, 2024), as an "other reason[]" under § 1B1.13(b)(5).[2] (See Doc. No. 434.) But, for reasons explained below, none of these reasons are extraordinary and compelling as to warrant a reduction in Defendant's sentence. Moreover, the § 3553(a) factors weigh against his release. Accordingly, Defendant's Motion for Compassionate Release (Doc. No. 425) will be denied.

## I.    BACKGROUND

### A.    Events Leading to Defendant's Conviction

The Court previously summarized the events leading to Defendant's conviction as follows:

> The crimes in this case arose from the sting operation undertaken by Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents that targeted individuals whom ATF believed were involved in planning robberies of drug stash houses. In 2012, a confidential informant referred to at trial as "Roc" alerted ATF that Dwight Berry, who became another defendant and co-conspirator in the case,

---

[2]    In Cromitie, the court granted the defendant's motion for compassionate release, finding that "the severity of [the] defendant's sentence relative to his actual criminal behavior" and "the Government's role in designing a sting operation that mandates a draconian mandatory-minimum sentence" combined to form an extraordinary and compelling reason for the defendant's release under the "other reason" provision in U.S.S.G. § 1B1.13(b)(5). United States v. Cromitie, No. 09 CR 558-01, 2024 WL 216540, at *6, *10 (S.D.N.Y. Jan. 19, 2024).

had asked Roc if he knew anyone Berry could rob for drugs.  ATF subsequently began an investigation of Berry led by Special Agent John Bowman.

On February 18, 2013, Roc met with co-conspirator Berry to discuss the prospect of conducting a robbery of a drug stash house.  (Doc. No. 264 at 2.)  The meeting was electronically recorded.  (Id.)  During the meeting, Roc and Berry discussed plans to carry out a home invasion robbery of a drug stash house.  Roc told Berry he had a friend who is a drug courier in New York who frequently made trips to Philadelphia to pick up kilograms of cocaine from a drug stash house maintained by a drug supplier.  This drug courier was, in reality, Special Agent Patrick Edwards, an undercover agent (the "UC").  Berry expressed interest in robbing the stash house and discussed plans to divide the kilograms of cocaine and money that they would steal during the robbery.

On February 20, 2013, during another recorded meeting, Berry, Roc, and the UC posing as the drug courier further discussed the stash house robbery.  The UC told Berry that, while picking up cocaine from the stash house, he had seen over ten kilograms of cocaine inside a cooler.  During the conversation, Berry expressed a willingness to shoot the intended robbery victims if necessary, and explained that he knew others who would participate in the robbery.  (Id. at 3.)

On March 4, 2013, Roc and the UC met with Berry, Defendant Washington, and an unknown man.  The meeting was electronically recorded.  The Government accurately describes the meeting as follows based on the evidence introduced at trial:

Berry, Washington and the unknown man arrived at the meeting together.  Berry introduced the two men, without giving their names, as the individuals who would commit the robbery with Berry, that is, as the robbery team he had boasted about in an earlier meeting.  Washington and the unknown man emphatically expressed their desire to take part in the robbery.  As the UC provided details about the stash house, Washington was heard repeatedly in the recording stating, "Mm-Hmm," taking it all in and affirming each detail of the discussion.  When the UC finished describing the layout and the scenario, Washington asked, "Being that jaun is so safe like that, what about the outside?  Like you know, nobody going to be watching the jawn from the outside or nothing?"  Interestingly, this was the same question that Berry had asked during a previous meeting.  When the UC told Washington that he never saw anyone outside the home, Washington replied, "That's good.  Alright, well we got it."   He continued to ask for details of the robbery plan.  Washington asked, "Alright, so on the tip, you walking in there . . . we walking in behind you;" ". . . When you go in there, you lock the door behind yourself;" "So you want me to be in there with you . . . when you go in there, you want us to come in there;" and "How many guns you think is in that joint?" . . .

During this conversation the robbery team discussed the details of the robbery including their willingness to harm the men guarding the stash house if necessary.

Washington stated, "I ain't gonna hit you (referring to the UC), but say if I come there . . . I hit him from the rip.  I ain't gonna kill him, but I hit him just to make him to know that I ain't fucking playing no games."  Later, Washington also stated "I'm walking in with my gun out;" and "Yeah cause I'm gonna hit him cause I know he got a gun.  So I got no choice.  But I'm not gonna just play.  I don't play with them when it comes to this shit."  . . . [Washington also stated,] "Everybody should be love at the end of the day.  The way you explained it . . . I shouldn't even have to hit this n----r.  Cause I'm so sharp on the draw."  "Once you open the door, I got you."  ". . . We are just gonna be shooting the fuck out of this joint, but you got to be out of the way."  "You know what I'm saying?  We trying to make it as safe as possible for you."  "I'm walking in with my gun out."  "So I got him and he ain't going to risk getting his head blew off and start shooting on everybody."

During the meeting, the UC explained to Berry, Washington, and the unknown man that they will have to be divide [sic] the kilograms of cocaine for distribution after the intended home invasion robbery.  The UC explained that he "can't take the cocaine to NY."  Washington agreed stating, "Yeah you can't take the shit back."  Washington offered to help sell the UC's portion of the stolen cocaine, stating, "So what, you want it sold or what . . .?"  "I can't get it moved yo, but I don't like fucking with n-----rs."  "See I don't fuck with coke." . . . "They got to be somebody I really trust.  Like all right buy this jawn I just came up on."  "Buy this jawn real quick so. . . you can most likely, you can get your shit out before you leave.  You know what I'm saying?"  As the conversation ended, Berry told the UC that "it's gonna get done," referring to the home invasion robbery.  Berry added, "However it go down, that shit's gotta go down."  Washington agreed and added . . . "I know we can do it.  That shit sounds super sweet."

Recorded phone calls from March 4 to March 15, 2013 showed that Berry and Defendant spoke frequently about the plan to rob the stash house.  In these calls, they planned the robbery for March 15, 2013 and decided to use a van that had doors on both sides.  During this time, Berry continued to meet with Roc and the UC to discuss the details of the robbery.

The Government further summarizes the events on the day of the robbery from the trial record:

The day began with a text message between Washington and Berry, both saying that they were "Ready for work."  Shortly thereafter, the men met at Berry's mother's home where Berry retrieved two guns, secreted them in an Eggo Waffle box, and handed them to Jermau Johnston, who had joined the conspiracy and was seated in Berry's car.  Berry and Johnston then drove to a grocery store with Washington and Antonio Ellis [another conspirator] following in the rented Chrysler driven by Washington's girlfriend.  Johnston and Ellis bought gloves to use in the robbery then everyone drove to the Hilton Hotel on Island Avenue, in Philadelphia, Pennsylvania, where they met with the UC and [Roc].  The purpose of this final meeting was for the UC to provide the robbers with the address of [the]

6

house to be robbed and review the plan once again. This was the first time both Ellis and Johnston participated in a meeting with [Roc] and/or [the] UC. Prior to this date, the government was not aware of either man. A total of five individuals met the UC at that location in two vehicles, including Washington's girlfriend, who arrived along with Washington in a rented Chrysler. [Roc] drove Berry, Ellis, and Johnston in a minivan, as previously requested by Berry and Washington. The UC drove in a separate vehicle.

Once in the Hilton parking lot, Washington, Ellis, Johnston, Berry, and the UC got into the minivan with [Roc] in the driver's seat. Washington was immediately heard in the recording complaining about Johnston and Ellis going to the grocery store to buy gloves, Washington repeatedly complained that the men could have been observed on video tape purchasing the gloves. [FN 1: Washington was right. The men were caught on the store's surveillance system and the video played for the jury at trial, as was the recording of the conversations inside the minivan and numerous other recordings.] Washington also told the men, "If y'all would have told me you ain't had that shit [referring to the gloves], I would have got it already." . . .

Once all of the men were inside the van, Berry instructed the UC to review the details of the planned robbery with everyone. At Berry's direction, the UC explained, again, that the target of the robbery was a house at which 10 kilograms of cocaine would be found; that the building would be guarded by a man at the door, who carried a firearm; that a second man further inside the home would also be armed; that the second man would have control of the drugs; that the drugs would be stored in a white cooler; and that there would be no money found in the house. The men then discussed their plan of action; that they would all drive to a staging area closer to the target location; that when they made their assault on the drug house, two of them would be the first to enter the house; that they would be armed; that they would likely bind the people inside the house; that they would treat the UC, who would be in the house, as if he were another victim to evade the suspicion by the drug dealers. . . . During the conversation, Washington asked the UC if he got the address yet and requested that he text it to him and the other robbers when he did, so they could circle the block before the robbery. . . . A search of Washington's iPhone revealed that on March 15, 2013, at 3:00 a.m. he downloaded a police scanner app.

From the hotel, the UC and the five member robbery crew drove to a parking lot in Southwest Philadelphia where the robbery conspirators were arrested. Washington, Ellis, and Johnston were immediately taken into custody, but Berry fled on foot and was found hiding in an attempt to evade apprehension. He was removed from his hiding place and placed under arrest.

After the defendants were arrested, ATF Special Agents recovered from inside the minivan two firearms secreted inside the Eggo Waffle box, ammunition, gloves, and zip ties. From the Chrysler, Agents recovered a backpack, gloves, a mask, a lighter, and lighter fluid. According to the testimony of Washington's

coconspirator, Washington intended to burn down the stash house if things went bad.

(Doc. No. 268 at 2-6 (internal citations omitted).)

### B.    Procedural History

The Court has also previously summarized Defendant's trial and sentencing as follows:

Defendant proceeded to trial and on June 9, 2015, a jury found him guilty of conspiracy and attempt to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Counts 1 and 2), conspiracy to possess five or more kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count 3), and attempted possession of five or more kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (Count 4).    (See id.) Defendant was acquitted of possession of a firearm in furtherance of a crime of violence and a drug trafficking crime, and thereafter the Government dismissed a felon in possession of a firearm charge. (See id.)

On June 13, 2016, this Court sentenced Defendant to a total term of 264 months' imprisonment followed by 10 years' supervised release.  (See Doc. No. 287.)

(Doc. No. 403 at 2.)

On March 15, 2021, Defendant filed his first Motion for Compassionate Release.  (Doc. No. 396.)  On April 13, 2021, the Court denied this Motion for Compassionate Release.  (Doc. No. 404.)

On July 11, 2023, Defendant filed the instant Motion for Compassionate Release.  (Doc. No. 425.)  On the same day, the Government filed its Response in Opposition to Defendant's Motion for Compassionate Release.  (Doc. No. 426.)  On September 5, 2023, Defendant filed a Reply.  (Doc. No. 431.)  On March 11, 2024, Defendant filed a letter submitting the Southern District of New York's decision in United States v. Cromitie, No. 09 CR 558-01, 2024 WL 216540 (S.D.N.Y. Jan. 19, 2024) to the Court as supplemental authority.[3]  (Doc. No. 434.)

---

[3]    As noted earlier, in Cromitie, the court granted the defendant's motion for compassionate release, finding that "the severity of [the] defendant's sentence relative to his actual criminal behavior" and "the Government's role in designing a sting operation that mandates a draconian

On May 15, 2024, the Court ordered the Government to file a response to Defendant's Reply. (Doc. No. 435.)  On May 22, 2024, the Government filed a Supplemental Response, noting that Defendant had cited the "unusually long sentence" provision in U.S.S.G. § 1B1.13(b)(6) as an extraordinary and compelling reason for a reduction to his sentence and that the validity of § 1B1.13(b)(6) was currently an issue before the Third Circuit Court of Appeals in United States v. Carter.[4]  (Doc. No. 436 at 4); see also United States v. Carter, 711 F. Supp. 3d 428, 430 (E.D. Pa. 2024).  As such, the Court stayed the case pending the outcome of Carter.  (Doc. No. 437.)  On December 2, 2024, the Third Circuit made its final decision in Carter, summarily affirming the District Court's decision in light of the Third Circuit's holding in United States v. Rutherford, 120 F.4th 360 (3d Cir. 2024).[5]  See United States v. Carter, No. 24-1115, 2024 WL 5339852 (3d Cir.

---

mandatory-minimum sentence" combined to form an extraordinary and compelling reason for the defendant's release under the "other reason" provision in U.S.S.G. § 1B1.13(b)(5).  United States v. Cromitie, No. 09 CR 558-01, 2024 WL 216540, at *6, *10 (S.D.N.Y. Jan. 19, 2024).

[4]  In United States v. Carter, the defendant filed a motion for compassionate release, arguing that he was serving an unusually long sentence under U.S.S.G. § 1B1.13(b)(6) based on a nonretroactive amendment to 18 U.S.C. § 924(c).  711 F. Supp. 3d 428, 430 (E.D. Pa. 2024). The District Court denied the motion for compassionate release, finding that, in light of the Third Circuit's controlling precedent in United States v. Andrews, § 1B1.13(b)(6) could not serve as a basis for compassionate release.  See id. at 436 (holding that § 1B1.13(b)(6) "is incompatible with Andrews' interpretation of the compassionate release statute, 18 U.S.C. § 3582(c)(1)A)(i), and its holding that 'the duration of [a defendant's] sentence and the nonretroactive changes to mandatory minimums' is not one of the 'extraordinary and compelling reasons' described by the statute") (quoting United States v. Andrews, 12 F.4th 255, 260 (3d Cir. 2021)).  The defendant appealed the District Court's denial of his motion for compassionate release to the Third Circuit Court of Appeals.

Here, because Defendant cites § 1B1.13(b)(6) as one of the extraordinary and compelling reasons warranting a reduction in his sentence, the Court stayed the case pending the Third Circuit's decision in Carter concerning the validity of § 1B1.13(b)(6).  (See Doc. No. 437.)  As noted, infra, Carter has been decided by the Third Circuit.

[5]  In United States v. Rutherford, the defendant also filed a motion for compassionate release, arguing that he was serving an unusually long sentence under U.S.S.G. § 1B1.13(b)(6) based on a nonretroactive amendment to 18 U.S.C. § 924(c).  120 F.4th 360, 362 (3d Cir. 2024).  On

Dec. 2, 2024).  On December 18, 2024, the Government filed a Second Supplemental Response, informing the Court that <u>Carter</u> had been resolved and briefing the Court on the effects of its outcome on the instant case.  (Doc. No. 438.)  Defendant's Motion for Compassionate Release is thus ripe for disposition.

## II.    STANDARD OF REVIEW

Generally, a district court "may not modify a term of imprisonment once it has been imposed . . . ."  18 U.S.C. § 3582(c).  There are, however, "a few narrow exceptions" to this general "rule of finality[,]" including the compassionate release statute § 3582(c)(1)(A).  <u>Freeman v. United States</u>, 564 U.S. 522, 526 (2011).  As amended by the First Step Act, § 3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies if, among other reasons, the defendant has provided "extraordinary and compelling reasons [for] such a reduction."[6]  <u>See</u> 18 U.S.C. § 3582(c)(1)(A).

---

appeal, the Third Circuit held that its prior decision in <u>United States v. Andrews</u> precluded the nonretroactive amendment to § 924(c) from being considered on a motion for compassionate release.  <u>See</u> <u>id.</u>  at 378 ("[O]ur holding in <u>Andrews</u> was that the nonretroactive change to [Section] 924(c), whether by itself or in combination with other facts, cannot be considered in the compassionate release eligibility context. We stand by that ruling today. When it comes to the modification of § 924(c), Congress has already taken retroactivity off the table, so we cannot rightly consider it.") (citing <u>United States v. Andrews</u>, 12 F.4th 255 (3d Cir. 2021)).

[6]    As noted above, Section 3582(c)(1)(A) provides, in part, that:

> [T]he Court, upon Motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that—

Congress, however, has not specifically defined the term "extraordinary and compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to constitute an extraordinary and compelling reason. 28 U.S.C. § 994(t). Instead, Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission. In this regard, Section 1B1.13 of the Sentencing Guidelines explains that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines:

> [A]fter considering the factors set forth in 18 U.S.C. § 3553(a), . . . that—
>
> (1) (A) Extraordinary and compelling reasons warrant the reduction; . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13(a)(1)-(3). Under Section 1B1.13(b), "extraordinary and compelling reasons" exist under any of the following circumstances or a combination thereof:

> (1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT. —
>
> > (A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (B) The defendant is—
> >
> > > (i)    suffering from a serious physical or mental condition,

---

(i) extraordinary and compelling reasons warrant such a reduction; . . .

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

(ii)   suffering from a serious functional or cognitive impairment, or

(iii)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided without which the defendant is at risk of serious deterioration in health or death.

(D) The defendant presents the following circumstances—

(i)   the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)   due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

(iii)   such risk cannot be adequately mitigated in a timely manner.

(2) AGE OF THE DEFENDANT. —The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3) FAMILY CIRCUMSTANCES OF THE DEFENDANT. —

(A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family members or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual.  For purposes of his provision, "immediate family member" refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4) VICTIM OF ABUSE. — The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A) sexual abuse involving a "sexual act," as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

(B) physical abuse resulting in "serious bodily injury," as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant.

For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5) OTHER REASONS. — The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) UNUSUALLY LONG SENTENCE. — If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

\*        \*        \*

U.S.S.G. § 1B1.13 (b)(1)-(6) (Nov. 1, 2023).

Further, Section 1B1.13(c) delineates the limitations to the policy exception regarding changes in law:

> (C)   LIMITATION ON CHANGES IN LAW. — Except as provided in subsection (b)(6), a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement. However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under this policy statement, a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction.
>
> *      *      *

U.S.S.G. § 1B1.13(c) (Nov. 1, 2023).

The Third Circuit has noted that "if a court finds that [extraordinary and compelling reasons] exist, it then turns to the sentencing factors in 18 U.S.C. § 3553(a) to determine whether compassionate release is appropriate." United States v. Stewart, No. 22-2770, 2023 WL 7509457, at *1 (3d Cir. Nov. 14, 2023).  Section 3553(a) sets forth factors for a court to consider when imposing a sentence.[7]  If on balance, a defendant's extraordinary and compelling reasons

---

[7]  The factors set forth by § 3553(a) are as follows:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established for—
>     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

combined with the § 3553(a) factors support a reduced sentence, and that reduction is consistent with the applicable policy statement of the Sentencing Commission, a court may reduce a defendant's prison term, modify the terms of supervised release, or both.

## III.    ANALYSIS

Here, because the Court finds that Defendant has not presented extraordinary and compelling reasons for a sentence reduction, and because the § 3553(a) sentencing factors weigh against his release, Defendant's Motion for Compassionate Release (Doc. No. 425) will be denied.[8]

---

(i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28;

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

[8]   Because the Court concludes no extraordinary and compelling reasons warrant a reduction in Defendant's sentence and that the § 3553(a) sentencing factors weigh against his release, the

**A.    Defendant Does Not Present Extraordinary and Compelling Reasons for a Reduction to His Sentence**

As mentioned above, in his Motion for Compassionate Release, Defendant provides four reasons that he believes are "extraordinary and compelling reasons" warranting a reduction to his sentence under § 3582(c).  (See Doc. No. 425.)  First, Defendant argues that he is serving an "unusually long" sentence because he would not be considered a career offender under today's law and would thus have received a lesser term of imprisonment if sentenced today.  (See id. at 5.)  Second, he argues that his existing medical circumstances put him at a high risk of suffering severe medical complications if exposed to COVID-19.  (See id. at 7.)  Third, he asserts that he has been rehabilitated and such rehabilitation warrants a reduction in his sentence.  (Id. at 9.)  Finally, in his letter to the Court filed as supplemental authority, Defendant submitted the Southern District of New York's decision in United States v. Cromitie, No. 09 CR 558-01, 2024 WL 216540 (S.D.N.Y. Jan. 19, 2024).  (See Doc. No. 434.)  The Court construes this supplemental authority as an "other reason[]" argument under U.S.S.G. § 1B1.13(b)(5).  The Court will discuss each of Defendant's arguments seriatim.

**1.    Defendant's Sentence is Not "Unusually Long"**

First, Defendant's sentence is not unusually long under U.S.S.G. § 1B1.13(b)(6).  As mentioned above, the Sentencing Commission recently recognized as a basis for compassionate release "the circumstance where a defendant has served more than 10 years of an 'unusually long sentence' that due to a 'change in law' would be grossly disparate under current law." (Doc. No. 438 at 1-2.)  Defendant argues that, due to a change in law, he would not be considered a career offender today under U.S.S.G. § 4B1.1 and thus, because his current sentence is more severe than

---

Court need not address whether the reduction is consistent with the policy statement found in U.S.S.G. § 1B1.13.  See U.S.S.G. § 1B1.13(a).

any sentence he would receive today for the same offense, he is serving an unusually long sentence under § 1B1.13(b)(6).  (See Doc. No. 425 at 5-7.)  In its Response, the Government concedes that Defendant would not be considered a career offender under today's law.  (See Doc. No. 436 at 6 (". . . the career offender guideline likely would not apply if sentencing were held today."))  Despite this concession, the Government argues that Defendant's 264-month sentence is not an unusually long sentence because it is not grossly disparate to the sentence he would have received under current law.  (Id.)

In June 2016, when Defendant was sentenced to 264 months' imprisonment, he was designated a "career offender" because "(1) [he] was at least eighteen years old at the time [he] committed the instant offense of conviction; (2) the instant offense of conviction [was] a felony that [was] either a crime of violence or a controlled substance offense; and (3) [Defendant] ha[d] at least two prior felony convictions of either a crime of violence or a controlled substance offense."  See U.S.S.G. § 4B1.1(a).  Defendant qualified as a career offender in part because of his two prior felony convictions:  one for drug trafficking, which is a controlled substance offense, and another for second-degree aggravated assault, which was considered a crime of violence at the time.  (See Doc. No. 436 at 6.)  However, in 2023, the Third Circuit held that the type of second-degree aggravated assault for which Defendant was convicted is no longer categorically considered a "crime of violence" within the meaning of the career offender provision.  See United States v. Jenkins, 68 F.4th 148, 155 (3d Cir. 2023).  As such, the Government now agrees that "[i]f sentenced today, [Defendant] would no longer present the required two prior predicate offenses" and would thus not qualify for the career offender designation.  (Doc. No. 436 at 9.)

At Defendant's sentencing, however, the Court elected not to apply the career offender designation.  The Court initially found that, taking into consideration the instant offense and

because he qualified as a career offender, Defendant was in Criminal History Category VI with an offense level of 37, and the sentencing guideline range was 360 months to life.  (Doc. No. 293 at 25:7-15.)  But the Court granted Defendant's request for a variance, choosing not to apply the career offender guidelines and instead placed Defendant in Criminal History Category V with an offense level of 34.  (See id. at 43:5-6, 67:6-12.)  This variance brought the sentencing guideline range to 235 to 293 months' imprisonment.  (See id. at 43:2-3.)  Specifically, the Court noted as follows:

> I also have to consider the ranges recommended in the Sentencing Guidelines. We have Guidelines here of 360 months to life. In my opinion those Guidelines are higher than would be necessary to impose a sentence sufficient and -- but not greater than necessary under the circumstances so that a variance is warranted based upon everything I've learned about [Defendant]'s family life and the presence of so many friends and family in court and the support he has and the letters I've received . . . And I note another reason for a variance and that is what Mr. Greenberg has brought to my attention with respect to what the Guidelines would be had [Defendant] been convicted of first-degree aggravated assault the Guidelines would be lower than they are now. Not significantly lower, but lower than they are now, but he was convicted of second degree felony aggravated assault.  And I note that there has been no substantive challenge for what Mr. Greenberg has brought to my attention, but we do try to treat people fairly under the law and this is apparently a dichotomy that exists in the law.

(Id. at 67:3-12, 67:24-25, 68:1-9.)  Therefore, by granting the variance and applying Criminal History Category V and offense level 34, the sentenced imposed by the Court already excluded from consideration the career offender designation.  (See id.)

As such, because Defendant was sentenced to 264 months' imprisonment, which is well within the 235 to 293 month guideline range, there is no "gross disparity" between the sentence Defendant is serving and the sentence he would receive today without the career offender designation.  Accordingly, Defendant's sentence is not "unusually long" and does not provide an

extraordinary and compelling reason for reducing his sentence.[9]  See United States v. Hampton,

2024 WL 37948, at *2 (E.D. Pa. Jan. 3, 2024) (finding that a sentence within the guideline range

is not "unusually long").

### 2. Defendant's Medical Circumstances Do Not Warrant a Reduction to His Sentence

Next, Defendant asserts that his existing medical conditions put him at a higher risk for

more serious complications if he were to contract COVID-19, which he argues is an extraordinary

---

[9]  As mentioned above, the Court stayed the instant case pending the Third Circuit's decision in United States v. Carter.  See 711 F. Supp. 3d 428 (E.D. Pa. 2024).  On December 2, 2024, the Third Circuit summarily affirmed the decision in Carter in light of its decision in United States v. Rutherford, 120 F.4th 360 (3d Cir. 2024).  In both Carter and Rutherford, the defendants filed motions for compassionate release, arguing that the nonretroactive amendment to 18 U.S.C. § 924(c), "the federal statute that forbids using or carrying a firearm in furtherance of drug trafficking or a crime of violence," resulted in them serving unusually long sentences under Section 1B1.13(b)(6).  See Rutherford, 120 F.4th at 362 (noting the defendant had been sentenced to nearly 42.5 years' imprisonment after he was convicted on two counts of violating § 924(c) but, if sentenced today, "he would [instead] be subject to a 14-year mandatory minimum sentence for his two § 924(c) convictions"); see also Carter, 711 F. Supp. 3d at 430 (noting the defendant was serving consecutive 7-year, 25-year, and 25-year mandatory minimum sentences for three violations of § 924(c) when, if sentenced today, these violations would instead only result in three consecutive 7-year mandatory minimum sentences).

In Rutherford, the Third Circuit held that its prior decision in United States v. Andrews precluded the nonretroactive amendment to § 924(c) from being considered on a motion for compassionate release.  See id.  at 378 ("[O]ur holding in Andrews was that the nonretroactive change to § 924(c), whether by itself or in combination with other facts, cannot be considered in the compassionate release eligibility context. We stand by that ruling today. When it comes to the modification of § 924(c), Congress has already taken retroactivity off the table, so we cannot rightly consider it.") (citing United States v. Andrews, 12 F.4th 255 (3d Cir. 2021)).

Here, unlike in Rutherford and Carter, the instant case involves a § 1B1.13(b)(6) challenge based on a change in case law affecting whether Defendant would be considered a career offender today under U.S.S.G. § 4B1.1.  Therefore, because the Rutherford court made clear that its decision applies only to "unusually long sentence" challenges to § 924(c) convictions, the Third Circuit's holding in Rutherford does not apply to the instant case.  Whether Section 1B1.13(b)(6)'s "unusually long sentence" provision can be used to challenge a sentence following a nonretroactive change to case law affecting whether a defendant is considered a career offender under U.S.S.G. § 4B1.1 is an open question which need not be decided here because Defendant's sentence was not unusually long even with the change in law.

and compelling reason for his release under § 1B1.13(b)(1).  (Doc. No. 425 at 7.)  Defendant claims

the following existing health conditions:  obesity, borderline diabetes, and shortness of breath

caused by a previous case of COVID-19.  (See id. at 7-8.)  But the Court has previously considered

whether these same medical conditions put Defendant at a higher risk for serious complications if

he were to contract COVID-19 on Defendant's first Motion for Compassionate Release.  (See Doc.

No. 403.)  Because Defendant merely offers the same argument now, the Court again finds that

Defendant has not established "the required particularized vulnerability to COVID-19 and its

effects . . . to constitute extraordinary and compelling reasons for his release" for the same reasons

it came to this conclusion in denying Defendant's first Motion for Compassionate Release.[10]  (See

id. at 10-11 (finding that (1) Defendant's body mass index ("BMI") was 28.2 in November 2020,

which was below the threshold BMI of 30 that the Centers for Disease Control and Prevention

states presents a risk of severe COVID-19 disease; (2) pre-diabetes is not a listed as a COVID-19

risk factor; and (3) Defendant was prescribed an Albuterol inhaler to use as needed to treat his

shortness of breath).)[11]

### 3.  Defendant's Rehabilitation Does Not Warrant a Reduction to His Sentence

---

[10]  Of note, there are no reported cases of COVID-19 at FCC Allenwood, the federal correctional center at which Defendant is housed. (See Doc. No. 426 at 3.)  And even if FCC Allenwood was reporting or at immediate risk of a COVID-19 outbreak, Defendant has been vaccinated for the COVID-19 virus.  United States v. Hannigan, No. CR 19-373, 2022 WL 815449, at *15 (E.D. Pa. Mar. 17, 2022) (finding that vaccination from COVID-19 decreases the risk of serious illness or death from infection, such that even with pre-existing medical conditions, the threat of an outbreak cannot rise to meet extraordinary and compelling reason for compassionate release); United States v. Ali, No. 07-0042-2, 2024 WL 3161749, at *4 (E.D. Pa. June 25, 2024) ("[Defendant] is not unusually susceptible to serious illness or death from COVID-19, particularly given the fact he has been vaccinated.")

[11]  While Defendant claims obesity as an existing medical condition, he has not provided any medical records reporting an updated body mass index.  (See Doc. No. 425.)

Third, Defendant argues that he is rehabilitated and that this rehabilitation is an extraordinary and compelling reason warranting a reduction in his sentence. (Doc. No. 425 at 9.) But Congress has explicitly stated "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Accordingly, because the Court does not find Defendant's above arguments to be extraordinary and compelling reasons for a reduction in his sentence, Defendant's rehabilitation argument alone is not an extraordinary and compelling reason that warrants a reduction to his sentence.

### 4. Defendant's Reliance on United States v. Cromitie Does Not Present an "Other Reason" Warranting a Reduction to His Sentence

Finally, Defendant submitted to the Court the opinion in United States v. Cromitie as supplemental authority. (See Doc. No. 434.) In Cromitie, a court in the Southern District of New York granted a defendant's motion for compassionate release under the "other reasons" provision in § 1B1.13 (b)(5). Cromitie, 2024 WL 216540, at *10. Therefore, the Court will construe Defendant's submission of Cromitie as an "other reasons" argument under § 1B1.13(b)(5).

In Cromitie, the defendant was sentenced to 25 years' imprisonment after he was convicted of the following crimes:

> [C]onspiracy to use weapons of mass destruction, conspiracy to acquire and use anti-aircraft missiles, conspiracy to kill officers and employees of the United States, three counts of attempted use of weapons of mass destruction, and one count of attempted acquisition and use of anti-aircraft missiles— all in connection with [his] participation in an FBI-orchestrated conspiracy to "bomb" a Jewish community center in the Bronx and to "destroy military aircraft" at Stewart Air Force Base.

Cromitie, 2024 WL 216540, at *1. These convictions resulted from an FBI sting intended to identify potential terrorists. See id. at *2. Before becoming "the object of [the] lengthy sting operation," the defendant had been "a small time grifter and petty drug dealer with no history of violence." Id.

Despite becoming entangled in the terrorism conspiracy, "[n]othing about the crimes of conviction was of [the defendant's] own making." Id. at *3. Instead, "[t]he FBI invented the conspiracy; identified the targets; manufactured the ordnance; federalized what would otherwise have been a state crime (the Bronx 'bomb' plot) by driving [the defendant and his co-conspirators] into Connecticut to view the 'bombs' and 'stinger missile launchers' that would be used in the 'operation;' and picked the day for the 'mission' . . . drove the four men to [the site where the bombing was to take place] (they had no way to drive themselves); 'armed' the 'bomb' (because the hapless [defendant], despite his 'training,' could not figure out how to do it); and told [the defendant] how to place the device." Id. Moreover, "the purported attack on Stewart [Air Force Base] using 'stinger missiles' (never carried out, even in the carefully faked manner of the Bronx operation) was added to the sting solely to subject [the defendant] to the statutory mandatory minimum sentences of 25 years." Id.

There, after the defendant had served 15 years of his 25-year sentence, he filed a motion for compassionate release, arguing his release was warranted under the "other reasons" provision in § 1B1.13(b)(5). Id. at *7. The court granted the motion, finding that, because the Government's conduct in the sting operation resulted "in the imposition of a sentence that was both unjust and greater than necessary to redress any criminal behavior in which [the defendant] engaged," it thus "forced the court to violate the parsimony clause enshrined in 18 USC § 3553(a)" which qualified as an extraordinary and compelling reason for the defendant's release. Id. The parsimony clause in 18 USC § 3553(a) is the requirement that the court "impose a sentence sufficient, but not greater than necessary" to meet the goals of sentencing. See 18 U.S.C. § 3553(a).

Here, while Defendant's conviction also resulted from a sting operation orchestrated by the government, the facts leading to his conviction are distinguishable from those in Cromitie such

that Defendant does not establish an "other reason" to warrant a reduction to his sentence under Section 1B1.13(b)(5).  First, unlike the sting operation in Cromitie, the sting operation here was not solely manufactured by the government.  Instead, when reviewing Defendant's conviction on appeal, the Third Circuit found that Defendant's role in the crimes at issue was not minimal, as "[h]is recorded statements alone, bluster or not, showed a willing and inquisitive member of the conspiracy."  See United States v. Washington, 869 F.3d 193, 206 (3d Cir. 2017) (stating that "[o]n the day of the robbery itself, [the defendant] appeared committed to its success").

Second, unlike the defendant in Cromitie who had only been a "a small time grifter and petty drug dealer with no history of violence" before he became entangled in the FBI sting, Defendant has prior convictions for offenses similar to those underlying the instant conviction. For example, as mentioned above, at the time of his sentencing, Defendant had two prior felony convictions:  one for drug trafficking, which is a controlled substance offense, and another for second-degree aggravated assault, which was considered a crime of violence at the time.  (See Doc. No. 436 at 6.)

And third, the Government's role in the sting operation here is de minimis compared to its role in Cromitie.  In Cromitie, the Government "invented the conspiracy; identified the targets; manufactured the ordnance; federalized what would otherwise have been a state crime; . . . picked the day for the 'mission';" drove the defendant and his co-conspirators to the site of the planned bombing; "'armed the 'bomb'. . .; and told [the defendant how to place the [bomb]."  Cromitie, at *3.  But here, Defendant and his co-conspirators actively participated in planning the robbery and supplied their own equipment, including guns and gloves.  (Doc. No. 184 at 7.)  Accordingly, because the facts underlying Defendant's conviction are distinguishable from those underlying the

<u>Cromitie</u> defendant's conviction, the events leading up to Defendant's conviction do not qualify

as "other reasons" warranting a reduction in his sentence.

### B.    Section 3553(a) Sentencing Factors Weigh Against Defendant's Release

Finally, the relevant § 3553(a) factors do not support Defendant's compassionate release.

As the Court found on Defendant's first Motion for Compassionate Release:

> First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics. <u>See</u> § 3553(a)(1). While Defendant "does not dispute the severity of his crime, nor does he seek to minimize the harm he may have caused to the public[,]"  (Doc. No. 396 at 4), there is no assurance that he would be deterred from committing additional crimes if he were released.

> The Government notes that "[t]hroughout his adult life[] until the age of 33," Defendant "either committed crimes or served prison time."  (Doc. No. 397 at 15.) Specifically:

> In 1999, at age 19, he was convicted of possession of a controlled substance.  In 2001, at age 21, he committed an assault, after he fired three shots at a woman as she and her children ran into their home.  In 2003, at age 23, he committed aggravated assault and other offenses. . . . In 2004, he possessed narcotics with intent to distribute, as well as a firearm.

> (<u>Id.</u> at 2.)  Roughly three years after serving cumulative sentences in prison and "while still on parole, he committed the instant offenses" for which he is presently incarcerated—conspiracy and attempt "to participate in what promised to be a violent robbery of what he believed was a huge stash of cocaine."  (<u>Id.</u> at 3, 15.) Based on this history, there is no assurance that Defendant would abstain from criminal activity if he were granted compassionate release.

> The Court has also considered whether Defendant's release would reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by him.  <u>See</u> § 3553(a)(2)(A)-(C).  Defendant has served less than half of his 264-month sentence.  The magnitude of Defendant's crimes warrant the sentence he received. Although he asserts that "[a] reduction in [his] sentence is consistent with the sentencing guidelines[] and [he] no longer poses a danger to society" (Doc. No. 396 at 4), his release at this point would neither reflect the seriousness of his offenses, promote respect for the law, provide just punishment, afford adequate deterrence, nor protect the public from further crimes Defendant may commit.

> Lastly, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar

conduct.  <u>See</u> § 3553(a)(6).  Defendant received a sentence below the range set by the Sentencing Guidelines, which Congress created to address sentencing disparities.  The sentencing range was 360 months to life imprisonment.  (<u>See</u> Doc. No. 293 at 67:3-5.)  To reduce Defendant's sentence further would not reflect the Sentencing Commission's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.

(Doc. No. 403 at 12-14.)

Now, in the instant Motion for Compassionate Release, Defendant presents no new arguments concerning the § 3553(a) factors.  Accordingly, for the same reasons the Court previously found that the relevant § 3553(a) factors weighed against granting Defendant compassionate release, <u>supra</u>, the Court again finds the § 3553(a) factors do not weigh in favor of his release.

## V.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Compassionate Release (Doc. No. 425) will be denied.  An appropriate Order follows.